**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

NATIONAL FAIR HOUSING ALLIANCE
   1101 Vermont Ave NW, Suite 710
   Washington, DC 20005,

TEXAS LOW INCOME HOUSING
INFORMATION SERVICE
   1800 W 6th Street
   Austin, TX 78703,

and

TEXAS APPLESEED
   1609 Shoal Creek, Suite 201
   Austin, TX 78701,

          Plaintiffs,

    v.

BEN CARSON, Secretary of the U.S.
Department of Housing and Urban
Development, in his official capacity,
   451 7th Street SW,
   Washington, DC 20410,

and

U.S. DEPARTMENT OF HOUSING AND
URBAN DEVELOPMENT,
   451 7th Street SW,
   Washington, DC 20410,

          Defendants.

Civ. Action No. _1:18-cv_-01076

**COMPLAINT**

## INTRODUCTION

1.     Fifty years ago, Congress enacted the Fair Housing Act, 42 U.S.C. §§ 3601, *et seq.* That Act is best known for barring a variety of forms of housing discrimination. Less attention has been paid to its requirement that the Secretary of the U.S. Department of Housing

and Urban Development (HUD) "administer the programs and activities relating to housing and urban development in a manner affirmatively to further the policies of" that Act. *Id.* § 3608(e)(5). Although this Affirmatively Furthering Fair Housing (AFFH) requirement was of great importance to Congress in enacting the Act, for decades, HUD inadequately enforced it. The agency has permitted more than 1,200 grantees—mostly local and state government entities—to collectively accept billions of dollars in federal housing funds annually without requiring them to take meaningful steps to address racial segregation and other fair housing problems that have long plagued their communities.

2.     Recognizing that the AFFH requirement had not been adequately enforced, HUD in 2015 promulgated through notice-and-comment rulemaking the AFFH Rule, a regulation requiring covered cities and counties around the country to take meaningful action to address longstanding segregation and otherwise effectuate the Fair Housing Act's unrealized purposes. The AFFH Rule creates a rigorous process to ensure that recipients of federal housing funds identify local fair housing problems and then commit to taking concrete steps to correct them (under HUD's supervision and with considerable community input), while giving those jurisdictions flexibility to respond to local conditions. At the Rule's core is the requirement that jurisdictions prepare and submit for HUD review an Assessment of Fair Housing (AFH), a document that includes both the jurisdiction's diagnosis of fair housing impediments and a plan to overcome them.

3.     In January 2018, HUD abruptly announced that it was suspending for years the requirement that jurisdictions prepare AFHs and submit them for HUD review, effectively suspending the Rule itself. Plaintiffs National Fair Housing Alliance (NFHA), Texas Low Income Housing Information Service (Texas Housers), and Texas Appleseed bring this suit to

challenge HUD's suspension of the AFFH Rule's requirements as a violation of the
Administrative Procedure Act (APA), 5 U.S.C. §§ 500, *et seq.*

4.      Before it promulgated the AFFH Rule, HUD engaged in little enforcement of this
important provision of the Fair Housing Act, permitting its grantees to virtually ignore it. Even
after a number of federal courts articulated the breadth of HUD's obligations under the AFFH
statutory provision, HUD required jurisdictions only to certify that, every few years, they
analyzed barriers to fair housing in their communities, made gestures in the direction of solving
them, and memorialized this analysis in their own files (never reviewed by HUD). As both HUD
and the Government Accountability Office found, putting local jurisdictions on the honor system
was ineffective. When pressed, many jurisdictions could not produce any documentation
supporting their certifications; others had prepared documents that made no concrete promises or
otherwise did not translate into action on the ground to address fair housing concerns. A False
Claims Act suit against Westchester County, New York revealed that the County had certified
compliance for years without ever assessing whether racial segregation was a problem, let alone
committing to addressing the barriers to integration that were well known to exist in
Westchester.

5.      In response to these revelations, in 2009, HUD began an exhaustive, six-year
process of crafting a more effective AFFH enforcement regime, culminating in the promulgation
of the AFFH Rule in 2015. This Rule requires every covered jurisdiction to develop, submit for
HUD review, and implement a planning document—called an Assessment of Fair Housing
(AFH)—that includes concrete plans to address local fair housing issues. It requires jurisdictions
to provide wide notice and solicit public comment about fair housing problems in various
communities; to consult with fair housing groups and other interested entities; and to encourage

3

public comment on drafts of their AFHs. Jurisdictions must submit their AFHs for HUD review (along with their responses to comments from the public on those AFHs), and HUD must carefully review them, rejecting those AFHs not meeting specified requirements and requiring the submission of revised, compliant versions. In short, the AFFH Rule requires jurisdictions to take meaningful action to earn their federal housing funds by addressing local fair housing issues, while requiring HUD to monitor their compliance. It includes a schedule on which various jurisdictions are to submit their first AFHs, beginning in 2017 and 2018 for a small number of jurisdictions and then ramping up in 2019, by which time jurisdictions, HUD, and advocates will have gained greater familiarity with the process.

6.      In the approximately two years since it went into effect, the AFFH Rule already has paid dividends. Many jurisdictions that have gone through the AFH drafting process have committed to concrete reforms that will improve the lives of their most vulnerable residents and create more integrated, inclusive communities. They have, for example, committed to provide help for residents of predominantly African-American neighborhoods who disproportionately face unwarranted evictions; make zoning processes more inclusive for people with disabilities; and create affordable rental units in high-opportunity neighborhoods. The jurisdictions have done so after taking input from their communities, accepting comments from fair housing organizations and others on their initial drafts, and undergoing review by HUD (which, sometimes, has required revisions). This robust process has led to a newfound commitment to take meaningful steps towards affirmatively furthering fair housing.

7.      Even before becoming Secretary of HUD, Defendant Ben Carson criticized the AFFH Rule, which he compared to "failed socialist experiments" such as "mandated busing" of schoolchildren. After he became Secretary, HUD began cutting back implementation efforts. For

example, it reduced the technical assistance that it provided to help local jurisdictions craft effective and compliant AFHs.

8.      On January 5, 2018, HUD abruptly announced, without prior notice or opportunity to comment, that it was suspending the AFFH Rule's requirement that local governments complete and submit AFHs. It delayed that requirement until the next submission date for each grantee that occurs after October 31, 2020. Consequently, most recipients of federal housing funds will not have to complete or submit an AFH until at least 2024. In the announcement, HUD also stated that it would not review the AFHs that jurisdictions had already submitted and would not require revision and resubmission of rejected AFHs. Put simply, HUD abandoned the AFFH Rule and left local governments once more without regulatory supervision, guidance as to what constitutes compliance with the statutory AFFH requirement, or any required process to follow—a situation that had already proven to result in rampant non-compliance.

9.      HUD had no authority to suspend local governments' and its own regulatory duties in this manner. The AFFH Rule specifically provides that federal housing money may not continue to flow to jurisdictions without an AFH that HUD has approved. Yet HUD's action permits exactly that result for most jurisdictions in the country. Meanwhile, by abandoning the AFH process, HUD has effectively excused jurisdictions and itself from a host of non-discretionary duties related to that process, including meeting regulatory deadlines for submitting AFHs and respecting the procedural rights for various community members and groups that the AFH process protects. HUD may not refuse to follow (or authorize others not to follow) these clear requirements set forth in properly promulgated regulations without new notice-and-comment proceedings.

10.     Additionally, based on the sparse reasoning HUD provided in its three-page notice, HUD's action was arbitrary and capricious. HUD stated that it based its decision on the fact that it rejected 17 of the first 49 initially submitted AFHs. It said that complying with the AFFH Rule was proving to require (unspecified amounts of) work for both HUD and for local governments and that HUD could improve its technical assistance with the benefit of more time. HUD did not explain how these facts support excusing local governments from further compliance with the Rule, and they do not. The Rule is *supposed* to require that local governments and HUD spend time ensuring that concrete action is taken to affirmatively further fair housing rather than (as too often occurred in the past) paying only perfunctory attention to that statutory requirement. HUD is *supposed* to reject inadequate AFHs. Indeed, most of the jurisdictions whose AFHs were initially rejected soon submitted an improved AFH that HUD accepted—a fact HUD did not acknowledge in the notice. Thus, what HUD characterizes as a reason to suspend compliance with the Rule is, in fact, evidence that HUD's enforcement of the Rule was working exactly as intended.

11.     By returning to the dysfunctional, pre-AFFH Rule regime that HUD itself concluded did not work, HUD also is violating its statutory duty under the Fair Housing Act to ensure that federal funds are used to affirmatively further fair housing. Decades of experience have shown that, left to their own devices, local jurisdictions will simply pocket federal funds and do little to further fair housing objectives. When suspending the AFFH Rule's requirements, HUD made no attempt to reconcile its action with its own prior finding in the administrative record that the Rule is necessary or to explain why history will not repeat itself.

12.     HUD's suspension of the AFFH Rule's requirements is causing irreparable harm to Plaintiffs and others in communities across the country. Plaintiffs, organizations with

purposes that include promoting fair housing, are already having their missions frustrated by HUD's action and are having to divert scarce resources from other important activities to remedy the effects of HUD's action.

13.     Plaintiffs bring this action seeking preliminary and permanent injunctive relief, including a ruling that the January 2018 Notice constitutes unlawful agency action, an order that HUD rescind the January 2018 Notice and take all necessary steps to implement and enforce the AFFH Rule, and attorneys' fees and costs and all other appropriate relief.

14.     Fifty years after the passage of the Fair Housing Act, it is well past time that HUD carries out its statutory duty to ensure that jurisdictions that take federal housing funds fulfill their end of the bargain and affirmatively further fair housing. HUD failed for decades to require local jurisdictions to take meaningful action with respect to racially segregated communities and other obvious impediments to fair housing. It finally created a regulatory scheme to ensure that jurisdictions receiving federal funds effectuate the Act's requirements, but now has unlawfully abandoned it. Judicial intervention is necessary to vindicate the rule of law and to bring fair housing to communities that have been deprived of it for too long.

## PARTIES

15.     The National Fair Housing Alliance (NFHA) is a national, nonprofit, public service organization incorporated under the laws of the Commonwealth of Virginia with its principal place of business in Washington, DC. NFHA is a nationwide alliance of private, nonprofit, fair housing organizations, including organizations in 28 states. NFHA's mission is to promote residential integration and combat discrimination in housing based on race, national origin, disability, and other protected classes covered by federal, state, and local fair housing laws.

16.     Plaintiff Texas Housers is a non-profit corporation with offices in Austin, Fort Worth, Hidalgo County, and Houston, Texas. It is the principal statewide advocacy group focused on expanding housing opportunities for low-income residents of Texas.

17.     Plaintiff Texas Appleseed is a non-profit organization headquartered in Austin, Texas. Its mission is to promote social and economic justice for all Texans, including by ensuring that all Texas families can recover in the wake of natural disasters; that communities are rebuilt to be more resilient; and that all families have the opportunity to live in safe, decent neighborhoods with equal access to educational and economic opportunity.

18.     Defendant U.S. Department of Housing and Urban Development (HUD) is an executive branch agency of the United States Government. It is charged with administering a variety of federally funded programs and funding sources. It also is responsible for ensuring that federal programs and activities relating to housing and urban development affirmatively further fair housing.

19.     Defendant Ben Carson is the Secretary of HUD and is sued in his official capacity.

## JURISDICTION AND VENUE

20.     This Court has jurisdiction over this matter under 28 U.S.C. § 1331 and 5 U.S.C. § 702.

21.     Venue is proper in this District under 28 U.S.C. § 1391(b) and 5 U.S.C. § 703 because the claims arose in the District, Defendants reside in this District, and a substantial part of the events giving rise to this action occurred in the District.

## FACTUAL ALLEGATIONS

### A.  Overview of the Fair Housing Act's AFFH Provisions and Historical Context

22.    HUD sends billions of dollars in federal funds each year to state and local jurisdictions, and those communities regularly certify both that they do not discriminate and that they are taking affirmative steps to further fair housing. But until recently, the agency has largely neglected to require those communities to do anything meaningful to fulfill those promises. HUD thus failed, until the promulgation of the AFFH Rule at issue in this case, to give appropriate force to a central part of the Fair Housing Act. That law does not simply bar overtly discriminatory actions, but also requires that federal funds are spent in ways that ameliorate (rather than exacerbate) long-standing patterns of residential segregation.

23.    The AFFH requirement, like much else in the Fair Housing Act, arose from the findings of the National Advisory Committee on Civil Disorders ("Kerner Commission"). In 1967, President Johnson charged the Kerner Commission with studying the causes of recent urban unrest and recommending solutions. The Kerner Commission's report, released in February 1968, found "[p]ervasive discrimination and segregation in employment, education and housing." *Report of the National Advisory Commission on Civil Disorders: Summary of Report*, at 9 (1968), https://www.hsdl.org/?view&did=35837. It noted that federal money was being spent in ways that contributed to this segregation and recommended, among other things, that "[f]ederal housing programs must be given a new thrust aimed at overcoming the prevailing patterns of racial segregation." *Id*. at 24.

24.    When Congress enacted the Fair Housing Act weeks later, in the immediate aftermath of the assassination of Dr. Martin Luther King, Jr. and in response to the recommendations of the Kerner Commission, it sought to replace racially segregated

neighborhoods with "truly integrated and balanced living patterns." *Trafficante v. Metro. Life Ins. Co.*, 409 U.S. 205, 211 (1972) (citing 114 Cong. Rec. 3422, statement of FHA sponsor Senator Walter Mondale). Consistent with this legislative purpose, in addition to barring discrimination in housing, the FHA also imposed on HUD the obligation to "administer the programs and activities relating to housing and urban development in a manner affirmatively to further the policies of this subchapter." 42 U.S.C. § 3608(e)(5). Effective implementation of this provision is central to the "Fair Housing Act's continuing role in moving the Nation toward a more integrated society." *Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project*, 135 S. Ct. 2507, 2525-26 (2015).

25.     As the Fair Housing Act's legislative history and subsequent case law make clear, this duty to "affirmatively further fair housing" requires HUD to address segregation and other barriers to fair housing not just in its own policies and practices, but also in its oversight of its state and local jurisdictions and other entities that receive HUD grants. HUD's duty under the Fair Housing Act requires it to "do more than simply refrain from discriminating," *NAACP v. Secretary of Housing and Urban Development*, 817 F.2d 149, 155 (1st Cir. 1987). Rather, HUD also must ensure that the Fair Housing Act powers affirmative movement towards integration in communities around the country, as Congress intended.

26.     Since soon after the passage of the Fair Housing Act, federal courts have recognized that HUD must adopt processes to ensure that local governments administering federal housing programs abide by this congressional mandate. In *Shannon v. U.S. Department of Housing and Urban Development*, 436 F.2d 809, 821 (3rd Cir. 1970), the court concluded that HUD "must utilize some institutionalized method" for assessing local compliance. Similarly, in *NAACP v. Secretary of Housing and Urban Development*, the First Circuit held HUD liable

for its failure to use its authority to "assist in ending discrimination and segregation, to the point where the supply of genuinely open housing increases." 817 F.2d at 155.

27.     In response to these and other rulings, HUD adopted only modest measures that barely staunched the flow of federal funds to projects and entities that failed to further fair housing objectives. For more than two decades, the agency neglected to adopt any system for ensuring that fair housing concerns were taken seriously by the many cities, towns, and counties that collectively receive billions of dollars every year through the Community Development Block Grant (CDBG) and HOME Investment Partnership (HOME) programs, notwithstanding that the Fair Housing Act obligates all such grantees to affirmatively further fair housing and obligates HUD to ensure that they do.

28.     In Fiscal Year 2017, HUD distributed $4.615 billion in federal grants devoted to housing block grant programs, accounting for about a tenth of HUD's annual budget.[1] In Fiscal Year 2018, that amount is slated to rise to almost $5.5 billion.[2] By far the largest such program— accounting for about two-thirds of the total, and reaching every corner of the United States—is the CDBG program, which provides annual block grants to approximately 1,210 grantees, mostly units of state and local government. *Id.*; *see also Community Development Block Grant Program – CDBG*, U.S. Department of Housing & Urban Development (last accessed May 4, 2018), http://www.hud.gov/program_offices/comm_planning/communitydevelopment/programs.

29.     The CDBG program, which began with the Housing and Community Development Act of 1974, is one of HUD's longest continuously running funding programs.

---

[1] See *Key Programs of the U.S. Department of Housing and Urban Development Budget*, Novogradac & Company LLP (Mar. 22, 2018), https://www.novoco.com/atom/168201.
[2] Peter Lawrence, *Congress Agrees to Historic Funding for HUD in Fiscal Year 2018 Omnibus Spending Bill*, Novogradac & Company LLP (Mar. 22, 2018), https://www.novoco.com/notes-from-novogradac/congress-agrees-historic-funding-hud-fiscal-year-2018-omnibus-spending-bill

HUD awards CDBG grants to local governments to carry out a wide range of community development activities directed toward revitalizing neighborhoods, fostering economic development, and providing improved community facilities and services. Local governments eligible for CDBG funds, known as "entitlement communities," include the principal cities of Metropolitan Statistical Areas (MSAs); other metropolitan cities with populations of at least 50,000; and qualified urban counties with populations of at least 200,000 (excluding the population of entitled cities).

30.     Entitlement communities have discretion to develop their own programs and funding priorities, so long as they use CDBG funds consistent with certain statutory objectives, such as benefitting low- and moderate-income persons. 42 U.S.C. § 5304(b)(3). They may, for example, use CDBG funds to rehabilitate affordable housing; acquire land for new affordable housing development; improve infrastructure and public facilities in low- and moderate-income areas; or foster economic development that creates jobs for low- and moderate-income workers.

31.     Each CDBG recipient must develop a document called a Consolidated Plan every three to five years and submit it to HUD for review and approval. See 24 C.F.R. §§ 570.302, 91.200-91.230. The Consolidated Plan sets out community development priorities and multiyear goals based on housing and community development needs, housing and economic market conditions, and available resources. CDBG recipients also submit to HUD each year Annual Action Plans, which summarize the specific actions and activities planned and the federal and non-federal resources that will be used. HUD uses these submissions to monitor communities' use of CDBG funds to achieve the goals of the CDBG program.

32.     The majority of local governments participating in the CDBG program are on a five-year cycle and renewed their Plans most recently in 2014 or 2015. Thus, they are due to

submit their next proposed Plans on various dates in 2019 or 2020. As discussed below, this timeframe also controls the timing of when the AFFH Rule requires these governments to, for the first time, submit to HUD for review and approval their Assessments of Fair Housing. The Rule thus specifically requires governments around the country in the coming months to engage in the robust process (including engagement of the community and local fair housing groups) that the AFFH Rule mandates.

33.     CDBG recipients must certify that their grants will be conducted and administered in conformity with the Civil Rights Act of 1964 (which bars discrimination by recipients of federal funds on the basis of race, color, and national origin) and the Fair Housing Act. They also must certify that they will affirmatively further fair housing. 42 U.S.C. § 5304(b)(2); *see also* 24 C.F.R. § 570.601. But until the AFFH Rule's promulgation, they were not required to submit to HUD any fair housing equivalent of the Consolidated Plan, *i.e.*, a detailed explanation of planned activities and how they will conform to the AFFH requirement. Until the mid-1990s, HUD required its grantees merely to sign a bare certification that they complied with the 42 U.S.C. § 3608(e)(5).

34.     In the mid-1990s, HUD finally promulgated regulations requiring each CDBG grantee to periodically conduct a written "Analysis of Impediments to Fair Housing Choice" (AI). Grantees were instructed to identify impediments to fair housing choice, take appropriate actions to overcome the effects of any such impediments, and maintain records reflecting the analyses and actions taken.

35.     This system was virtually toothless. HUD did not require the grantees to submit their AIs to HUD for review or approval, and the AIs themselves had no required format or goals. HUD required grantees only to certify that they had conducted an AI and were taking

appropriate actions to overcome identified impediments. The agency did not require that the impediments identified be meaningful, did not offer guidance as to what would be "appropriate actions" to overcome these impediments, and did not adopt a system for compliance review. At best, AIs were paper exercises in the planning of fair housing policy that sat on municipal shelves and never translated into actual policy; at worst, meaningful assessments of fair housing problems and solutions never appeared, even on paper.

36.     HUD conducted almost no oversight of this process. It did not review AIs and, except for publishing a non-binding *Fair Housing Planning Guide* in 1996, did not provide any technical assistance to grantees. It imposed no consequences when a grantee failed to produce or update an AI or to take the actions described in an AI. With HUD failing to meaningfully oversee its grantees in accordance with 42 U.S.C. § 3608, jurisdictions around the country routinely skirted their AI obligations and falsely certified their compliance with even these weak requirements.

37.     In 2008, the National Commission on Fair Housing and Equal Opportunity—a body co-chaired by former HUD Secretaries Jack Kemp (a Republican) and Henry Cisneros (a Democrat)—reported: "The current federal system for ensuring fair housing compliance by state and local recipients of housing assistance has failed…. HUD requires no evidence that anything is actually being done as a condition of funding and it does not take adverse action if jurisdictions are directly involved in discriminatory actions or fail to affirmatively further fair housing." National Commission on Fair Housing and Equal Opportunity, *The Future of Fair Housing: Report of the National Commission on Fair Housing and Equal Opportunity* 44 (2008), *available at* http://www.naacpldf.org/files/publications/Future%20of%20Fair%20Housing.pdf. *See also* The Opportunity Agenda, *Reforming HUD's Regulations to Affirmatively Further Fair*

*Housing* 7 (2010), *available at* https://opportunityagenda.org/sites/default/files/2017-03/2010.03ReformingHUDRegulations.pdf (stating that "[a] range of housing experts, civil rights groups, and former HUD officials have documented the inadequacy of the current AI process," and detailing that testimony).

38.     HUD's countenancing of rampant non-compliance with the AFFH mandate came to a head in a False Claims Act case brought against Westchester County, New York. In that case, a whistleblower organization alleged that the County had defrauded the United States for years by continually certifying to HUD its compliance with the Fair Housing Act, even as it was deliberately concentrating affordable housing for families in a small number of heavily African-American and Latino communities and distributing CDBG funds to overwhelmingly white suburbs that refused to allow the development of affordable housing. *United States ex rel. Anti-Discrimination Ctr. of Metro N.Y., Inc., v. Westchester Cty., N.Y.*, 495 F. Supp. 2d 375 (S.D.N.Y. 2007); 668 F. Supp. 2d 548 (S.D.N.Y. 2009)

39.     The *Westchester* case publicly exposed the failings of the AI process and the annual "certification" process. On summary judgment, the district court found that the County could produce no evidence that it even evaluated race-based impediments to fair housing, let alone did anything about them, while annually certifying compliance and accepting more than $50 million in federal housing funds during the relevant years. 668 F. Supp. 2d at 562.

40.     Following the *Westchester* decisions, HUD took a closer look at what its grantees were doing in exchange for billions of dollars of federal funds every year. It engaged in a series of hearings, listening sessions, and internal reports, and it concluded that the AI process was not working.

41.     For the first time, HUD asked participating jurisdictions to produce their AIs for review, and the results were unacceptable. More than a third of jurisdictions could not or would not produce any AI at all. Of those that did produce an AI, HUD rated 49 percent as "needs improvement" or "poor." HUD found that only 20 percent of AIs committed jurisdictions to doing *anything* on a set timeframe. *See* U.S. Department of Housing and Urban Development, Office of Policy Development and Research, *Analysis of Impediments Study* (2009).

42.     At the same time, the Government Accountability Office (GAO) was undertaking a detailed review of the AI process. It released its conclusions in a 2010 report to Congress, GAO-10-905, *Housing and Community Grants: HUD Needs to Enhance Its Requirements and Oversight of Jurisdictions' Fair Housing Plans* (2010), *available at* https://www.gao.gov/assets/320/311065.pdf (GAO Report).

43.     The GAO Report highlighted the weaknesses of the AI process and urged HUD to reform the system of fair housing oversight of HUD grantees. The report found that many jurisdictions, lacking any oversight or accountability, failed to make minimal efforts to comply even with the lax requirements of the AI system.

44.     For example, the GAO found that 29 percent of jurisdictions had not completed an AI within the last five years, as recommended by HUD's *Fair Housing Planning Guide*, while 11 percent had not done so within the last 10 years; for another 6 percent the date of completion could not be determined. Since the purpose of an AI was to be a planning document for a 5-year period, these jurisdictions effectively had no operative AI at all. Many jurisdictions could not produce a document labeled an AI, and others produced perfunctory documents—or, in one case, an e-mail.

45.     Even for those jurisdictions that had operative AIs, the GAO found little evidence that the AIs made a practical difference. The GAO reviewed many of the AIs that grantees had completed (and used as the basis for certifying compliance with the Fair Housing Act) and found most of them contained little more than aspirational statements of vague goals. It found, for example, that most AIs reviewed "lack time frames for implementing identified recommendations," making it impossible "to establish clear accountability." GAO Report at 31. Moreover, because HUD never established clear rules as to the most basic substantive and procedural "requirements" it meant to impose—*e.g.*, a timeline on which AIs should be completed, a process for completing them, the documents' form and content—it was virtually impossible for HUD field offices to participate meaningfully in the process and ensure compliance even if they wanted to do so. *Id.* at 25.

46.     By the time the GAO Report was issued, HUD had begun the process of formulating the AFFH Rule, and the GAO Report contained specific recommendations that the Rule largely incorporated. In particular, the GAO Report recommended that HUD establish standards and a common format for grantees to use in their planning documents; that grantees be required to include time frames for completing promised actions; and that grantees be required to submit these documents to HUD for comprehensive review on a regular basis. GAO Report at 32-33.

47.     Based on the GAO Report, a vast record of rulemaking comments, and its own experience, HUD concluded that the AI process did not work. That was for myriad reasons; among other things, the AI drafting process "was not well integrated into the planning efforts for expenditure of funds made by HUD program participants," and "HUD has not, in a systematic manner, offered to its program participants the data in HUD's possession that may better help

them frame their fair housing analysis." Final Rule: Affirmatively Furthering Fair Housing, 80

Fed. Reg. 42,272, 42,275 (July 16, 2015) (AFFH Rule).

**B.  HUD AFFH Rulemaking**

48.      In 2009, in response to the growing and uncontroverted evidence that it was

failing to ensure that federal housing dollars were spent in ways consistent with the AFFH

obligation, HUD began formulating a better system. The regulation that HUD formally proposed

in 2013 and promulgated as a final rule in 2015 was the product of a comprehensive process of

outreach and study that informed the Rule's eventual design. 80 Fed. Reg. 42,272; GAO Report

at 29.

49.      For example, in July 2009, HUD held a listening conference in which more than

600 people participated, both in person and remotely. As Assistant Secretary for Fair Housing

John Trasviña testified to Congress the next year: "There, fair housing and civil rights groups,

mayors, counties, and states all voiced their desire for HUD to amend its regulations to provide

more concrete, specific information about how to develop a meaningful plan for affirmatively

furthering fair housing." John D. Trasviña, Assistant Secretary for Fair Housing and Equal

Opportunity, U.S. Department of Housing and Urban Development, Statement before the

Subcommittee on Housing and Community Opportunity, Committee on Financial Services, U.S.

House of Representatives, Hearing on H.R. 476 Housing Fairness Act of 2009 (Jan. 20, 2010),

*available at* https://financialservices.house.gov/media/file/hearings/111/trasvina_-_hud.pdf.

50.      After several years of gathering information, HUD published its proposed AFFH

Rule on July 19, 2013. 78 Fed. Reg. 43,710 (July 19, 2013). It acknowledged that the problems

revealed by the GAO, advocates, stakeholders, and program participants regarding the existing

AI process required it to develop a new regime for AFFH enforcement. It determined that, under

the AI regime, federal funding recipients did "not sufficiently promote the effective use of limited public resources to affirmatively further fair housing." 78 Fed. Reg. at 43,711.

51.     HUD found that it was required to change course in order to carry out its statutory mission: "HUD and its grantees have a statutory duty to affirmatively further fair housing. *This is not an administrative requirement that can be waived by HUD.*" 80 Fed. Reg. at 42,348 (emphasis added).

52.     HUD explained that it was not seeking to "mandate specific outcomes" for jurisdictions. 78 Fed. Reg. at 43,711. Rather, the AFFH Rule would structure decision-making processes in ways that ensured that local fair housing concerns would be heard, considered, and ultimately acted upon on a regular basis, with HUD review of the resulting product providing accountability. It would no longer be possible for jurisdictions to fail to produce an AI altogether, or to produce one that entirely ignored fair housing concerns (as Westchester's had), without HUD detecting and remedying the violation.

53.     To accomplish this, the AFFH Rule introduced the Assessment of Fair Housing, or AFH, as the core planning and oversight tool that integrates fair housing considerations into jurisdictions' regular planning processes. HUD would review the adequacy of jurisdictions' plans—but it would also assist them, in a variety of ways, rather than leaving them at sea as to how to comply with their obligation to affirmatively further fair housing. HUD committed to providing participants with national data and meaningful direction, including clear standards to follow and ample technical support. 78 Fed. Reg. at 43,714; *see also* 80 Fed. Reg. at 42,275 (reiterating these "key features" of the rule). HUD received 1,025 comments on the proposed rule.

54.     HUD published its final AFFH Rule on July 16, 2015, with an effective date of
August 17, 2015. The final rule addressed the public comments HUD had received and made
changes in response, such as strengthening the requirement that participants identify "meaningful
actions" to further fair housing. The final rule also provided for a staggered AFH submission
schedule, to reduce the burden on HUD and program participants and give smaller participants
extra time to prepare. It described HUD's plans to issue guidance and technical assistance to
assist with the regulation's rollout.

55.     The AFFH Rule provides for a consistent template (the AFH) that participants
must complete, engage the public in reviewing, and submit to HUD for oversight at regular
intervals. 24 C.F.R § 5.154(d). Participants must use the AFH to identify local fair housing issues
and make concrete plans to address them—including measurable goals and metrics for
measuring success—with public input and HUD review. While the initial AFHs are an exercise
in goal-setting, subsequent AFHs must review progress toward these goals, such that the process
provides a cycle of accountability. 24 C.F.R. § 5.154(d)(7).

56.     Under the AFFH Rule, a funding recipient "must certify that it will take
meaningful actions to further the goals identified in its AFH," 24 C.F.R. § 91.225(a)(1), with
"meaningful actions" defined as "significant actions that are designed and can be reasonably
expected to achieve a material positive change that affirmatively furthers fair housing." 24
C.F.R. § 5.152.

57.     In conjunction with this "meaningful action" requirement, HUD for the first time
provided a regulatory definition of what it means to affirmatively further fair housing. HUD
defined "AFFH" as:

> taking meaningful actions, in addition to combating discrimination, that overcome
> patterns of segregation and foster inclusive communities free from barriers that

restrict access to opportunity based on protected characteristics. Specifically, affirmatively furthering fair housing means taking meaningful actions that, taken together, address significant disparities in housing needs and in access to opportunity, replacing segregated living patterns with truly integrated and balanced living patterns, transforming racially and ethnically concentrated areas of poverty into areas of opportunity, and fostering and maintaining compliance with civil rights and fair housing laws.

24 C.F.R. § 5.152.

58.    Thus, the regulation guarantees performance of the statutory duty to affirmatively further fair housing by requiring meaningful steps towards achieving the Fair Housing Act's ambitious goals. Those steps may vary widely from jurisdiction to jurisdiction, depending on local conditions and needs, but the constant is that every jurisdiction must take meaningful steps towards addressing its own barriers to fair housing.

59.    Following its promulgation of the AFFH Rule, HUD issued an Assessment Tool (as required by the rule) to standardize the AFH process. The Assessment Tool was separately subject to public notice and comment under the Paperwork Reduction Act and is to be updated at regular intervals. In preparing their AFHs, local governments must use the Assessment Tool, which organizes all the required elements of an AFH into a template for simpler preparation and review. 24 CFR § 5.154(d). HUD determined that "program participants' use of an Assessment Tool to create their AFH will help to ensure that AFHs are developed consistently and will facilitate objective, consistent reviews." 80 Fed. Reg. at 42,311.

60.    After several rounds of comments and revisions, the current version of the Assessment Tool went into effect in January 2017 and is slated to remain in effect until January 31, 2020. *Affirmatively Furthering Fair Housing: Announcement of Renewal of Approval of the Assessment Tool for Local Governments*, 82 Fed. Reg. 4,388 (Jan. 13. 2017).

61.     The Tool contains questions that local governments are required to answer by reference to, among other things, HUD-provided local data and maps. Local governments must provide a narrative description and analysis of local fair housing conditions (including by reference to the maps) and describe policies and practices that influence those conditions. They must provide an analysis of, among other things, residential racial segregation, racially or ethnically concentrated areas of poverty, disparities in access to opportunity (such as jobs or education), and the housing needs of persons with disabilities. 24 C.F.R. § 5.154(d)(2), (3).

62.     To facilitate this detailed analysis, the Rule provides for HUD to publicly issue a variety of maps and provide data customized for each participant. Much of this information has been posted on HUD's website. For each participating jurisdiction, a user can see patterns of residential segregation by race, national origin, and disability; the location of affordable housing; and details such as transit, job proximity, and school proficiency. These maps and data are available at https://egis.hud.gov/affht/.

63.     The AFFH Rule provides that, in preparing the AFH, the funding recipient must provide for "meaningful community participation," including through public hearings— publicized by "means designed to reach the broadest audience"—and through public review of an initial AFH draft. 24 C.F.R. § 5.158(a); *see also* 80 Fed Reg. at 42,300 ("public input is a fundamental and necessary component in the AFH process"). The jurisdiction also must consult with a number of designated community organizations, including but not limited to fair housing organizations, *see* 24 C.F.R. § 91.100(a), (e)(1), as well as "any organizations that have relevant knowledge or data to inform the AFH and that are sufficiently independent and representative to provide meaningful feedback to a jurisdiction on the AFH, the consolidated plan, and their implementation." 24 C.F.R. § 91.100(e)(2). This consultation "must occur at various points in

the fair housing planning process," including not only with respect to the drafting of the AFH, but also with respect to implementation of the AFH's goals in the Consolidated Plan. 24 C.F.R. § 91.100(e)(3).

64.     The completed AFH must include a summary of comments received, and explanations as to why any recommended changes to the draft AFH were not accepted. 24 C.F.R. § 5.154(d)(6).

65.     Once a funding recipient has prepared and submitted an AFH, the Rule specifically contemplates and requires an iterative process between HUD and funding recipients. It calls on HUD not simply to pass judgment on AFHs, but to help funding recipients improve them and meet the AFFH Rule's rigorous requirements.

66.     The AFFH Rule requires HUD to review every Assessment of Fair Housing. HUD must "determine whether the program participant has met the requirements for providing its analysis, assessment, and goal setting," 24 C.F.R § 5.162(a). The agency may not "accept an AFH if HUD finds that the AFH or a portion of the AFH is inconsistent with fair housing or civil rights requirements or is substantially incomplete," 24 C.F.R. § 5.162(b). An AFH can be "substantially incomplete" for, among other things, failure to meet the required community participation and consultation requirements. 24 C.F.R. § 5.162(b)(1)(ii)(A). If HUD does not accept an Assessment, it must specify the reasons the Assessment has not been accepted and "provide guidance on how the AFH should be revised in order to be accepted." 24 C.F.R. § 5.162(b)(2). If an Assessment fails to meet any required element, HUD must deem it incomplete and require revision, even if other elements are complete. 24 C.F.R. § 5.162(b)(1)(ii)(B).

67.     The AFFH Rule establishes that each jurisdiction must complete and submit an AFH every three to five years—depending on that jurisdiction's Consolidated Plan submission schedule—and do so in a way that integrates fair housing concerns into the Consolidated Plan that CDBG recipients already prepare on a similar schedule. 24 C.F.R. § 5.160.

68.     Each CDBG recipient must complete and submit an AFH ahead of its Consolidated Plan schedule, so that financial and other commitments to implement the AFHs can be included in the next Consolidated Plan. Both the process of developing the Consolidated Plan and the Plan's substance must then reflect various components of the AFH. *See* 24 C.F.R. § 5.160(a)(1)(i); 80 Fed. Reg. at 42,287; *see also* 24 C.F.R. § 91.105(e)(1)(i) (requiring that Consolidated Plan hearings include presentation of "proposed strategies and actions for affirmatively furthering fair housing consistent with the AFH"); 24 C.F.R. § 91.215(a)(5)(i) (CDBG participant must "[d]escribe how the priorities and specific objectives of the jurisdiction…will affirmatively further fair housing by setting forth strategies and actions consistent with the goals and other elements identified in an AFH").

69.     In order to ensure that HUD's review could be rigorous, HUD considered and rejected a proposal that a funding recipient submit an AFH at the same time as its proposed Consolidated Plan. HUD reasoned that it was necessary to build in several months' gap between the submissions to ensure that, prior to submission of the Consolidated Plan, "the affected communities would have already had the opportunity to review and comment on the AFH, HUD will have the opportunity to identify any deficiencies in the AFH, and the program participant will have the opportunity to correct any deficiencies, prior to incorporation of the AFH into the consolidated plan or PHA Plan, such that funding to program participants will not be delayed." 80 Fed. Reg. at 42,311. Thus, HUD constructed a schedule that permits it to initially reject

24

AFHs—and then work with jurisdictions to improve them—as part of the routine process rather than as extraordinary event that seriously endangers federal funding.

70.     The Consolidated Plan that follows must include fair housing elements that have been approved in the AFH. *See* 24 C.F.R. § 91.500(b); *see also* 80 Fed. Reg. at 42,299. An accepted AFH is now a requirement for HUD's approval of the Consolidated Plan, 24 C.F.R. § 5.162(d), which in turn is a prerequisite for funding by the CDBG program. The AFFH Rule gives HUD only limited authority to excuse non-compliance with these requirements; if any jurisdiction fails to submit a Consolidated Plan that includes an approved AFH by August 16 of the federal fiscal year in question, that failure "will *automatically* result in the loss of the CDBG funds to which the jurisdiction would otherwise be entitled." 24 C.F.R. § 5.162(d)(1) (emphasis added).

71.     HUD set the dates for submission and review of AFHs on a staggered schedule, such that only a minority of jurisdictions must submit AFHs prior to 2019. The AFFH Rule requires jurisdictions to submit their first AFH by 270 calendar days before the beginning of their next CDBG program year. 24 C.F.R. § 5.160(a)(1). For most CDBG jurisdictions, this schedule requires that jurisdictions submit AFHs between 2019 and early October 2020. Additionally, HUD postponed until 2019 the date by which any jurisdiction receiving an award of $500,000 or less was required to make a submission. *See* 81 Fed. Reg. 73,129 (Oct. 24, 2016). Thus, HUD structured the schedule of submissions such that 2017 and 2018 would be used as learning years in which both HUD and early-submitting jurisdictions (none of which are small jurisdictions) gained expertise with the process.

72.     The AFFH Rule makes concrete what had been a largely theoretical statutory obligation to affirmatively further fair housing for jurisdictions that accept federal housing funds.

Those jurisdictions now must make fair housing considerations—both identifying fair housing issues and making plans to overcome them—part of their core planning processes, and HUD will regularly check their work and help them improve upon it.

### C. Secretary Carson's Public Opposition to the AFFH Rule

73.     Secretary Carson has been outspoken in opposing the AFFH Rule, before and after he was nominated to his position.

74.     In an article published in 2015, Secretary Carson criticized the AFFH Rule at length, equating it to "mandatory busing" of schoolchildren. Ben S. Carson, *Experimenting With Failed Socialism Again*, Wash. Times, July 23, 2015, *available at* https://www.washingtontimes.com/news/2015/jul/23/ben-carson-obamas-housing-rules-try-to-accomplish-/. He condemned both the AFFH Rule and a Supreme Court decision recognizing that the Fair Housing Act bars disparate impact discrimination, stating that "based on the history of failed socialist experiments in this country, entrusting the government to get it right can prove downright dangerous." *Id.*

75.     In his confirmation hearing, Secretary Carson reiterated his hostility to the AFFH Rule. In response to a question from Senator Sherrod Brown regarding his 2015 article, Secretary Carson said:

> As you probably know, that Act says that we want people who are receiving HUD grants to look around and see if they find anything that looks like discrimination and then we want them to come up with a solution on how to solve the problem. They're not responding to people saying that there's a problem, they're saying go and look for a problem and then give us a solution. And what I believe to be the case is we have people sitting around their desks in Washington D.C. deciding on how things should be done – you know—telling mayors and commissioners that

you need to build this place right here and you need to put these kinds of people at it.[3]

76.     In an interview after being confirmed, Secretary Carson said in response to a question about these prior statements that he "believe[s] in fair housing" but not in "extra manipulation and cost." Accordingly, he said about the AFFH Rule: "So we just have to reinterpret it, that's all."[4]

77.     Since Secretary Carson took office, HUD has provided no new guidance and has stopped providing the same level of technical support that it previously offered to jurisdictions preparing AFHs.

### D.  HUD's January 5, 2018 Suspension of the AFFH Rule

78.     Without providing advance notice or opportunity for comment, on January 5, 2018, HUD published a three-page notice in the Federal Register abruptly suspending the key requirements of the AFFH Rule. *See* Affirmatively Furthering Fair Housing: Extension of Deadline for Submission of Assessment of Fair Housing for Consolidated Plan Participants, 83 Fed. Reg. 683 (Jan. 5, 2018) (attached as Exhibit A).

79.     HUD's notice announced that no local government would be required to submit AFHs until the next scheduled submission date that falls after October 31, 2020, nor would HUD review AFHs submitted to it until after that date. 83 Fed. Reg. at 684.

---

[3] *Housing and Urban Development Secretary Confirmation Hearing Before the Senate Banking, Housing and Urban Affairs Comm.* (Jan. 12, 2017) (statement of Ben S. Carson, Nominee, Housing and Urban Development Secretary), *available at* https://www.c-span.org/video/?421258-1/hud-secretary-nominee-ben-carson-testifies-confirmation-hearing&start=2552.

[4] Joseph Lawler & Al Weaver, *Ben Carson: HUD Will "Reinterpret" Obama Housing Discrimination Rule*, Wash. Examiner, July 20, 2017, *available at* https://www.washingtonexaminer.com/ben-carson-hud-will-reinterpret-obama-housing-discrimination-rule

80.     This action effectively postpones implementation of the AFFH Rule until 2024 or
2025 for most local jurisdictions that receive CDBG funding. That is because most of those
governments are due to submit an AFH for HUD review between 2019 and early October 2020.
Now they will not need to (and, indeed, may not) submit an AFH and receive HUD review until
their next scheduled submission that falls after October 31, 2020, *i.e.*, between April 2024 and
January 2025.

81.     HUD stated that this delay applies to both program participants whose AFHs were
coming due and participants to which HUD had granted extensions of time to submit previously
due AFHs. Additionally, HUD stated that it would immediately discontinue its review of AFHs,
including already-submitted AFHs. Only the small number of participants whose AFHs HUD
had already approved would be required to comply with the actions and goals promised in them.

82.     HUD stated that this suspension of the AFFH Rule's requirements was necessary
because, "[b]ased on initial reviews," the agency concluded that "program participants need
additional time and technical assistance to adjust to the new AFFH process and complete AFH
submissions that can be accepted by HUD." 83 Fed. Reg. at 684.

83.     HUD stated that many program participants were struggling to meet the
requirements of the AFFH rule, "such as developing goals that could be reasonably expected to
result in meaningful actions[.]" 83 Fed. Reg. at 684-85. Further, HUD said, "program
participants struggled to develop metrics and milestones that would measure their progress as
they affirmatively further[] fair housing." *Id*. at 685. The result of "program participants'
frequent misunderstanding of how to set clear goals, metrics, and milestones," HUD stated, was
often "non-accepted AFHs." *Id*.

84.     HUD stated that it drew these conclusions from the first 49 proposed AFHs it reviewed. 83 Fed. Reg. at 684. It stated that 17 of these submitted AFHs (or 35 percent) were not initially accepted. *Id.* HUD did not contend that this was a surprising rate of non-acceptance for the first batch of AFHs reviewed.

85.     HUD stated that "additional technical assistance may result in program participants better understanding their obligations under the AFFH Rule." 83 Fed. Reg. at 685. It further stated that "enhancing its technical assistance" would result in fewer resources expended by program participants "because they are more likely to submit an initial AFH that can be accepted by HUD." *Id.* HUD did not explain how it would enhance its technical assistance capabilities, nor did it acknowledge that it had failed to deploy all the technical assistance resources already available to it. Nor, finally, did it explain why enhancing its technical assistance required delaying the submission of the next round of AFHs at all, let alone for years. It did say, cryptically, that it did not accept one regional AFH that was submitted collaboratively by 19 program participants and that "improving technical assistance for collaborative AFHs will enable collaborations to more efficiently use their resources to address fair housing issues that cross jurisdictional boundaries." *Id.* Once again, it did not explain how it intended to improve technical assistance for collaboratively prepared AFHs, nor why such improvements required effectively suspending the Rule for years.

86.     HUD also stated that it could use the additional time to improve the Assessment Tool. 83 Fed. Reg. at 685. It did not explicitly claim that this point justified or required its suspension of the Rule.

87.     While the AFH process is suspended, HUD told local governments to resort to the failed AI process, *i.e.*, prepare an Analysis of Impediments without HUD assistance, "take

appropriate actions," and then "maintain records reflecting the analysis and actions," without submitting anything for HUD review. 83 Fed. Reg. at 685. HUD did not explain why it now believed this process would be effective; indeed, it did not even acknowledge that the AFFH Rule's basic premise was that the AI process had failed to ensure that federal funds were used to affirmatively further fair housing, as the Fair Housing Act requires. *See, e.g.*, 78 Fed. Reg. at 43,711 (finding that, under the AI regime, federal funding recipients did "not sufficiently promote the effective use of limited public resources to affirmatively further fair housing").

88.     HUD told local governments they should "continue to affirmatively further fair housing as required by the Fair Housing Act. 42 U.S.C. 3608." 83 Fed. Reg. at 685. It did not go beyond this bare statutory citation—not even to instruct local governments to follow HUD's implementing regulations (such as the definition of the AFFH term now found at 24 C.F.R. § 5.152) or its own guidance. Nor did it tell local governments to carry out the critical community participation and consultation provisions of the AFFH Rule, 24 C.F.R. §§ 5.158 and 5.162(b)(1)(ii)(A), which require substantially more of local governments than the previous HUD regulations governing the production of an AI. Because those regulatory requirements are procedurally linked to the AFH process—which HUD now has suspended—they are effectively suspended as well. HUD said nothing to suggest that local governments must comply with them, nor is it obvious how they apply when it is no longer mandatory that funding recipients prepare an AFH for HUD review.

89.     Thus, HUD has instructed local governments to revert to the same pre-AFFH Rule Analysis of Impediments process that HUD itself has determined is ineffective—and involves no assistance or enforcement by HUD. It has abdicated oversight and enforcement of the AFFH statutory requirement for years to come.

30

90.     HUD did not identify any legal authority permitting it to suspend the requirement that covered jurisdictions submit AFHs on a timeline corresponding with their next Consolidated Plan submission, notwithstanding that the required timeframe for first AFH submissions is in the text of the regulation.

91.     HUD did not identify any legal authority permitting it not to review already submitted AFHs, notwithstanding that the AFFH Rule requires HUD to undertake such reviews and make determinations on each submitted AFH. *See* 24 C.F.R. § 5.162(a).

92.     HUD did not identify any legal authority permitting it to distribute federal housing funds based solely on a certification that a jurisdiction complied with the pre-AFFH Rule requirements, notwithstanding that the AFFH Rule bars HUD from approving a Consolidated Plan in the absence of an accepted AFH. *See* 24 C.F.R. § 5.162(d) ("If a program participant does not have an accepted AFH, HUD will disapprove a consolidated plan.").

93.     Although it failed to take comments *before* acting, HUD said it would accept comments on its action until March 6, 2018. 83 Fed. Reg. at 685. Almost all of the comments HUD received criticized its action as unwarranted and unlawful. Nonetheless, HUD has given no indication that it will rescind its suspension of the AFFH Rule.

94.     Since issuing its notice suspending the AFFH Rule's requirements, purportedly to improve technical assistance, HUD has not taken any public actions aimed at improving its technical assistance.

### E.  HUD's Experience with the First Set of AFH Submissions Provided No Reason to Suspend the Rule

95.     Not only did HUD thus lack legal authority to suspend the AFFH Rule's core requirements, the evidence before it did not support suspending the Rule at all, let alone for years. That some municipalities failed in their initial submissions to meet the Rule's

31

requirements reaffirms, rather than calls into question, why HUD thought the Rule necessary in the first place: left to their own devices, many municipalities will fail to take their obligations under the Fair Housing Act seriously. That they continue to need HUD enforcement and oversight is not a reason to remove such oversight. Moreover, to the extent that HUD's current technical assistance is inadequate, that is because HUD under Secretary Carson has cut back on its technical assistance offerings to local jurisdictions and has stopped issuing technical guidance on new developments to its own staff. It is not more time that HUD needs to offer enhanced technical assistance—it is the willingness to take the task seriously.

96.     Even before promulgating the AFFH Rule, HUD began taking steps to prepare jurisdictions for complying with it. Since at least Fiscal Year 2012, Congress has appropriated significant funds for HUD's technical assistance efforts, and much of that money has been devoted to the implementation of the Affirmatively Furthering Fair Housing Rule.

97.     HUD and its agents have designed regional, multi-day trainings delivered around the country for participating jurisdictions; drafted guidance on how to use the AFH tool; and answered questions submitted through the HUD Exchange website. At one point, HUD's agents even provided direct, on-site assistance to multiple program participants. HUD staff prepared and published the *AFFH Rule Guidebook*, while HUD staff and the agency's technical assistance contractors answered questions from program participants by phone or e-mail.

98.     All of this changed in 2017. Despite funding appropriated by Congress for technical assistance and the availability of a highly trained team of technical assistance providers, HUD has willfully and systematically underutilized technical assistance resources available to it.

99.     For example, HUD no longer permitted its contractors or staff to engage in on-site technical assistance. Additionally, HUD failed to publish further guidance and ceased to monitor and respond to questions about the AFFH Rule submitted through the HUD Exchange Ask-A-Question portal.

100.     In large part due to HUD's own failure to assist them—as well as suspicion that HUD no longer has the will to enforce the AFFH Rule vigorously—some jurisdictions submitted inadequate AFHs that properly required rejection. Where HUD has initially rejected an AFH, it has often done so because the jurisdiction failed to include even the basic components of a functional AFH. For example, municipalities whose AFHs were rejected ignored segregation in an entire section of their jurisdiction (notwithstanding maps that should have made such segregation obvious); failed to include any metrics or milestones to measure improvements in fair housing; failed to analyze the data HUD had provided to the jurisdiction; and/or failed to consider housing barriers for key constituents, such as persons residing in public housing.

101.     HUD's description of the record before it when suspending the AFFH Rule's requirements also is incomplete in a way that makes its analysis unreasonable. HUD focuses only on the additional work that HUD and local jurisdictions are required to do to implement the AFFH Rule and entirely ignores the Rule's already evident benefits. Despite HUD's less than robust efforts to make the Rule work, the AFH submissions it received before suspending the Rule demonstrate that, on balance, the Rule was vastly improving jurisdictions' commitment to fair housing, which in turn was providing tangible benefits for individuals.

102.     As HUD acknowledged, most of the 49 submissions it received cleared the high bar the AFFH Rule sets even in their first submission. Thus, 32 of the 49 jurisdictions were immediately on the path to finally meeting the Fair Housing Act's requirements in exchange for

the federal money they receive. HUD did not contend the Rule did not work for those jurisdictions, nor would such a contention be reasonable.

103.     With respect to the 17 jurisdictions whose submissions it initially rejected, HUD paints a misleading picture by failing to acknowledge or consider relevant facts. Most of those 17 submissions that HUD initially rejected were improved through a collaborative process between HUD and the jurisdictions, and all but a few of them have already been accepted after revision. One of those that has not—by the Hidalgo County Regional Consortium (Hidalgo County) in Texas—is described further in the next section regarding harm to Plaintiffs. That submission was deeply flawed and was properly rejected; HUD's suspension of the AFFH Rule ended the process that would have improved it.

104.     Accordingly, what HUD characterizes as a failure—that 17 submissions were initially rejected—is in fact a success, because those jurisdictions were properly required to improve their inadequate AFHs. This is precisely how the Rule was written to work: HUD review, individualized feedback, and AFH revision by participants are all explicitly contemplated. See 24 CFR §§ 5.162(a) and (b). After decades in which participants had operated without oversight, it was to be expected that many participants would need assistance to meet a new level of accountability. And by and large they have, eventually, met the challenge.

105.     One study of the 28 AFHs submitted to HUD between October 2016 and July 2017 (that is, the majority of the 49 on which HUD based its decision) compared those submissions to the AIs previously prepared by the same participants, and found striking improvements. Whereas the AIs contained nebulous goals, the AFHs contained more concrete ones. *See* Justin Steil & Nicholas Kelly, *Survival of the Fairest? An Analysis of Affirmatively Furthering Fair Housing Compliance* (Sep. 15, 2017) (working paper for The Future of Housing

Policy in the U.S. Conference, University of Pennsylvania), *available at*

http://web.mit.edu/afs/athena.mit.edu/org/f/fairhousing/research/Steil_Kelly_Survival_of_Fairest

.pdf. In the past, most municipalities did not set a single goal that included a quantifiable metric

of success or concrete policy to be enacted. Now, almost all did.[5]

106.    For example, Paramount, California committed to making (by explicit deadlines)

specific amendments to its zoning ordinance to make its housing more inclusive, such as

allowing group homes for people with disabilities in residential zones. New Orleans, Louisiana

promised to increase homeownership by Section 8 voucher recipients by 10 percent annually.

Chester County, Pennsylvania committed to creating 200 new affordable rental units in high

opportunity neighborhoods across the county by 2021. El Paso County, Colorado similarly

promised to assist in the development of 100 publicly supported affordable housing units in areas

of opportunity. All of these commitments can be monitored and their success measured.

107.    A representative success story is the AFH which Philadelphia completed and

HUD approved. In accordance with the AFFH Rule's community participation requirements,

Philadelphia conducted a survey in both English and Spanish (receiving more than 5,000

responses, including more than 900 from residents of high-poverty neighborhoods), conducted

focus groups around the city, took comments on an initial (weak) draft AFH, and otherwise made

far greater effort than it ever had to learn about barriers to fair housing in its own communities.

The substantive results were striking. For example, the city's final AFH identified widespread

evictions in neighborhoods where predominantly racial minorities live as a substantial barrier to

fair housing. It committed the city to taking concrete steps in response, including creating an

---

[5] Submitted AFHs can be viewed at: https://furtheringfairhousing.mit.edu/assessment-fair-housing-city.

"eviction prevention project" pursuant to which lawyers and advocates will represent those facing unjust eviction.

108.    These outcomes are exactly the sort of concrete, locally driven commitments to fair housing that were rarely made under the AI regime and that the AFFH Rule was intended to promote, assist, and require. And they were made with greater community input, thanks to the AFFH Rule's requirements in that regard.

109.    One study, which was submitted to HUD in response to its call for comments on the suspension of the Rule, found that the AFH process in virtually all cases provided a greater level of public engagement than the AI process had. That meant, for example, more public meetings and notice provided in more places and media (as well as in more languages) to ensure that more members of the public were aware of the process and had the opportunity to participate. It also meant greater acknowledgment of the public's input in the AFH itself. For example, Nashville, Tennessee's AFH spent 107 pages detailing public comments received and its response to them; it had devoted nine pages of its AI to such topics. *See* Furman Center Comment Letter, *available at* https://www.regulations.gov/document?D=HUD-2018-0001-0036 (last visited Apr. 26, 2018).

110.    As HUD stated in the Final Rule, the extent to which the AFFH Rule increases burden on program participants was expected to depend on how seriously those jurisdictions took their AFFH obligations all along. *See* 80 Fed. Reg. at 42,273. HUD fully expected that those jurisdictions that had flouted their obligations for years would face some increased burden when finally made to comply. It estimated that participating jurisdictions overall would incur compliance costs of about $25 million, while HUD itself would incur about $9 million in

resource costs. *Id.* In suspending the Rule, HUD did not contend that costs to either participants or HUD were greater than HUD had expected.

### F.  HUD's Action Will Harm Plaintiffs If Not Enjoined

111.    Defendants' unlawful actions have caused Plaintiffs to suffer irreparable and ongoing injury for which there is no adequate remedy at law. These unlawful actions will continue to cause injury to Plaintiffs unless and until injunctive relief is granted. Defendants' suspension of the AFFH Rule's core requirements is frustrating Plaintiffs' missions. In response, Texas Appleseed and Texas Housers (Texas Plaintiffs) have had to divert resources they were planning to devote to other activities critical to their missions to remedying the effects of Defendants' action in municipalities around Texas. NFHA, meanwhile, has had to divert resources to assisting its members around the country in similar efforts to combat the effects of Defendants' action.

#### 1.  *Harm to Texas Plaintiffs*

112.    Both Texas Plaintiffs contributed to the development of the AFFH Rule (including by submitting comments) and have devoted considerable resources to ensuring that it is implemented properly in Texas. They have relied heavily on the AFH Rule's requirements, which ensure that local jurisdictions take fair housing seriously rather than continuing to perpetuate the patterns of residential racial segregation and discriminatory use of federal funds that historically have plagued much of Texas.

113.    For example, since 2008, the Texas Plaintiffs have devoted substantial time and resources (including filing multiple complaints with HUD) to requiring state and local governments to spend federal disaster relief money in ways that are non-discriminatory and affirmatively further fair housing. They have played a large role in the creation of an AI for the

State of Texas that requires specific steps to address disaster relief discrimination, including training for local grantees and a commitment to spend disaster recovery money in certain ways. They also have developed, with the State of Texas, a form for local jurisdictions to use to assess and report their compliance with AFFH requirements with respect to the use of disaster relief money and have closely monitored local jurisdictions' compliance.

114.    Since the AFFH Rule's promulgation, the Texas Plaintiffs have devoted resources to the development of effective AFHs in a number of communities and regions. In particular, they have provided substantial input into the development of municipal AFHs in Fort Worth, Corpus Christi, and League City. They also have helped organize community members and assisted in the development of a regional AFH in the Hidalgo County region, covering 19 jurisdictions and housing authorities. They have spent thousands of dollars in staff time and resources in various Texas communities, providing public education to municipalities, planners, and attorneys. These efforts have begun to pay dividends in large part because of specific protections that the AFFH Rule provides. HUD's suspension of the Rule's requirements, if not enjoined, will frustrate Texas Plaintiffs' efforts to ensure fair housing in the communities they serve.

115.    The efforts of the Texas Plaintiffs, combined with the AFFH Rule's protections, have substantially increased the degree of public participation in each community's AFH process. The AFFH Rule's requirements have amplified the ability of individuals, grassroots groups, and advocacy groups like Texas Plaintiffs to identify, publicly articulate, and force jurisdictions to grapple with local fair housing problems that previously went unaddressed. If HUD's suspension of the Rule's requirements is not enjoined, Texas Plaintiffs will be required to repeat and redouble their efforts to ensure fair housing in the communities they serve, because

there will be no AFH process in which such local input must be considered, nor any process by which HUD will review the AFH and determine whether it complies with the AFFH Rule's procedural and substantive requirements.

116.     As one illustration, the Texas Plaintiffs devoted substantial resources to ensuring that, when Hidalgo County prepared its AFH (as one of the first AFH submitters in Texas), community participation was more robust. Among other things, they prepared a lengthy comment letter advising County officials to provide multiple forums in which interested residents could participate, ensured that materials were prepared in Spanish, and saw to it that notice and opportunity to participate was given to the predominantly Latino population living in "colonias," *i.e.*, plots of land outside incorporated cities that often lack infrastructure such as water, sewage, electricity, and paved roads. Hidalgo County historically has ignored the needs of the people living there (even as it takes federal funds and certifies AFFH compliance), but the AFFH Rule's requirements provide a mechanism for the Texas Plaintiffs to force the county to consider those needs.

117.     The AFH that Hidalgo County submitted to HUD in 2017 nonetheless was deficient. It failed, among other things, to grapple with the publicly stated needs of colonias residents or to engage with the comments Texas Plaintiffs and others provided. Texas Plaintiffs sent HUD a letter alerting the agency to these problems, and on December 12, 2017, HUD rejected the submitted AFH, requiring the County to submit a revised one by March 12, 2018. Hidalgo County's AFH thus is one of the 17 initially rejected submissions upon which HUD relies as a reason to suspend the Rule.

118.     Relying on the AFFH Rule's requirements, Texas Plaintiffs spent thousands of dollars in staff time, materials, and other resources to create the conditions under which fair

housing finally could come to Hidalgo County. Just when those efforts seemed to be bearing

fruit—with HUD rejecting the County's initial submission and requiring it to prepare a revised

submission that reflects an effort to, finally, take its AFFH obligations seriously—HUD's action

endangers this progress. Now HUD will not require Hidalgo County to make a compliant

submission, although it already has found that Hidalgo County has not made a sufficient

commitment to affirmatively further fair housing.

119.    HUD's abdication of its statutory responsibility, if not enjoined, will require

Texas Housers and Texas Appleseed to expend considerable additional resources to bring fair

housing to Hidalgo County without HUD's assistance and without the procedural rights the

AFFH Rule provides them. The County, no longer needing HUD approval, now has no incentive

to meaningfully improve its rejected AFH or otherwise address the housing needs that have

plagued many of its residents for too long. That means that Texas Plaintiffs will have to expend

considerable resources making fair housing a reality in Hidalgo County that they would not have

to expend if HUD were enforcing the requirements of the AFFH Rule.

120.    Similarly, in the City of Corpus Christi, which also had an AFH due on January 4,

2018, the Texas Plaintiffs consulted extensively with local advocates, encouraged HUD to offer

the City an extension of time to incorporate changes based on the devastating impact of

Hurricane Harvey on the City and surrounding region, and submitted comments on the AFH. The

City declined the extension and submitted an AFH that barely acknowledged massive housing

loss, extended displacement, and infrastructure impacts caused by one of the costliest disasters in

U.S. history. Because of HUD's unlawful action, HUD will not review that defective AFH,

leaving the City with no obligation to improve it and no incentive otherwise to make concrete

plans to address fair housing concerns in disaster relief. The Texas Plaintiffs therefore will have

to expend considerable resources trying to make fair housing a reality in Corpus Christi, including by monitoring the use of hundreds of millions of dollars in federal disaster relief money that will be flowing to the region. These activities will require considerably more effort and expenditure of resources than if HUD had not suspended the AFFH Rule.

121.    Meanwhile, with Fort Worth's AFH coming due, Texas Housers hired an employee, set up an office in that city, engaged in discussion with community leaders and municipal employees, and otherwise devoted considerable resources to laying the groundwork for the development and then implementation of an AFH that would make fair housing in Fort Worth, finally, a reality. Just as it was nearly time for Fort Worth to submit a draft to HUD, HUD announced that it would no longer accept or review AFHs.  As a consequence, Fort Worth decided not to complete an AFH. Rather, it will rely on the former AI process to support its claim that it has met its AFFH obligations. Texas Housers thus will have to devote still more resources in Fort Worth to sustain or recreate a climate and process in which community members and city officials are able to air their significant concerns about segregation and unequal access to opportunity for families of color. It also will have to spend more resources, in the absence of HUD review, monitoring Fort Worth's use of federal funds to ensure compliance with federal law. Those are resources it would not have to expend if HUD continued to enforce the AFFH Rule.

122.    The Texas Plaintiffs will continue to work to promote fair housing in those two municipalities and elsewhere in Texas, but they have lost the benefit of the AFFH Rule's requirements, pursuant to which municipalities must consult with them at regular intervals, must review and engage with their comments and concerns, must reach out to community members, and more. They also have lost the benefit of HUD review of submitted AFHs (and the Texas

Plaintiffs' comments on them), along with the prospect of HUD non-acceptance of AFHs that inadequately assess fair housing conditions and/or fail to commit to concrete solutions. These consequences of HUD's action frustrate Texas Plaintiffs' mission of achieving fair housing for the communities they serve.

123.    Texas Plaintiffs have taken or will take many specific actions to counter the effects of HUD's suspension of the AFH submission requirement and convince local government program participants to nonetheless take their fair housing obligations seriously. Such actions include:

- Producing a video to educate the public (including affected grantees) about the impact of the Rule and grantees' continuing obligation to affirmatively further fair housing notwithstanding HUD's action;

- Developing a fact sheet for advocates statewide on the effect of HUD's action;

- Responding to continuing requests for information and resources;

- Engaging in ongoing public education efforts, including community forums on fair housing in Amarillo and Fort Worth; meeting with Hidalgo County; writing advocacy pieces; and advising attorneys, community groups, and consultants working on now-suspended AFHs on the impact of HUD's suspension of the AFH submission requirement on ongoing fair housing obligations; and

- Writing letters to the 65 most immediately impacted jurisdictions regarding their continued obligation to affirmatively further fair housing, an in-process action which by itself will take about 120 hours of staff time.

124.    The Texas Plaintiffs have had to divert resources in many other ways to ensure that the interest in fair housing that the AFFH Rule created is not lost while the Rule's core

requirements are suspended. For example, Texas Housers' staff continues to meet on a regular basis with community groups in Hidalgo County, to keep them engaged in long-term efforts to secure additional housing and community development resources for the colonias and otherwise combat discrimination on the basis of national origin. Texas Housers also continues to invest resources in educating grassroots groups in Hidalgo County about their rights to equitable flood drainage, the need to reform subdivision rules, and the rights of non-English speakers to receive information about public programs in a language and format they can understand. Without the focused AFH process that provides a specific forum for articulating these grassroots concerns at specific times—and requires the County to listen to and address them—these efforts are much more inefficient, requiring far more of Texas Housers' time and achieving less tangible results.

125.    HUD's unlawful suspension of the AFH process has greatly undermined Texas Plaintiffs' ability to accomplish their missions and is making them divert resources to activities they would not otherwise have engaged in, just to get to an inferior result. Because of HUD's action, Texas Plaintiffs have diverted their resources and will continue to divert their resources to educating funding recipients and community members that jurisdictions still must comply with the AFFH statutory requirements notwithstanding HUD's refusal to enforce them. They consequently have had to cut back on important activities they would be pursuing if not for HUD's suspension of the AFFH Rule's requirements.

126.    For example, Texas Plaintiffs have had to substantially curtail their grassroots outreach, education, and policy and legal support in Houston and surrounding areas recovering from the effects of Hurricane Harvey. If not for their need to counteract the effects of HUD's action, Texas Plaintiffs would be deeply engaged in research, data analysis, policy and legal support, and public education concerning various recovery issues, including State and municipal

compliance with civil rights obligations associated with federal disaster recovery funding programs and the effectiveness and efficiency of State and municipal programs offering disaster recovery services and supports to low-income families.

127.   Counteracting the effects of HUD's suspension of the AFFH Rule's requirements also limits the Texas Plaintiffs' ability to engage in outreach and education for low-income families in places like Beaumont and Port Arthur, where low-income families are disproportionately exposed to environmental hazards that cause persistent health problems, as well as in Amarillo, where Texas Plaintiffs had begun to meet with community groups to talk about fair housing problems and develop advocacy strategies, but now must suspend such efforts.

128.   Texas Appleseed has also been required to divert the time of the head of its Disaster Recovery and Fair Housing Project away from developing a project to protect land rights of African Americans who own "heir property," *i.e.*, land that has been passed down informally from generation to generation without recorded transactions—complicating, among other things, eligibility for federal benefits for disaster recovery—and from providing input on the revision of the zoning code in Austin, Texas, to address patterns of segregation and access to opportunity in that city. Other organizational representatives have diverted resources away from fundraising and other programmatic work to assist with these projects and to address various other capacity issues caused by the shift in focus relating to HUD's suspension of the AFH process.

### 2.   *Harm to NFHA*

129.   The Texas-specific harm being suffered by the Texas Plaintiffs is representative of the harm that NFHA and its members are suffering around the country.

44

130.     NFHA is a non-profit corporation dedicated to ending discrimination in housing. NFHA works to ensure equal housing opportunity for all people through leadership, education and outreach, membership services, public policy initiatives, advocacy, community development, investigation of fair housing violations, and enforcement. Its mission is being frustrated by HUD's unlawful decision to suspend the AFFH Rule's requirements. To counteract the effects of HUD's action, NFHA has been forced to divert resources away from other important projects.

131.     Since the late 1980s, NFHA has worked to encourage HUD to do more to implement and enforce the Fair Housing Act's requirement that recipients of federal funds affirmatively further fair housing. Among other things, it has long called on HUD to enact procedures that ensure AFFH compliance. When HUD has been unwilling to effectively enforce the AFFH requirement, NFHA has had to expend resources in its stead.

132.     When HUD modified the Analysis of Impediments process in 1995 and issued the *Fair Housing Planning Guide* in 1996, NFHA was intimately involved with the implementation of the AI process on the ground. Among other things, it trained its members and worked with them locally to develop AIs; held educational sessions at conferences; and helped HUD identify key fair housing issues that funding recipients should address in their AIs.

133.     In 2001, NFHA developed and disseminated a template for developing AIs, because HUD's *Fair Housing Planning Guide* had proven inadequate for that task. NFHA's template was widely distributed and used nationally.

134.     NFHA and its members have played a key role in the development and implementation of local AIs across the country.

135.     Based on its experience with the failed AI process, NFHA was one of the leading advocates pushing for the creation of the AFFH Rule to replace it. Along with partners, NFHA

created and supported the National Commission on Fair Housing and Equal Opportunity. This

Commission conducted five public hearings and gathered evidence regarding, among other

things, HUD's progress in implementing the AFFH obligation. Its report, published in 2008,

concluded that "[t]he current federal system for ensuring fair housing compliance by state and

local recipients of housing assistance has failed" and recommended many specific changes.

National Commission on Fair Housing and Equal Opportunity, *The Future of Fair Housing:*

*Report of the National Commission on Fair Housing and Equal Opportunity* 44 (2008), *available*

*at* http://www.naacpldf.org/files/publications/Future%20of%20Fair%20Housing.pdf.

136.    NFHA devoted considerable resources to assisting HUD with developing the

AFFH Rule. Among other things, it participated in HUD's public hearings and submitted written

comments on the proposed AFFH Rule itself and the AFH template.

137.    Once HUD issued the final AFFH Rule, NFHA and its members worked in local

communities across the country to generate effective community participation and substantive

provisions in AFHs that would make meaningful differences to communities. NFHA members

have actively participated in the AFH planning process in many jurisdictions, with NFHA

providing resources, guidance, and strategic help. NFHA has posted on its website an extensive

list of AFFH resources and materials to assist its members and the grantees themselves.

138.    HUD's action, if not enjoined, will diminish the benefits that NFHA derives from

all this work already done and will frustrate the accomplishment of NFHA's mission. NFHA

engages in a variety of activities aimed at advancing fair housing priorities around the country.

The AFFH Rule's requirements, when in effect, make NFHA's efforts more efficient and

effective. Not only does the Rule provide NFHA and its members greater ability to ensure that

fair housing considerations are included in municipal planning decisions, but its standardized

process and formalized rules make it much simpler for NFHA to advise and assist its members in effectively engaging at the local level. HUD now has removed those regulatory benefits, directly harming NFHA's ability to achieve fair housing and help its members to do the same.

139.    HUD's abrupt suspension of the AFFH Rule's requirements has required NFHA to divert resources to educating and counseling its members, civil rights organizations, and affordable housing stakeholders about HUD's action and how to achieve fair housing locally under much more challenging circumstances. Such diversion will continue unless and until HUD's action is enjoined.

140.    Because of NFHA's long-standing commitment to and expertise regarding the AFFH statutory obligation (before and after the promulgation of the AFFH Rule), its members and other civil rights and affordable housing stakeholders look to it for education and counseling regarding HUD's notice and how to promote effective fair housing planning without the AFFH Rule's protections. NFHA is expending considerable financial and human resources on this education and counseling.

141.    For example, NFHA staff gave presentations concerning the notice and its effects to the Leadership Conference on Civil and Human Rights Fair Housing and Fair Lending Taskforce; Americans for Financial Reform Housing and Foreclosure Working Group; and the Affirmatively Furthering Fair Housing Working Group of NFHA's members.

142.    NFHA staff members have begun developing a comprehensive side-by-side analysis of the differences between the AFH and AI processes for use in educating and counseling its members. NFHA will disseminate this document to its members upon its completion and will expend further resources continuing to update it.

143.    NFHA has engaged in and will need to continue to engage in individualized counseling regarding HUD's action with its members located in strategic areas throughout the country. These efforts, which already have required considerable staff time, have been necessary and will continue to be necessary to educate members about the notice's impact and the most effective means for ensuring effective fair housing planning without the AFFH Rule's protections. NFHA has had to identify those areas most immediately affected by HUD's actions, such as where local government program participants submitted AFHs prior to January 5 but did not receive HUD's acceptance of their submissions, and then conduct outreach to its members and other allied local civil rights and affordable housing advocates operating in those jurisdictions.

144.    The amount of resources that NFHA must divert to such activities will increase in the coming months, because most local government program participants would have had AFHs due in the next two years pursuant to the AFFH Rule. Hundreds of local governments in the coming months will have to determine whether to use the AFH tool to fulfill their AI obligations prior to developing their Consolidated Plans, and whether they will adhere to the AFFH Rule's timeline and procedural protections. NFHA will have to continue to divert resources from its planned operations to helping these jurisdictions, its members, and other civil rights and affordable housing groups further fair housing in these uncertain circumstances. And it will not be able to do so in such a targeted way, because of the much larger number of jurisdictions at issue.

145.    In the absence of HUD oversight, NFHA is preparing to devote substantial resources to outreach, public education, and advocacy to assist its members and community groups working to ensure that jurisdictions formulate AIs that are robust as possible (given the

circumstances) and then monitoring compliance. Through this work, NFHA plans to blunt, as best it can, the negative impact of HUD's action. It will have to devote resources to assisting its members and others with respect to monitoring and enforcing AFFH compliance in the absence of effective monitoring and enforcement by HUD. NFHA would not have to devote nearly the same level of resources to such tasks with the AFFH Rule in place.

146.    As a result of HUD's action, funding recipients that already were at work on assessments—many of which would have been due not much more than a year from now—have halted their work. Accordingly, NFHA and its members will face a more onerous task in helping these jurisdictions develop effective AFHs after the lengthy period of delay.

## CAUSES OF ACTION

### First Cause of Action
### Administrative Procedure Act – Agency Action Taken Without Observance of Procedure Required by Law

147.    The APA empowers this Court to hold unlawful and set aside agency actions taken "without observance of procedure required by law." 5 U.S.C § 706(2)(D).

148.    Without following notice-and-comment procedure, HUD has delayed for three years the AFH process required by the properly promulgated AFFH Rule. During this time, the agency announced, it will exempt local governments from following their regulatory obligation to prepare and submit AFHs. Meanwhile, the agency will not meet its own regulatory obligation to review all AFHs submitted—including those already submitted—and either accept them or work with jurisdictions to generate AFHs that meet the Rule's requirements.

149.    Without notice-and-comment procedure, HUD has reinstated the AI process that was superseded by the AFFH Rule and does not exist in current regulation.

150.   Without notice-and-comment procedure, HUD has effectively suspended all the subsidiary requirements of the AFH process, including the AFFH Rule's community participation procedural rules.

151.   Without notice-and-comment procedure, HUD has suspended the requirement of the AFFH Rule that jurisdictions certify that they meet the Rule's definition of affirmatively furthering fair housing. HUD also has suspended the requirement that jurisdictions meet the fair housing requirements that the AFFH Rule added to the Consolidated Plan process in order to continue to receive federal funds.

152.   Pursuant to the APA, HUD was required to undertake notice-and-comment rulemaking to revise the AFFH Rule, including changing the dates on which jurisdictions are required to submit their first AFHs for HUD review.

153.   By failing to engage in notice-and-comment rulemaking before delaying and altering the AFFH Rule, HUD failed to observe procedures required by law, in contravention of the APA.

<u>Second Cause of Action</u>
**Administrative Procedure Act – Agency Action That is Arbitrary, Capricious or an Abuse of Discretion**

154.   The APA empowers this Court to "hold unlawful and set aside" agency action that is "arbitrary, capricious, an abuse of discretion or not otherwise in accordance with law." 5 U.S.C. § 706(2)(A).

155.   HUD stated that it was suspending the AFFH Rule's requirements in part because implementing it required the expenditure of agency resources. Abandoning a regulatory program lawfully promulgated by the agency for that reason was arbitrary and capricious, particularly

where the agency does not contend or state facts suggesting that the resources required to implement the program are unexpected or render implementation infeasible.

156.    HUD also stated that it was suspending the AFFH Rule's requirements in part because local governments must expend resources to comply with it. That local governments must expend resources to implement a duly promulgated regulatory program—a program that they have voluntarily agreed to implement as a condition of accepting federal funding—does not justify delaying the requirement that they comply with the regulatory scheme while permitting them to keep the federal funds. HUD does not contend that the additional resources local governments have had to expend are unreasonable or unexpected, and they are not.

157.    HUD suspended the AFFH Rule's requirements in part because some local governments initially submitted AFHs that HUD was unwilling to accept. HUD does not contend that it was surprising that some local governments required assistance to formulate compliant AFHs in the Rule's early days, and it was not. Nor did HUD explain why it concluded that the submission of some deficient AFHs was a reason to effectively suspend the Rule.

158.    HUD stated that it was suspending the AFFH Rule's requirements because of unspecified concerns about the quality of its own technical assistance. HUD did not explain why it cannot improve the quality of its technical assistance while implementing the Rule. HUD did not acknowledge or explain its decision to voluntarily reduce its technical assistance to jurisdictions.

159.    HUD stated that it intends to use the time during which the AFFH Rule is effectively suspended to revise the Assessment Tool for Local Governments. Changes could be made to the Assessment template without stopping the Assessment process—as the Rule

specifically contemplates and requires at regular intervals. The intention to revise the Assessment Tool does not justify HUD's action.

160.    HUD's reasoning ignores key evidence that was before the agency and improperly focuses on what the agency now perceives to be the Rule's costs (such as increased work) without mentioning the benefits flowing from the Rule.

161.    HUD's reasoning fails to acknowledge that almost all jurisdictions participating in the process so far have successfully submitted compliant AFHs, either on first submission or after work with HUD. It fails to acknowledge that these AFHs contain far more concrete, measurable commitments to further fair housing than were in the AIs prepared by the same jurisdictions.

162.    HUD has not explained why it is acceptable to return to the AI regime that, as the agency itself has found, does not work. It did not acknowledge its own findings in promulgating the Rule regarding the ineffectiveness of the AI regime.

163.    HUD's delay of the Rule is arbitrary, capricious, or an abuse of discretion, in contravention of the APA.

### Third Cause of Action
### Administrative Procedure Act – Agency Action Not in Accordance with Law

164.    The APA empowers this Court to set aside an agency action that is "not in accordance with law." 5 U.S.C. 706(2)(A).

165.    In promulgating the AFFH Rule, HUD found that it needed a new and robust approach to ensuring that local governments and other grantees take actions that meet their obligations under the Fair Housing Act as recipients of federal housing funds. HUD found that its previous practices had not been effective in leading to meaningful action regarding segregation, concentrated poverty, disparities in access to community assets, and other problems

that the Fair Housing Act requires funding recipients to address. It adopted the AFFH Rule to bring its own practices and its grantees' practices into compliance with the statutory requirement. 80 Fed. Reg. at 42,275.

166.    HUD has an affirmative obligation under the Fair Housing Act to ensure that federal housing programs are administered, and federal housing funds spent, in a manner that furthers fair housing. The AFFH obligation requires both addressing actions that are actively discriminatory and taking affirmative steps to overcome barriers to fair housing choice that, in many cases, are the products of long-standing structural and institutional racism. 42 U.S.C. §§ 3608(d), (e)(5). As HUD has stated, where a program participant "has the ability to create opportunities outside of the segregated, low-income areas but declines to do so," that raises a serious question as to whether the participant is meeting its obligation to affirmatively further fair housing. 80 Fed Reg. 42279. HUD is now making a comparable decision.

167.    In suspending core provisions of the AFFH Rule, HUD abdicated its statutory responsibilities. It now is once again distributing federal housing funds without ensuring that local government grantees take the steps necessary to comply with their obligation to affirmatively further fair housing.

168.    HUD's effective suspension of the AFFH Rule violates the Fair Housing Act, in contravention of the APA.

# PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court:

(a)  Enter a declaratory judgment that HUD's January 5, 2018 decision to suspend various requirements of the AFFH Rule is arbitrary, capricious, an abuse of discretion or contrary to law, and without observance of procedure required by law;

(b)  Issue preliminary and permanent injunctions requiring HUD to rescind its January 5, 2018 notice suspending the AFFH Rule's requirements and timely implement and enforce all the requirements of the AFFH Rule going forward;

(c)  Direct HUD to take all affirmative steps necessary to remedy the effects of the illegal conduct described herein and to prevent similar occurrences in the future;

(d)  Award Plaintiffs their reasonable attorneys' fees and costs; and

(e)  Order such other relief as this Court deems just and equitable.

Dated: May 8, 2018

Respectfully submitted,

/s/ Sasha Samberg-Champion

Sasha Samberg-Champion (DC Bar No. 981553)
Sara Pratt (DC bar admission pending)
Michael G. Allen (DC Bar No. 409068)
RELMAN, DANE & COLFAX PLLC
1225 19th Street, NW, Suite 600
Washington, DC 20036
Phone: (202) 728-1888
Fax:     (202) 728-0848
ssamberg-champion@relmanlaw.com
spratt@relmanlaw.com
mallen@relmanlaw.com

Jon Greenbaum (DC Bar No. 489887)
Joseph D. Rich (DC Bar No. 463885)
Thomas Silverstein (DC Bar No. 1552406)

LAWYERS' COMMITTEE FOR CIVIL
RIGHTS UNDER LAW
1401 New York Ave., NW
Washington, DC 20005
(202) 662-8331
jrich@lawyerscommittee.org

Philip Tegeler (DC Bar No. 1002526)
Megan Haberle (DC bar admission pending)
POVERTY & RACE RESEARCH ACTION
COUNCIL
740 15th Street NW, Suite 300
Washington, DC 20005
(202) 360-3906
ptegeler@prrac.org

Rachel Goodman
Sandra Park
AMERICAN CIVIL LIBERTIES UNION
125 Broad St., 18th Floor
New York, NY 10004
(212) 549-2500
rgoodman@aclu.org
spark@aclu.org

Arthur B. Spitzer (DC Bar No. 235960)
AMERICAN CIVIL LIBERTIES UNION
OF THE DISTRICT OF COLUMBIA
915 15th Street, NW - 2nd floor
Washington, DC 20005-2302
Tel. 202-457-0800
Fax 202-457-0805
aspitzer@acludc.org

Ajmel Quereshi
NAACP LEGAL DEFENSE &
EDUCATIONAL FUND, INC.
1444 I Street NW
Washington, DC 20005
(202) 682-1300
aquereshi@naacpldf.org

Sherrilyn A. Ifill
Samuel Spital
NAACP LEGAL DEFENSE &
EDUCATIONAL FUND, INC.

40 Rector Street, 5th Floor
New York, NY  10006
(212) 965-2200

Allison M. Zieve (DC Bar No. 424786)
PUBLIC CITIZEN LITIGATION GROUP
1600 20th Street NW
Washington, DC 20009
(202) 588-1000

*Attorneys for all Plaintiffs*

Morgan Williams (pro hac vice application
forthcoming)
NATIONAL FAIR HOUSING ALLIANCE
1101 Vermont Ave. NW, Suite 710
Washington, DC 20005
(202) 898-1661
mwilliams@nationalfairhousing.org

*Attorney for Plaintiff National Fair Housing
Alliance*

Madison Sloan (pro hac vice application
forthcoming)
TEXAS APPLESEED
1609 Shoal Creek Bld. # 201
Austin, TX 78701
(512) 473-2800
msloan@texasappleseed.net

*Attorney for Plaintiff Texas Appleseed*

# EXHIBIT

# A

*Contact Person:* Donald Scott Wright, Ph.D., Scientific Review Officer, Center for Scientific Review, National Institutes of Health, 6701 Rockledge Drive, Room 5108, MSC 7854, Bethesda, MD 20892, (301) 435–8363, wrightds@csr.nih.gov.

*Name of Committee:* Vascular and Hematology Integrated Review Group, Hypertension and Microcirculation Study Section.

*Date:* February 8–9, 2018.

*Time:* 8:00 a.m. to 6:00 p.m.

*Agenda:* To review and evaluate grant applications.

*Place:* Hilton Garden Inn Orlando East UCF, 1959 N. Alafaya Trail, Orlando, FL 32822.

*Contact Person:* Ai-Ping Zou, M.D., Ph.D., Scientific Review Officer, Center for Scientific Review, National Institutes of Health, 6701 Rockledge Drive, Room 4118, MSC 7814, Bethesda, MD 20892, 301–408–9497, zouai@mail.nih.gov.

*Name of Committee:* Endocrinology, Metabolism, Nutrition and Reproductive Sciences Integrated Review Group, Integrative Nutrition and Metabolic Processes Study Section.

*Date:* February 8–9, 2018.

*Time:* 8:00 a.m. to 1:00 p.m.

*Agenda:* To review and evaluate grant applications.

*Place:* Westin Grand, 2350 M Street NW, Washington, DC 20037.

*Contact Person:* Gregory S Shelness, Ph.D., Scientific Review Officer, Center for Scientific Review, National Institutes of Health, 6701 Rockledge Drive, Room 6156, Bethesda, MD 20892–7892, 301–755–4335, greg.shelness@nih.gov.

*Name of Committee:* Bioengineering Sciences & Technologies Integrated Review Group, Nanotechnology Study Section.

*Date:* February 8–9, 2018.

*Time:* 8:00 a.m. to 5:00 p.m.

*Agenda:* To review and evaluate grant applications.

*Place:* Baltimore Marriott Waterfront, 700 Aliceanna Street, Baltimore, MD 21202.

*Contact Person:* James J Li, Ph.D., Scientific Review Officer, Center for Scientific Review, National Institutes of Health, 6701 Rockledge Drive, Room 5148, MSC 7849, Bethesda, MD 20892, 301–806–8065, lijames@csr.nih.gov.

*Name of Committee:* Molecular, Cellular and Developmental Neuroscience Integrated Review Group, Cellular and Molecular Biology of Glia Study Section.

*Date:* February 8–9, 2018.

*Time:* 8:00 a.m. to 5:00 p.m.

*Agenda:* To review and evaluate grant applications.

*Place:* St. Gregory Hotel, 2033 M Street NW, Washington, DC 20036.

*Contact Person:* Linda MacArthur, Ph.D., Scientific Review Officer, Center for Scientific Review, National Institutes of Health, 6701 Rockledge Drive, Room 4187, Bethesda, MD 20892, 301–537–9986, macarthurlh@csr.nih.gov.

*Name of Committee:* Integrative, Functional and Cognitive Neuroscience Integrated Review Group, Auditory System Study Section.

*Date:* February 8–9, 2018.

*Time:* 8:00 a.m. to 6:00 p.m.

*Agenda:* To review and evaluate grant applications.

*Place:* The Westgate Hotel, 1055 Second Avenue, San Diego, CA 92101.

*Contact Person:* Ying-Yee Kong, Ph.D., Scientific Review Officer, Center for Scientific Review, National Institutes of Health, 6701 Rockledge Drive, Room 5185, Bethesda, MD 20892, ying-yee.kong@nih.gov.

*Name of Committee:* Emerging Technologies and Training Neurosciences Integrated Review Group, Neuroscience and Ophthalmic Imaging Technologies Study Section.

*Date:* February 8–9, 2018.

*Time:* 8:00 a.m. to 5:00 p.m.

*Agenda:* To review and evaluate grant applications.

*Place:* Renaissance Washington, DC Downtown Hotel, 999 Ninth Street, Washington, DC 20001.

*Contact Person:* Yvonne Bennett, Ph.D., Scientific Review Officer, Center for Scientific Review, National Institutes of Health, 6701 Rockledge Drive, Room 5199, MSC 7846, Bethesda, MD 20892, 301–379–3793, bennetty@csr.nih.gov.

*Name of Committee:* Risk, Prevention and Health Behavior Integrated Review Group, Behavioral Medicine, Interventions and Outcomes Study Section.

*Date:* February 8–9, 2018.

*Time:* 8:00 a.m. to 6:00 p.m.

*Agenda:* To review and evaluate grant applications.

*Place:* Doubletree Guest Suites Santa Monica, 1707 Fourth Street, Santa Monica, CA 90401.

*Contact Person:* Lee S Mann, Ph.D., Scientific Review Officer, Center for Scientific Review, National Institutes of Health, 6701 Rockledge Drive, Room 3224, MSC 7808, Bethesda, MD 20892, 301–435–0677, mannl@csr.nih.gov.

*Name of Committee:* Musculoskeletal, Oral and Skin Sciences Integrated Review Group, Skeletal Biology Development and Disease Study Section.

*Date:* February 8–9, 2018.

*Time:* 8:00 a.m. to 3:00 p.m.

*Agenda:* To review and evaluate grant applications.

*Place:* Westin Baltimore Washington Airport, 1100 Old Elkridge Landing Road, Linthicum Heights, MD 21090.

*Contact Person:* Aruna K Behera, Ph.D., Scientific Review Officer, Center for Scientific Review, National Institutes of Health, 6701 Rockledge Drive, Room 4211, MSC 7814, Bethesda, MD 20892, 301–435–6809, beheraak@csr.nih.gov.

*Name of Committee:* Molecular, Cellular and Developmental Neuroscience Integrated Review Group, Cellular and Molecular Biology of Neurodegeneration Study Section.

*Date:* February 8–9, 2018.

*Time:* 8:30 a.m. to 4:00 p.m.

*Agenda:* To review and evaluate grant applications.

*Place:* SpringHill Suites San Diego Downtown/Bayfront, 900 Bayfront Court, San Diego, CA 92101.

*Contact Person:* Laurent Taupenot, Ph.D., Scientific Review Officer, Center for

Scientific Review, National Institutes of Health, 6701 Rockledge Drive, Room 4183, MSC 7850, Bethesda, MD 20892, 301–435–1203, taupenol@csr.nih.gov.

*Name of Committee:* Center for Scientific Review Special Emphasis Panel, Integrative Nutrition and Metabolic Processes.

*Date:* February 8, 2018.

*Time:* 1:30 p.m. to 2:30 p.m.

*Agenda:* To review and evaluate grant applications.

*Place:* Westin Grand, 2350 M Street NW, Washington, DC 20037.

*Contact Person:* Gary Hunnicutt, Ph.D., Scientific Review Officer, Center for Scientific Review, National Institutes of Health, 6701 Rockledge Drive, Room 6164, MSC 7892, Bethesda, MD 20892, 301–435–0229, hunnicuttgr@csr.nih.gov.

(Catalogue of Federal Domestic Assistance Program Nos. 93.306, Comparative Medicine; 93.333, Clinical Research, 93.306, 93.333, 93.337, 93.393–93.396, 93.837–93.844, 93.846–93.878, 93.892, 93.893, National Institutes of Health, HHS).

Dated: *December 29, 2017.*

**Anna Snouffer,**

*Deputy Director, Office of Federal Advisory Committee Policy.*

[FR Doc. 2018–00052 Filed 1–4–18; 8:45 am]

**BILLING CODE 4140–01–P**

# DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT

**[Docket No. FR–5173–N–15]**

## Affirmatively Furthering Fair Housing: Extension of Deadline for Submission of Assessment of Fair Housing for Consolidated Plan Participants

**AGENCY:** Office of the Assistant Secretary for Fair Housing and Equal Opportunity, HUD.

**ACTION:** Notice.

**SUMMARY:** This notice advises that HUD is extending the deadline for submission of an Assessment of Fair Housing (AFH) by local government consolidated plan program participants to their next AFH submission date that falls after October 31, 2020. Such program participants will not be required to submit an AFH using the current Office of Management and Budget (OMB)-approved version of the Assessment of Fair Housing Tool for Local Governments (OMB Control No: 2529–0054), but must continue to comply with existing obligations to affirmatively further fair housing. Local government program participants that have already submitted an AFH that has been accepted by HUD must continue to execute the goals of that AFH.

**DATES:**

*Applicability Date:* January 5, 2018.

*Comment Due Date:* March 6, 2018.

**ADDRESSES:** Interested persons are invited to submit comments responsive to this notice to the Office of General Counsel, Regulations Division, Department of Housing and Urban Development, 451 7th Street SW, Room 10276, Washington, DC 20410–0001. All submissions should refer to the above docket number and title. Submission of public comments may be carried out by hard copy or electronic submission.

1. *Submission of Hard Copy Comments.* Comments may be submitted by mail or hand delivery. Each commenter submitting hard copy comments, by mail or hand delivery, should submit comments to the address above, addressed to the attention of the Regulations Division. Due to security measures at all federal agencies, submission of comments by mail often results in delayed delivery. To ensure timely receipt of comments, HUD recommends that any comments submitted by mail be submitted at least 2 weeks in advance of the public comment deadline. All hard copy comments received by mail or hand delivery are a part of the public record and will be posted to *http:// www.regulations.gov* without change.

2. *Electronic Submission of Comments.* Interested persons may submit comments electronically through the Federal eRulemaking Portal at *http://www.regulations.gov.* HUD strongly encourages commenters to submit comments electronically. Electronic submission of comments allows the commenter maximum time to prepare and submit a comment, ensures timely receipt by HUD, and enables HUD to make comments immediately available to the public. Comments submitted electronically through the *http://www.regulations.gov* website can be viewed by other commenters and interested members of the public. Commenters should follow instructions provided on that site to submit comments electronically.

*No Facsimile Comments.* Facsimile (fax) comments are not acceptable.

*Public Inspection of Comments.* All comments submitted to HUD regarding this notice will be available, without charge, for public inspection and copying between 8 a.m. and 5 p.m., Eastern Time, weekdays at the above address. Due to security measures at the HUD Headquarters building, an advance appointment to review the public comments must be scheduled by calling the Regulations Division at 202–708–3055 (this is not a toll-free number). Individuals with speech or hearing impairments may access this number through TTY by calling the Federal Relay Service at 800–877–8339 (this is

a toll-free number). Copies of all comments submitted are available for inspection and downloading at *http:// www.regulations.gov.*

**FOR FURTHER INFORMATION CONTACT:** Krista Mills, Deputy Assistant Secretary, Office of Policy, Legislative Initiatives, and Outreach, Office Fair Housing and Equal Opportunity, Department of Housing and Urban Development, 451 7th Street SW, Room 5246, Washington, DC 20410; telephone number 202–402–6577. Individuals with hearing or speech impediments may access this number via TTY by calling the toll-free Federal Relay Service during working hours at 1–800–877–8339.

**SUPPLEMENTARY INFORMATION:**

## I. Background

On July 16, 2015, at 80 FR 42357, HUD published in the **Federal Register** its Affirmatively Furthering Fair Housing (AFFH) final rule. The AFFH final rule provides HUD program participants with a new approach for planning for fair housing outcomes that will assist them in meeting their statutory obligation to affirmatively further fair housing as required by the Fair Housing Act, 42 U.S.C. 3608. To assist HUD program participants in meeting this obligation, the AFFH rule provides that program participants must conduct an Assessment of Fair Housing (AFH) using an ''Assessment Tool.'' HUD's AFFH regulations provide for a staggered AFH submission deadline for its program participants. (See 24 CFR 5.160.)

On October 24, 2016, at 81 FR 73129, HUD published a notice extending the deadline for submission of an AFH for local government consolidated plan participants that received in Fiscal Year (FY) 2015, or receive in a subsequent fiscal year, a CDBG grant of $500,000 or less, or in the case of a HOME consortium, whose members collectively received a CDBG grant of $500,000 or less, from the program year that begins on or after January 1, 2018, to the program year that begins on or after January 1, 2019 for which a new consolidated plan is due. By notice published in the **Federal Register** on January 13, 2017, at 82 FR 4388, HUD announced the renewal of approval of the Assessment Tool for use by local governments that receive Community Development Block Grants (CDBG), HOME Investment Partnerships Program (HOME), Emergency Solutions Grants (ESG), or Housing Opportunities for Persons With AIDS (HOPWA) formula funding from HUD when conducting and submitting their own AFH, and in some joint and regional collaborations,

as explained in that notice. This Assessment Tool is referred to as the Assessment of Fair Housing Tool for Local Governments.

This notice extends the deadline for submission of an Assessment of Fair Housing (AFH) to all local government consolidated plan program participants until their next AFH submission deadline that falls after October 31, 2020. (See 24 CFR 5.160(a) for information about how to calculate a program participant's AFH submission deadline.) The AFFH rule requires that program participants have no less than 9 months after the publication of the OMB-approved assessment tool to submit their AFH. Therefore, the Department selected the October 31, 2020 date in anticipation that it will complete the Paperwork Reduction Act requirements and receive OMB approval to renew the Assessment of Fair Housing Tool for Local Governments by January 31, 2020. Local government program participants will not be required to submit an AFH using the current OMB-approved version of the Assessment of Fair Housing Tool for Local Governments (OMB Control No: 2529–0054), but must continue to comply with existing statutory obligations to affirmatively further fair housing. (See 42 U.S.C. 3608.) Local government program participants who qualified for an extension under the October 24, 2016 notice are also covered by this notice, extending their deadline for submission of an AFH to their next AFH submission deadline (See 24 CFR 5.160(a).) that falls after October 31, 2020.

Based on the initial AFH reviews, HUD believes that program participants need additional time and technical assistance to adjust to the new AFFH process and complete AFH submissions that can be accepted by HUD. HUD's decision is informed by the review of AFH submissions received. Based on the first 49 AFH initial submissions that received a determination of accept, non-accept, or deemed accepted from HUD, the Department found that many program participants are striving to meet the requirements of the AFFH rule. In 2017, the Department conducted an evaluation of these submissions and found that more than a third (35%) were initially non-accepted.

HUD's analysis identified several reasons that merit a delay of AFH submission deadlines, including program participants' need for additional technical assistance. HUD determined that many program participants struggled to meet the regulatory requirements of the AFFH rule, such as developing goals that

could be reasonably expected to result in meaningful actions to overcome the effects of contributing factors and related fair housing issues. Further, program participants struggled to develop metrics and milestones that would measure their progress as they affirmatively furthering fair housing. HUD determined that program participants' frequent misunderstanding of how to set clear goals, metrics, and milestones that addressed their identified contributing factors and related fair housing issues often resulted in non-accepted AFHs. HUD believes that additional technical assistance may result in program participants better understanding their obligations under the AFFH rule. HUD also believes that by enhancing its technical assistance that resources expended by program participants will be reduced because they are more likely to submit an initial AFH that can be accepted by HUD.

Additionally, HUD determined that significant staff resources are required when deciding that an AFH will not be accepted because it is inconsistent with fair housing or civil rights requirements or substantially incomplete, or both. (See 24 CFR 5.162 (a)(2)(b).) HUD believes that it can reduce the resources expended by program participants by examining and revising its technical assistance content and methods of delivery so that program participants' AFHs are more likely to meet the regulatory requirements on first submission.

In order to reduce burden for program participants in conducting AFHs that meet the regulatory requirements, HUD, in the AFFH rule, encourages program participants to share resources and to address fair housing issues from a broader perspective by collaborating and submitting a single AFH. Nonetheless, HUD believes that some joint and regional collaborations that were non-accepted on their first submission may have benefited from technical assistance early in the process. For example, the largest regional AFH submitted to HUD consisted of 19 program participants. In its review of the AFH, HUD determined that each of the 19 program participants met the regulatory standards for nonacceptance. HUD believes that improving technical assistance for collaborative AFHs will enable collaborations to more efficiently use their resources to address fair housing issues that cross jurisdictional boundaries.

Based on the initial AFH reviews, HUD believes that local government program participants need additional time and technical assistance from HUD to adjust to the new AFFH process and

complete acceptable AFH submissions. HUD also believes it can use this time to improve its Data and Mapping Tool (AFFH–T) and the User Interface (AFFH–UI). The extension period allows HUD to further refine its materials to provide additional guidance to program participants. Finally, this extension allows HUD staff to devote additional time to providing program participants, and program participants in an AFH collaboration, with technical assistance on the legal objective to affirmatively further fair housing.

Consolidated plan program participants must continue to comply with existing, ongoing obligations to affirmatively further fair housing. Until a consolidated plan program participant is required to submit an AFH, it will continue to provide the AFFH Consolidated plan certification in accordance with the requirements that existed prior to August 17, 2015. See 24 CFR 5.160(a)(3). The requirements obligated a program participant to certify that it will affirmatively further fair housing, which means that it will conduct an analysis of impediments (AI) to fair housing choice within the jurisdiction, take appropriate actions to overcome the effects of any impediments identified through that analysis, and maintain records reflecting the analysis and actions.

For Consolidated plan program participants that are starting a new 3–5-year Consolidated plan cycle that begins before their due date for an AFH, the AI should continue to be updated in accordance with the HUD, Fair Housing Planning Guide (1996), available at *https://www.hud.gov/sites/documents/ FHPG.PDF* until those consolidated plan program participants submit an AFH after October 31, 2020. HUD encourages consolidated plan program participants to use the data and mapping tool and the AFH Assessment Tool as resources for program participants that are updating their AIs. HUD encourages program participants to collaborate to develop a regional AI, as regional collaborations provide an opportunity for program participants to share resources and address fair housing issues that cross jurisdictional boundaries.[1]

Program participants that have already submitted an AFH which has

been accepted by HUD must continue to execute the goals of that accepted AFH and are not required to conduct a separate AI. Program participants that are covered by this notice and that may have already begun work on an AFH may continue to do so, as the AFFH rule may provide program participants with a useful framework for complying with their AFFH obligation.

HUD will discontinue the review of AFHs currently under review and will not render an accept, deemed accepted, or non-accept determination. Program participants that received a non-accept decision from HUD on their AFH submission and are preparing to re-submit an AFH are also covered by this notice and should not submit their revised AFHs. HUD encourages these program participants to use the information contained in their draft AFHs to conduct the required AI analysis. Finally, program participants prepared to submit their first AFH are covered by this notice and should not submit an AFH to HUD. Program participants that have not received an accept or non-accept determination from HUD, or that have received a non-accept but will no longer be required to resubmit their AFH, are still required to prepare an AI, as described above in this notice.

HUD is issuing this notice for applicability immediately upon publication. Program participants must continue to affirmatively further fair housing as required by the Fair Housing Act. 42 U.S.C. 3608.

Although HUD is issuing this notice for applicability immediately upon publication, it also invites public comment for a period of 60-days on the extension. HUD will consider all the comments in its ongoing process of reviewing the Assessment of Fair Housing Tool for Local Governments.

Dated: January 2, 2018.

**Anna Maria Farías,**
*Assistant Secretary for Fair Housing and Equal Opportunity.*

[FR Doc. 2018–00106 Filed 1–4–18; 8:45 am]

**BILLING CODE 4210–67–P**

---

# DEPARTMENT OF THE INTERIOR

## Bureau of Ocean Energy Management

**[Docket No. BOEM–2017–0020]**

## Outer Continental Shelf Official Protraction Diagrams MMAA104000

**AGENCY:** Bureau of Ocean Energy Management, Interior.
**ACTION:** Availability of World Geodetic System Datum of 1984 Outer

---

[1] Please refer to HUD's 2017 interim guidance for additional information on collaboration, specifically the Q&A captioned: "How can States Collaborate with Local Governments or PHAs?". The guidance is available at: *https:// www.hudexchange.info/resources/documents/ Interim-Guidance-for-Program-Participants-on- Status-of-Assessment-Tools-and-Submission- Options.pdf*. This guidance is generally applicable to all types of program participants.