# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

NATIONAL FAIR HOUSING ALLIANCE,
*et al.*,

        Plaintiffs,

v.

BENJAMIN C. CARSON, SR., M.D., in his
official capacity as Secretary of Housing and
Urban Development, *et al.*,

        Defendants.

Civil Action No. (BAH) 18-1076

Chief Judge Beryl A. Howell

## <u>MEMORANDUM OPINION</u>

The Fair Housing Act, 42 U.S.C. §§ 3601, *et seq.*, enacted in 1968, requires the U.S.

Department of Housing and Urban Development ("HUD") to "administer the programs and

activities relating to housing and urban development in a manner affirmatively to further the

policies of" fair housing, *id.* § 3608(e)(5).  HUD acknowledges that the agency has not always

administered programs in a manner to ensure that this long-standing statutory requirement

affirmatively to further fair housing ("AFFH") is met "as effective[ly] as had been envisioned."

HUD Proposed Rule, Affirmatively Furthering Fair Housing ("Proposed AFFH Rule"), 78 Fed.

Reg. 43,710, 43,710 (July 19, 2013).  In 2015, HUD promulgated a rule, by notice-and-comment

rulemaking, to "provide[ ] HUD program participants with an approach to more effectively and

efficiently incorporate into their planning processes the duty to affirmatively further the purposes

and policies of the Fair Housing Act," including the AFFH requirement.  HUD Final Rule,

Affirmatively Furthering Fair Housing ("AFFH Rule"), 80 Fed. Reg. 42,272, 42,272 (July 16,

2015).  Among the "[m]ajor [p]rovisions" in this new Rule, *id.* at 42,273, is a "standardized

Assessment of Fair Housing (AFH)" process, *id.*, to be rolled out along with an Assessment Tool

customized for different types of program participants, *id.* at 42,277, 42,339, 42,347, such as

States, local government agencies and Public Housing Authorities ("PHAs").  To date, HUD has

fully issued an Assessment Tool only for use by local government agencies.  *See generally* HUD

Notice, Affirmatively Furthering Fair Housing Assessment Tool: Announcement of Final

Approved Document ("LG2015 Tool Announcement"), 80 Fed. Reg. 81,840 (Dec. 31, 2015);

HUD Notice, Affirmatively Furthering Fair Housing: Announcement of Renewal of Approval of

the Assessment Tool for Local Governments ("LG2017 Tool Announcement"), 82 Fed. Reg.

4,388 (Jan. 13, 2017) (discussing issues with the LG2015 Tool and describing changes in the

LG2017 Tool).

This case is about two of HUD's notices, issued in May 2018, one of which withdraws

the only extant Assessment Tool that was intended to help local government agencies measure

progress in meeting the AFFH requirement. *See generally* HUD Notice, Affirmatively Furthering

Fair Housing: Withdrawal of the Assessment Tool for Local Governments ("LG2017

Withdrawal Notice"), 83 Fed. Reg. 23,922 (May 23, 2018).  As a result, "currently no type of

program participant has an Assessment Tool available for use."  HUD Notice, Affirmatively

Furthering Fair Housing (AFFH): Responsibility to Conduct Analysis of Impediments ("AI

Reliance Notice"), 83 Fed. Reg. 23,927, 23,927 (May 23, 2018).  The other HUD notice at issue

directs program participants to revert to prior HUD guidance that they "will conduct an analysis

of impediments (AI) to fair housing choice within the jurisdiction." *Id.*

HUD concedes that use of the LG2017 Tool and the AFH process laid out in the AFFH

Rule is "superior" to the prior AI process in aiding program participants in meeting the AFFH

requirement.  Tr. Motions Hr'g (Aug. 9, 2018) ("Mot. Hr'g") at 68:25–69:4, ECF No. 44; *see

also id.* at 63:7–13 (responding to Court's query whether HUD concedes "the AI process [ ] was

so terribly flawed," HUD's counsel stated "We've developed a record of that, certainly . . . .
You're right"). Nevertheless, in HUD's view, the LG2017 Assessment Tool was "unworkable,"
warranting its withdrawal. LG2017 Withdrawal Notice, 83 Fed. Reg. at 23,923; *see also* Defs.'
Mem. Opp. Pls.' Mot. Preliminary Injunction & Expedited Summ. J. ("Defs.' Opp'n PI") at 12–
13, ECF No. 33. The plaintiffs contend otherwise, viewing the withdrawal of the LG2017 Tool
as impeding the progress made over the last few years to fulfill the statutory promise of
furthering fair housing policies. *See* Am. Compl. ¶¶ 6, 11–12, ECF No. 18.

The plaintiffs, three non-profit organizations "with purposes that include promoting fair
housing," *id.* ¶¶ 13, seek preliminary and permanent injunctive relief under the Administrative
Procedure Act ("APA"), 5 U.S.C. § 706(2), against HUD and Secretary Benjamin Carson in his
official capacity (collectively, "HUD" or "defendants"), Am. Compl. ¶¶ 14, 19–20, 154–73,
contending that the two May 2018 notices—one of which withdraws the LG2017 Tool and the
other of which directs local government program participants "to revert to" the earlier AI
assessment method, "effectively suspend[ ] the AFFH Rule indefinitely," *id.* ¶ 9. In the
plaintiffs' view, these two notices "constitute unlawful agency action," Am. Compl. ¶ 14,
because they suspend the AFFH Rule without notice-and-comment procedures and because the
withdrawal of the LG2017 Tool was arbitrary and capricious, *id.* ¶¶ 10–14.[1]

Pending before this Court are three motions. First, the plaintiffs have moved, pursuant to
Federal Rule of Civil Procedure 65 and Local Rule 65.1, for a preliminary injunction ordering
HUD "to (1) rescind [the] May 23, 2018 Notices," referring to the LG2017 Withdrawal Notice
and the AI Reliance Notice; "(2) reinstate the Assessment Tool for Local Governments"; and
"(3) take all other necessary steps to ensure prompt implementation of the AFFH Rule." Pls.'

---

[1] The plaintiffs made clear at the motions hearing that these two notices were the focus of their complaint.
Mot. Hr'g at 6:19–7:5.

Mot. Preliminary Injunction & Expedited Summ. J. ("Pls.' Mot. PI") at 1, ECF No. 19. Second, the defendants have moved to dismiss the Amended Complaint, pursuant to Federal Rule of Civil Procedure 12(b)(1), arguing that the plaintiffs lack standing. *See generally* Defs.' Mot. Dismiss Pls.' Am. Compl. ("Defs.' MTD"), ECF No. 38. Third, the State of New York seeks to intervene on behalf of the plaintiffs pursuant to Federal Rule of Civil Procedure 24(a) or (b). NYS's Mot. Intervene Supp. Pls. ("NYS's Mot. Intervene") at 1, ECF No. 24.

For the reasons provided below, the defendants' motion to dismiss is granted and the remaining two motions for preliminary injunctive relief and to intervene are therefore denied.[2]

## I.    BACKGROUND

The relevant statutory and regulatory framework, as well as the facts from which this litigation arises, are presented below.[3]

### A.    Statutory and Regulatory Framework

Since 1968, it has been "the policy of the United States to provide, within constitutional limitations, for fair housing throughout the United States." 42 U.S.C. § 3601. HUD's general obligation to affirmatively further fair housing in line with this policy is discussed first, followed by a summary of HUD's generally inadequate efforts to fulfill this obligation when administering housing block grant programs and ensuring compliance with statutory and regulatory requirements by program participants.

---

[2]    The plaintiffs have also moved for "expedited summary judgment," pursuant to Federal Rule of Civil Procedure 56, Pls.' Mot. PI at 1, which motion is also denied.
[3]    The parties submitted numerous declarations supporting their positions with respect to the plaintiffs' request for a preliminary injunction and expedited summary judgment. Each declaration and the associated exhibits have been reviewed, but only those declarations and exhibits necessary for resolution of the instant motions are cited herein. In addition, the Court has reviewed the substantial briefing submitted by *amicus curiae* in support of the relief sought by the plaintiffs. *See generally* Nat'l Housing Law Project, *et al.*, Brief as *Amici Curiae* Supp. Pls.' Mot. PI & Summ. J., ECF No. 30; PolicyLink, *Amicus* Brief Supp. Pls.' Renewed Mot. PI & Summ. J., ECF No. 29; State of Maryland, *et al.*, Brief as *Amici Curiae* Supp. Pls.' Renewed Mot. PI & Summ. J., ECF No. 27.

1.     *Overview of the AFFH Requirement*

Congress enacted the Fair Housing Act as Title VIII of the Civil Rights Act of 1968, Pub.

L. No. 90-284, 82 Stat. 81 ("FHA" or the "Act"), over fifty years ago in an effort to achieve

"truly integrated and balanced living patterns."  114 CONG. REC. 3421, 3422 (1968) (statement of

Sen. Mondale); *see also Trafficante v. Metro. Life Ins. Co.*, 409 U.S. 205, 211 (1972) ("[A]s

Senator Mondale who drafted § 810(a) ['Enforcement' by HUD] said, the reach of the proposed

law was to replace the ghettos 'by truly integrated and balanced living patterns.'" (quoting 114

CONG. REC. at 3422)).  The FHA was, in large part, a response to the heightened racial tensions

and riots erupting in the United States throughout the 1960s, and the FHA's passage reflected an

understanding that "fair housing legislation" was "the best way for [ ] Congress" at that time "to

start on the true road to integration."  114 CONG. REC. at 3422 (statement of Sen. Mondale); *see

also Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Communities Project, Inc.*, 135 S. Ct. 2507,

2516 (2015) (explaining the FHA was passed in response to the assassination of Dr. Martin

Luther King and the "new urgency" "the Nation faced . . . to resolve the social unrest in the inner

cities").  The FHA thus prohibits discrimination based on "race, color, religion, sex, familial

status, or national origin" in the sale and rental of housing and other residential real estate–

related transactions.  42 U.S.C. §§ 3604–05.  Accordingly, the Act requires HUD to "administer

[ ] programs and activities relating to housing and urban development in a manner affirmatively

to further the policies of" fair housing, *id.* § 3608(e)(5), a requirement known as the

"affirmatively further fair housing," or "AFFH," requirement.

Courts have recognized that the Act "imposes upon HUD an obligation to do more than

simply refrain from discriminating (and from purposely aiding discrimination by others)."

*NAACP v. Sec'y of Hous. & Urban Dev.*, 817 F.2d 149, 155 (1st Cir. 1987) (Breyer, J.) (noting

that Congress's goal in passing the FHA "reflects the desire to have HUD use its grant programs

to assist in ending discrimination and segregation, to the point where the supply of genuinely open housing increases"); *see also Shannon v. U.S. Dep't of Hous. & Urban Dev.*, 436 F.2d 809, 821 (3d Cir. 1970) (remanding HUD decision about a proposed project change for HUD to consider the "substantial net reduction in supply of housing in the project area available to racial minority families," as well as the "substantial net increase in racial minority families in the area as a result of the project," which "is an equally obvious consideration"). Indeed, pursuant to the AFFH requirement, HUD must take action "to fulfill, as much as possible, the goal of open, integrated residential housing patterns and to prevent the increase of segregation, in ghettos, of racial groups whose lack of opportunities the Act was designed to combat." *Otero v. N.Y. City Hous. Auth.*, 484 F.2d 1122, 1134 (2d Cir. 1973). HUD maintains discretion in determining how the agency will fulfill its AFFH obligation, but courts have "the power to review [ ] claim[s] that the Secretary has not 'administer[ed]' certain HUD programs 'in a manner affirmatively to further' the Act's basic policy." *NAACP*, 817 F.2d at 151 (last alteration in original) (quoting 42 U.S.C. § 3608(e)(5)).

### 2. *HUD's Housing Block Grant Programs*

One method by which HUD furthers its AFFH obligation is through the administration of housing block grant programs to State and local governments. The largest of these programs is the Community Development Block Grant ("CDBG") Program, which was established under the Housing and Community Development Act of 1974, 42 U.S.C. § 5301, *et seq.*, to "provide annual grants to provide housing and expand economic opportunities for low- and moderate-income persons." Defs.' Opp'n PI at 3; *see also* 42 U.S.C. § 5301(c) (explaining that the "primary objective" of the CDBG program is "the development of viable urban communities, by providing decent housing and a suitable living environment and expanding economic opportunities, principally for persons of low and moderate income"). In addition to the CDBG

Program, HUD administers block grants through other programs, including the Emergency Solutions Grants ("ESG") Program, 42 U.S.C. § 11371, *et seq.*; the HOME Investment Partnerships ("HOME") Program, *id.* § 12741, *et seq.*; and the Housing Opportunities for Persons with AIDS ("HOPWA") Program, *id.* § 12901, *et seq.* HUD also, through the U.S. Housing Act ("USHA"), *id.* § 1437c-1, *et seq.*, provides grants to Public Housing Agencies ("PHAs") for public housing operations as well as capital for tenant-based rental assistance. *See* AFFH Rule, 80 Fed. Reg. at 42,275.

Jurisdictions receiving these block grants must take certain actions to continue receiving funds, including "submit[ting] a consolidated plan" to HUD every three to five years. 24 C.F.R. § 570.302; *see also id.* pt. 91. A Consolidated Plan provides (1) "[a] planning document for the jurisdiction, which builds on a participatory process among citizens, organizations, businesses, and other stakeholders"; (2) "[a] submission for federal funds under HUD's formula grant programs for jurisdictions"; (3) "[a] strategy to be followed in carrying out HUD programs"; and (4) "[a] management tool for assessing performance and tracking results." *Id.* § 91.1(b)(1)–(4). With the Consolidated Plans, HUD is able to monitor a jurisdiction's use of federal funds.

As relevant here, recipients of housing block grants must also certify that they will "affirmatively further fair housing." 42 U.S.C. § 5304(b)(2) (local government recipients); *id.* § 5306(d)(7)(B) (State recipients); *id.* § 12705(b)(15) (State and local recipients); § 1437c-1(d)(16) (PHA recipients). HUD's recent efforts to assist program participants in meeting this requirement, as discussed next, are at issue in this litigation.

3. *HUD's Regulation of Grantees through Analysis of Impediments*

Beginning in the 1990s, a jurisdiction receiving HUD's housing block grants could meet its AFFH obligations by "submit[ting] a certification that it will affirmatively further fair housing, which means that it will conduct an analysis to identify impediments to fair housing

choice within the jurisdiction, take appropriate actions to overcome the effects of any impediments identified through that analysis, and maintain records reflecting the analysis and actions in this regard." 24 C.F.R. § 91.225(a)(1) (1995); *see also* HUD Final Rule, Consolidated Submission for Community Planning and Development Programs, 60 Fed. Reg. 1,878, 1,905, 1,910, 1,912 (Jan. 5, 1994).[4] This fair-housing planning analysis, known as the "Analysis of Impediments in Fair Housing" ("AI"), required jurisdictions certifying compliance with the AFFH obligation to: (1) conduct an AI, (2) take appropriate steps to address impediments identified through the AI, and (3) maintain related records. *See* 24 C.F.R. § 91.225(a)(1) (1995).

HUD issued guidance on the AI process in a 1996 Fair Housing Planning Guide. *See generally* U.S. DEP'T OF HOUSING AND URBAN DEVELOPMENT, OFFICE OF FAIR HOUSING AND EQUAL OPPORTUNITY, FAIR HOUSING PLANNING GUIDE (1996) ("1996 FAIR HOUSING PLANNING GUIDE"), *available at* https://www.hud.gov/sites/documents/fhpg.pdf. This Guide, which is still available, explains that, because HUD had "too often" failed in trying "to prescribe national remedies for local situations," HUD developed the AI process to allow local communities to meet the AFFH obligation by "defin[ing] the problems, develop[ing] the solutions, and be[ing] held accountable for meeting the standards they set for themselves." *Id.* at *i*. As a definitional matter, HUD clarified that actions "affirmatively further fair housing" when "steps are taken to assure that the housing is fully available to all residents of the community, regardless of race, color, national origin, gender, handicap, or familial status." *Id.* at 5-4. To this end, "all affected people in the community" needed to "be at the table and participate in making those decisions." *Id.* at *i*.

---

[4] 24 C.F.R. § 91.225 was promulgated to cover local governments, which are the relevant regulated entities in this litigation. The regulations imposed analogous requirements for each State and consortium of local governments acting as one local government. *See* 24 C.F.R. § 91.325 (1995) (State governments); *id.* § 91.425 (1995) (consortia).

The guidance document provides suggestions for adhering to the three components of the fair housing planning process, but none of the recommendations is binding.  *See id.* at 2-7 to -26.

The AI process reflected HUD's commitment at the time "to devolved decisionmaking," *id.* at *i*, and did "not generally" require that AIs be submitted to HUD for review, *id.* at 2-24.  "Instead, as part of the Consolidated Plan performance report, the jurisdiction" was required to provide "a summary of the AI and the jurisdiction's accomplishments during the past program year" to HUD, which "could request the AI in the event of a complaint and could review the AI during routine on-site monitoring."  *Id.* at 2-24.  HUD recommended, but did not require, "that jurisdictions conduct or update their AI at least once every 3 to 5 years (consistent with the Consolidated Plan cycle)."  *Id.* at 2-6.

Weaknesses in the AI process as a method of ensuring compliance by program participants with the AFFH requirement were exposed "through litigation and reports and testimonies for some years."  U.S. GOV'T ACCOUNTABILITY OFFICE ("GAO"), RPT. NO. GAO-10-905, HOUSING AND COMMUNITY GRANTS: HUD NEEDS TO ENHANCE ITS REQUIREMENTS AND OVERSIGHT OF JURISDICTIONS' FAIR HOUSING PLANS 2 (2010) ("GAO 2010 REPORT"), *available at* https://www.gao.gov/assets/320/311065.pdf.  These shortcomings were recognized by HUD in a 2009 internal study based on review of 45 AIs.  *See generally* U.S. DEP'T OF HOUSING AND URBAN DEVELOPMENT, OFFICE OF POLICY DEVELOPMENT AND RESEARCH, ANALYSIS OF IMPEDIMENTS STUDY (2009) ("HUD 2009 AI STUDY"), *available at* http://www.documentcloud.org/documents/365748-hud-reporting-compliance-report.html.  For this study, HUD had solicited AIs from 70 randomly selected jurisdiction but received only 45, signaling an initial "cause for concern."  *Id.* at 15.

Based on the 45 AIs submitted, HUD observed that "[c]itizens seeking to obtain AIs would not consistently find them readily available," that "many of the AIs obtained were completed over ten years ago and need to be updated," that "about three-fourths were prepared by a single author or organization," and that "a sizable proportion of the AIs reviewed did not contain key aspects recommended for inclusion by the [1996] Fair Housing Planning Guide." *Id.* at 6–7, 15. HUD found that "[m]any jurisdictions have obviously taken the AI planning process very seriously," but that the agency needed "to assess and work with [its] state and local partners, governmental and private, to explore options for improving the AI process and taking steps for translating it into positive action on the fair housing front." *Id.* at 16. HUD recommended that the agency: (1) provide "enhanced [ ] guidance and assistance [to] increase completeness and quality" of AIs, which "could take the form of providing better access to federal data tools, broad-based training options or in some cases perhaps more in-depth technical assistance"; (2) find "other possible revenue streams" to ensure jurisdictions have funding sources for conducting AIs; (3) update the 1996 Fair Housing Planning Guide; and (4) provide public access to AIs. *Id.* at 16–17. Noting "a basic fact with AIs—that jurisdictions are not currently required to submit them to HUD," *id.* at 17, the HUD 2009 AI Study pointed out that the agency has "the enforcement authority to decertify a jurisdiction's Consolidated Plan if the AI is inadequate," *id.* Nevertheless, the HUD 2009 AI Study cautioned that any consideration of "widespread HUD review, approval and/or enforcement" must "observe the fact that AIs are essentially local planning documents, and that options and resources available to localities vary widely." *Id.* at 18.

The HUD 2009 AI Study was followed the next year by a more extensive study by the GAO, based on review of 441 AIs, that identified HUD's "limited regulatory requirements and

oversight" as the main reason for weaknesses in the AI process. GAO 2010 Report (summary

page).[5] In particular, the GAO cited the absence of requirements in the regulations "for updating

AIs or their format" and for grantees "to submit AIs to the department for review." *Id.* As a

result, AIs were "outdated" and grantees placed "a low priority on ensuring that their AIs

serve[d] as effective fair housing planning tools." *Id.*; *see also id.* at 31 (finding that "29 percent

of all AIs [were] outdated, including 11 percent that were prepared in the 1990s" and thus that

the AIs "d[id] not likely serve as effective planning documents to identify and address current

potential impediments to fair housing choice"). The GAO made three recommendations: first,

"that HUD establish standards for grantees to follow in updating their AIs and the format that

they should follow in preparing the documents," *id.* at 32; second, "as part of the AI format," that

"HUD require grantees to include time frames for implementing recommendations and the

signatures of responsible officials" to enhance transparency and accountability, as well as to

facilitate a way to measure jurisdictions' progress, *id.* at 32–33; and, finally, that "HUD require,

---

[5]     The GAO 2010 Report opened by describing a 2006 lawsuit that documented AI process problems within a
single local government agency. That lawsuit was brought under the False Claims Act ("FCA"), 31 U.S.C. § 3729,
*et seq.*, against Westchester County, New York, for falsely certifying its compliance with the AFFH requirement by
failing to consider race in its AI analysis, leading to the County's improper receipt of "more than $45 million in
federal funds," *United States ex rel. Anti-Discrimination Ctr. of Metro N.Y., Inc. v. Westchester Cty.* ("*Westchester
I*"), 495 F. Supp. 2d 375, 378 (S.D.N.Y. 2007). In resolving partial motions for summary judgment, the Court found
that because the County had never conducted "the required analysis of race-based impediments" and had "never
created a contemporaneous record of how its management of the HUD-acquired funds or any other 'appropriate'
steps it could take would overcome the effects of those impediments," the County had made false certifications to
HUD by "represent[ing] that the County would take appropriate actions to overcome the effects of race-based
impediments to fair housing choice that its analysis had identified." *United States ex rel. Anti-Discrimination Ctr. of
Metro N.Y., Inc. v. Westchester Cty.* ("*Westchester II*"), 668 F. Supp. 2d 548, 565 (S.D.N.Y. 2009). Nonetheless, the
court denied the plaintiffs' motion for summary judgment as to the knowledge element of the FCA claim since,
"[d]espite the fact that HUD regulations do not require the submission of the AIs to HUD, the County submitted the
AIs to HUD as part of the Consolidated Plans," and, thus, "the County's voluntary submission at least permits the
inference that the County did not act in knowing and reckless disregard as to the falsity of its certifications." *Id.* at
568. Under the resulting consent decree from this case, the County paid approximately $30 million to the United
States, "$21.6 million of which would be credited to the County's HUD account to fund fair housing," and also
"made various commitments to affirmatively further fair housing and to eliminate discrimination in housing
opportunities." *United States ex rel. Anti-Discrimination Ctr. of Metro N.Y., Inc. v. Westchester Cty.* ("*Westchester
III*"), 712 F.3d 761, 765 (2d Cir. 2013) (explaining the still-ongoing consent decree).

at a minimum, that grantees submit their AIs to the department on a routine basis and that HUD staff verify the timeliness of the documents, determine whether they adhere to established format requirements, assess the progress that grantees are achieving in addressing identified impediments, and help ensure the consistency between the AIs and other required grantee reports," *id.* at 33.

According to HUD, the GAO 2010 Report's recommendations for clearer standards, uniform formats, and increased transparency and accountability in the AI process, with HUD review of AI submissions, "reinforced" the agency's own analysis of the deficiencies in the AI process. Proposed AFFH Rule, 78 Fed. Reg. at 43,713. In drafting the new rules to overhaul the AI process, HUD sought specifically to "respond[ ] to the GAO's observations," *id.* at 43,711, as described below.

4. *HUD's Regulation of Grantees through the AFFH Rule*

By 2013, HUD had determined that the then-existing requirements for program participants to carry out their obligations to affirmatively further fair housing needed to be "refine[d]," and, thus, HUD sought to provide "a fair housing assessment and planning process" to "better aid" participants in "fulfill[ing] this statutory obligation." *Id.* at 43,710. HUD's analysis stemmed "from substantial interaction with program participants and advocates" over "several years," as well as from the GAO 2010 Report. *Id.* at 43,713. On July 19, 2013, HUD issued a Proposed Rule to "provide direction, guidance, and procedures for program participants to promote fair housing choice." *Id.* at 43,711. Addressing the concern raised by the GAO about the lack of accountability, attributable both to the 1996 Fair Housing Planning Guide's focus on "extensive suggestions" without "fully articulat[ing] the goals that AFFH must advance," and to the lack of any requirement for AIs to be "submitted to HUD for review," the proposed rule "improve[d] fair housing planning by more directly linking it to housing and community

development planning processes currently undertaken by program participants as a condition of their receipt of HUD funds." *Id.* at 43,713. On July 16, 2015, the AFFH Rule was finalized. *See generally* AFFH Rule.

The AFFH Rule makes significant changes to HUD's regulations in order to remedy the noted deficiencies in the AI process, including by adding: (1) new clarifying definitions, *see* 24 C.F.R. § 5.152; (2) new regulations for submitting an Assessment of Fair Housing ("AFH"), *see generally id.* pt. 5, (3) new requirements for community participation, consultation, and coordination, applicable to both AFHs and Consolidated Plans, *see id.* §§ 5.158(a), 91.100(a)(1), 91.105(a); (4) new recordkeeping requirements, *see id.* § 5.168; and (5) requirements to ensure that the regulations governing Consolidated Plans also apply to the AFH development process, *see id.* pt. 91. These changes are explained in turn below.

First, the AFFH Rule adds a definition of "affirmatively furthering fair housing," 80 Fed. Reg. at 42,353, to mean "taking meaningful actions, in addition to combating discrimination, that overcome patterns of segregation and foster inclusive communities free from barriers that restrict access to opportunity based on protected characteristics. Specifically, affirmatively furthering fair housing means taking meaningful actions that, taken together, address significant disparities in housing needs and in access to opportunity, replacing segregated living patterns with truly integrated and balanced living patterns, transforming racially and ethnically concentrated areas of poverty into areas of opportunity, and fostering and maintaining compliance with civil rights and fair housing laws." 24 C.F.R. § 5.152. The Rule also defines other key terms, adding a "definition of 'data' to collectively refer to 'HUD-provided data' and 'local data,' both of which terms are also defined," AFFH Rule, 80 Fed. Reg. at 42,277, and "[r]evis[ing] the definition of 'integration'" and "segregation" to "provide greater clarity as to the meaning" of these terms, *id.*

HUD elected not to revise certain terms and instead opted to strengthen various provisions of the Rule. For example, in response to comments that HUD should "[s]trengthen the definition of 'community participation'" in the proposed rule, *id.* at 42,303, HUD responded that "[t]he additional detail that commenters are seeking about community participation can be found in [24 C.F.R.] § 5.158, entitled 'Community participation, consultation, and coordination,'" *id.*, which is discussed in more detail below.

Second, the AFFH Rule adds a new part to the Code of Federal Regulations addressing "Affirmatively Furthering Fair Housing," *see id.* at 42,352; 24 C.F.R. pt. 5, that requires jurisdictions to conduct an AFH "for the purpose of examining its programs, jurisdiction, and region, and identifying goals to affirmatively further fair housing and to inform fair housing strategies" in their Consolidated Plans. 24 C.F.R. § 5.154(d). Program participants must submit their first AFHs 270 days prior to their first scheduled Consolidated Plan after a certain date, which date is staggered depending on the type of participant. *See id.* §§ 5.160(a)(1)(i), 5.151. Given this timing, "the AFFH Rule contemplates that many program participants will not be required to submit an AFH until years after the July 2015 promulgation of the Rule," Defs.' Opp'n PI at 9, but the rule nonetheless "makes clear that program participants are still required to comply with their longstanding AFFH obligations regardless when the AFH submission requirement is triggered," *id.* Program participants are therefore required to "continue to conduct an [AI] . . . in accordance with requirements in effect prior to August 17, 2015," until their AFH submission requirement is triggered. 24 C.F.R. § 5.151.

The AFFH Rule lays out in detail the required contents of an AFH. Using HUD-provided data and HUD-created "Assessment Tools," the AFH must include "an analysis of fair housing data, an assessment of fair housing issues and contributing factors, and an identification of fair

housing priorities and goals." *Id.* § 5.152. A program participant's AFH must "address integration and segregation; racially or ethnically concentrated areas of poverty; disparities in access to opportunity; and disproportionate housing needs based on race, color, religion, sex, familial status, national origin, and disability," and "assess the jurisdiction's fair housing enforcement and fair housing outreach capacity," *id.* §5.154(d), and must identify various "contributing factors" that impede furthering fair housing, *id.* § 5.154(d)(3)–(4). In addition, the AFH must recommend "[s]trategies and actions" to "affirmatively further fair housing"; must "include a concise summary of the community participation process, public comments, and efforts made to broaden community participation in the development of the AFH"; must "provide a summary of progress achieved in meeting the goals and associated metrics and milestones of the prior AFH"; and must "identify any barriers that impeded or prevented achievement of goals." *Id.* § 5.154(d)(5)–(7). In creating an AFH, the program participant must "consult with other public and private agencies that provide assisted housing, health services, and social services," *id.* § 91.100(a)(1), at "various points in the fair housing planning process," including, "at a minimum," during "the development of both the AFH and the consolidated plan," *id.* § 91.100(e)(3); *see also id.* § 5.158(a).

As a third change, the AFFH Rule imposes new requirements for community participation, consultation, and coordination applicable to the development of both AFHs and Consolidated Plans. For example, to "ensure that the AFH, the consolidated plan, and the PHA Plan and any plan incorporated therein are informed by meaningful community participation, program participants should employ communications means designed to reach the broadest audience." *Id.* § 5.158(a). These communications can be met by "publishing a summary of each document in one or more newspapers of general circulation, and by making copies of each

document available on the Internet," among other locations. *Id.* In addition, Consolidated Plan

program participants must follow the existing requirements of part 91, which requires

consultation with various agencies and organizations as well as the creation of a "citizen

participation plan" in the preparation of a Consolidated Plan, in preparing their AFHs. *See id.*

§ 91.105. The AFFH Rule reiterates that "[p]rogram participants must certify that they will

affirmatively further fair housing" in accordance with preexisting certification requirements laid

out in 24 C.F.R. part 91 (for Consolidated Plan program participants) and part 903 (for PHA Plan

program participants). *Id.* § 5.166(a). Notably, the AFFH Rule also enhances the certification

requirements in part 91, requiring that program participants now certify that they "will take no

action that is materially inconsistent with [their] obligation to affirmatively further fair housing,"

*id.* § 91.225(a)(1); *see also* AFFH Rule, 80 Fed. Reg. at 42,301–02, which certification is also

enhanced by the new clarifying definition of AFFH requirement.

Once completed, HUD reviews each AFH "to determine whether the program participant

has met the requirements for providing its analysis, assessment, and goal setting, as set forth in

§ 5.154(d)." 24 C.F.R. § 5.162(a)(1). HUD will not accept an AFH if it finds that "the AFH or a

portion of the AFH is inconsistent with fair housing or civil rights requirements or is

substantially incomplete," *id.* § 5.162(b)(1), or that the AFH was "developed without the

required community participation or the required consultation," *id.* § 5.162(b)(1)(ii)(A). The

AFFH Rule sets up an iterative process if an AFH is rejected, in which HUD must provide notice

of the reasons for nonacceptance and as well as an opportunity for the program participant to

address those reasons. *Id.* § 5.162(a)(1), (c). The AFFH Rule also links the required AFH to the

Consolidated Plans that housing block grant recipients are required to submit every three to five

years. *See id.* §§ 5.1560(d), 570.302. Recipients are required to have an accepted AFH before

HUD will approve their Consolidated Plans. *See id.* § 5.162(d). Failure to timely submit a compliant AFH might therefore result in a delay in HUD's approval of the recipient's Consolidated Plan, which, in turn, might "automatically result in the loss of the [block grant] funds to which the jurisdiction would otherwise be entitled." *Id.* § 5.162(d)(1).

Fourth, the AFFH Rule imposes new recordkeeping provisions, requiring "[e]ach program participant" to "establish and maintain sufficient records to enable HUD to determine whether the program participant has met the requirements" of the Rule. *Id.* § 5.168(a). These records include, *inter alia*, records "relating to the program participant's AFH and any significant revisions to the AFH," "demonstrating compliance with the consultation and community participation requirements" and "the actions the program participant has taken to affirmatively further fair housing," "relating to the program participant's efforts to ensure that housing and community development activities . . . are in compliance with applicable nondiscrimination and equal opportunity requirements," and "[a]ny other evidence relied upon by the program participant to support its affirmatively furthering fair housing certification." *Id.* § 5.168(a)(1)–(3), (5), (7). These new recordkeeping requirements help remedy concerns that had been expressed before promulgation of the Rule regarding the lack of records maintained by some program participants.

Finally, the AFFH Rule revises many of the provisions in parts 91, 903, and others, to ensure that the regulations governing the development process apply in virtually the same way to both the Consolidated Plan process and the AFH process. *See, e.g.*, *id.* §§ 91.105 (citizen participation plans), 91.205 (housing and homeless needs assessment), 91.215 (strategic plan), 91.220 (action plan), 91.225 (certifications).

Of particular salience here is the AFFH Rule's requirement that program participants use HUD-created "Assessment Tools" to complete their AFHs.  *See* AFFH Rule, 80 Fed. Reg. at 42,272.  The term "Assessment Tool" "refers collectively to any forms or templates," and accompanying instructions, provided by HUD that "program participants must use to conduct and submit an AFH pursuant to § 5.154."  24 C.F.R. § 5.152.  HUD issues "different Assessment Tools for different types of program participants," and the availability of Assessment Tools is "published in the Federal Register."  AFFH Rule, 80 Fed. Reg. at 42,277.  Participants are required to use Assessment Tools in creating their AFHs, so if HUD has not yet issued a finalized Assessment Tool for the relevant category of participants, the participant's deadline for submitting a compliant AFH is extended to a date not less than "9 months from the date of publication" of the appropriate Assessment Tool.  24 C.F.R. § 5.160(a)(1)(ii).  The Assessment Tools themselves are not included in the AFFH Rule, however, and are separately issued by HUD, "subject to periodic notice and opportunity to comment," to maintain approval by the Office of Management and Budget ("OMB") under the Paperwork Reduction Act.  *Id.* § 5.152.

HUD's first (and only fully implemented) Assessment Tool, the Local Government Assessment Tool ("LG2015"), was published in December 2015, *see generally* LG2015 Tool Announcement, 80 Fed. Reg. 81,840, which triggered the requirement for local government program participants to submit AFHs, *id.*  In January 2017, after two rounds of notice and comment, and with approval from the OMB, HUD issued a new iteration of this tool, called LG2017.  *See generally* LG2017 Tool Announcement, 82 Fed. Reg. 4,388; Defs.' Opp'n PI, Ex. 1, Decl. of Krista Mills ("HUD Decl.") ¶ 35, ECF No. 33-1.[6]  As of the initiation of this lawsuit,

---

[6]     At the same time, HUD also published an Assessment Tool for PHAs, *see generally* HUD Notice, Affirmatively Furthering Fair Housing Assessment Tool for Public Housing Agencies: Announcement of Final

local government agencies were the only type of program participants for which AFHs were required.  *See* Defs.' Opp'n PI at 11.

6.    *HUD's 2018 Notices*

This lawsuit was initially prompted by HUD's notice, on January 5, 2018, extending the deadline for local governments to submit their AFHs "until their next AFH submission deadline that falls after October 31, 2020."  HUD Notice, Affirmatively Furthering Fair Housing: Extension of Deadline for Submission of Assessment of Fair Housing for Consolidated Plan Participants ("AFH Extension Notice"), 83 Fed. Reg. 683, 684 (Jan. 5, 2018).  HUD explained that, based on review of the first 49 local government AFH submissions, "local government program participants need additional time and technical assistance from HUD to adjust to the new AFFH process and complete acceptable AFH submissions."  *Id.* at 685.  The notice of the extension also "invite[d] public comment for a period of 60-days on the extension," which comments would be considered in HUD's "ongoing process of reviewing the Assessment of Fair Housing Tool for Local Governments."  *Id.*

Five months later, on May 23, 2018, HUD published three additional notices in the Federal Register regarding AFH deadlines and the LG2017 Tool, two of which are challenged in this lawsuit.  First, HUD announced the immediate withdrawal of the January 5, 2018, notice extending AFH deadlines until October 2020.  *See generally* HUD Notice, Affirmatively Furthering Fair Housing: Withdrawal of Notice Extending the Deadline for Submission of Assessment of Fair Housing for Consolidated Plan Participants ("Extension Withdrawal Notice"), 83 Fed. Reg. 23,928, 23,928 (May 23, 2018).  This announcement stated that, "[i]f HUD later finds it prudent to revise the regulations, including by revising the submission

<hr>

Approved Document, 82 Fed. Reg. 4,373 (Jan. 13, 2017), but this Tool did not trigger the AFH requirement for PHAs because HUD "ha[d] not yet provided PHAs with the data they will need," *id.* at 4,373.

schedule, HUD will publish a notice of proposed rulemaking to that effect for public comment." *Id.*

The remaining two notices published that same day, May 23, 2018, are at issue in this lawsuit. As noted, HUD withdrew the LG2017 Tool, the second iteration of the Local Government Assessment Tool, because "HUD has become aware of significant deficiencies in the Tool impeding completion of meaningful assessments by program participants," such that the Tool "is inadequate to accomplish its purpose of guiding program participants to produce meaningful AFHs." LG2017 Withdrawal Notice, 83 Fed. Reg. at 23,922. As support, HUD provided that "[t]aken together, 63% of the 49 AFHs submitted were either: (a) Returned as unacceptable and have not been successfully resubmitted, or (b) accepted only after the program participant supplied necessary additional information and revisions." *Id.* at 23,924. In HUD's view, because only 37 percent of the initial 49 submissions had been deemed acceptable, "the Tool was unduly burdensome and not working as an effective device to assist program participants with the creation of acceptable and meaningful AFHs with impactful fair housing goals." *Id.* at 23,923. Given the "significant problems" with the LG2017 Tool, HUD had "provided substantial technical assistance to this initial round of program participants, even for the AFHs that have been accepted"—but the agency "does not have the resources to continue to provide program participants with the level of technical assistance that they would need to submit acceptable AFHs using the current version of the Local Government Assessment Tool." *Id.* at 23,925. HUD stated that it would "review the Assessment Tool and its function under the AFFH regulations to make it less burdensome and more helpful in creating impactful fair housing goals," *id.* at 23,922, and "solicit[ed] comments and suggestions geared to creating a less

burdensome and more helpful AFH Tool for local governments," which comments were due by July 23, 2018. *Id.*[7]

Finally, in the third notice published on the same day, HUD explained that, in light of the withdrawal of the LG2017 Tool, "currently no type of program participant has an Assessment Tool available for use," and that program participants must therefore rely on use of the AI. AI Reliance Notice, 83 Fed. Reg. at 23,927. HUD stressed that Consolidated Plan program participants "must nonetheless continue to comply with existing, ongoing legal obligations to affirmatively further fair housing" by "conduct[ing] an analysis of impediments (AI) to fair housing choice within the jurisdiction, tak[ing] appropriate actions to overcome the effects of any impediments identified through that analysis, and maintain[ing] records reflecting the analysis and actions." *Id.* The latter two directions—regarding taking "appropriate actions" and recordkeeping—effectively remind program participants about the continuing effective parts of the AFFH Rule, including those set out in 24 C.F.R § 5.152 (defining "[a]ffirmatively furthering fair housing"), § 5.168 (recordkeeping requirements, applicable, *inter alia*, to "each consolidated plan program participant"); § 570.490 (recordkeeping requirements for States); § 574.530 (recordkeeping requirements for HOPWA grantees); and § 576.500 (recordkeeping requirements for ESG Program). To assist, "[t]he data HUD ha[d] developed in order to implement the AFFH rule w[ould] remain available for program participants to use in conducting their AIs." AI Reliance Notice, 83 Fed. Reg. at 23,927.

---

[7]     Although HUD has solicited comments regarding the development of a new Assessment Tool, HUD stated at the motions hearing that the agency does not yet have a timeline for developing such a Tool. Mot. Hr'g at 71:16–20 (stating that "analysis has been done" and HUD is "proceeding from there," but HUD's counsel did not "think there is a specific schedule" for "taking the next step on action with revising LG 2017"). HUD has also issued an Advance Notice of Proposed Rulemaking ("ANPR") to "invit[e] public comment on amendments to HUD's [AFFH] regulations" generally. *See* HUD ANPR, Affirmatively Furthering Fair Housing: Streamlining and Enhancements ("HUD ANPR"), 83 Fed. Reg. 40,713, 40,713 (Aug. 16, 2018); *see also* Pls.' Not. Post-Hearing Development, Ex. 1, HUD ANPR, 83 Fed. Reg. at 40,713, ECF No. 45-1.

HUD also informed participants that "if HUD believes the AI or actions taken to affirmatively further fair housing" are "inadequate," then "HUD may require submission of the full AI and other documentation." *Id.* HUD can also "question the jurisdiction's AFFH certification by providing notice to the jurisdiction that HUD believes the AFFH certification to be inaccurate and provide the jurisdiction an opportunity to comment." *Id.* at 23,928.

Despite withdrawal of the LG2017 Tool, many components of the AFFH Rule remain in effect. For example, the community participation, consultation, and coordination requirements stated in § 5.158 remain active insofar as they require participants to "ensure that the AFH, *the consolidated plan*, and the PHA Plan and any plan incorporated therein are informed by meaningful community participation." 24 C.F.R. § 5.158 (emphasis added). Thus, program participants submitting Consolidated Plans must still "employ communications means designed to reach the broadest audience" by, "as appropriate," "publishing a summary of each document in one or more newspapers of general circulation" and "making copies of each document available on the Internet, on the program participant's official government Web site, and as well at libraries, government offices, and public places." *Id.* Similarly, program participants must continue to "certify that they will affirmatively further fair housing when required by statutes and regulations governing HUD programs," *id.* § 5.166, including by complying with the revised enhanced certification requirement, in § 91.225(a)(1), that participants certify that they "will take no action that is materially inconsistent with [their] obligation to affirmatively further fair housing," *id.* § 91.225(a)(1), consistent with the new definition. Participants must also continue to satisfy the new recordkeeping requirements by "establish[ing] and maintain[ing] sufficient records to enable HUD to determine whether the program participant has met the requirements of this subpart," *id.* § 5.168(a), and must "make these records available for HUD inspection," *id.*

HUD confirmed at the motions hearing what is plain from the AFFH Rule: the new definitions in the AFFH Rule apply to Consolidation Plans, Mot. Hr'g at 61:15–18 (responding to Court query whether "these new definitions [ ] remain active and, certainly, apply to consolidation plans," HUD counsel stated "Yes"), and to the AI process under the 1996 Fair Housing Planning Guide, *id.* at 62:3–25 (responding to Court query whether "that guidance document use[s] any of the [ ] terms that are newly defined in the rule," HUD counsel stated: "So you're asking whether the definitions in that—the rule would now be incorporated . . . . Yeah. . . . And so, now, we have a definition that—you know, through duly promulgated rule that would apply by law."). Thus, HUD acknowledges that the revived AI process is not the same process operating prior to the AFFH Rule, due, at a minimum, to both the new definitions in the Rule that provide more clarity about the AFFH statutory requirement, and the provision of HUD-provided data to encourage more "evidence-based decision making." *Id.* at 64:17–21; *see also id.* at 63:18–21 (responding to Court's query whether "[t]his AI process that we have reverted to is not the same process that it was pre-2015 AFFH rule, right?" HUD counsel stated "That's right, Your Honor"); *id.* at 64:8–11 (responding to Court's query whether "[t]here is much more clarity [in the AI process] because of those definitions as to what HUD expects. Is that right?" HUD counsel stated "Absolutely, Your Honor").

In short, even without an Assessment Tool in place, program participants, including local government agencies, remain bound by key definitional, recordkeeping, and enhanced certification components of the AFFH Rule, and, importantly, to complying with the AFFH statutory requirement. *See id.* at 69:7–15 (HUD counsel stating, "the standard for both satisfying your obligations under an AI and an AFH is affirmatively furthering fair housing," and that "the AFH process is sort of a more targeted way of going through that . . . a little bit more resource

intensive, . . . [b]ut the standard that the jurisdictions are subject to either way is affirmatively furthering fair housing").

### B.     The Instant Litigation

#### 1.     *The Plaintiffs*

The plaintiffs in this case are three non-profit organizations who work to further fair housing across the country.  The National Fair Housing Alliance ("NFHA") is a "national, nonprofit, public service organization," incorporated in Virginia, which serves as a "nationwide alliance of private, nonprofit, fair housing organizations, including organizations in 28 states." Am. Compl. ¶ 16.  NFHA's "mission is to promote residential integration and combat discrimination in housing based on race, national origin, disability, and other protected classes covered by federal, state, and local fair housing laws."  *Id.*  Texas Low Income Housing Information Service, Inc. ("Texas Housers"), is a Texas-based non-profit corporation and "the principal statewide advocacy group focused on expanding housing opportunities for low-income residents of Texas."  *Id.* ¶¶ 3, 17.  Texas Appleseed is similarly a Texas-based non-profit organization that aims "to promote social and economic justice for all Texans, including by ensuring that all Texas families can recover in the wake of natural disasters; that communities are rebuilt to be more resilient; and that all families have the opportunity to live in safe, decent neighborhoods with equal access to educational and economic opportunity."  *Id.* ¶ 18.

All three plaintiffs allege that they have "devoted considerable resources" to the development and implementation of the AFFH Rule.  *Id.* ¶¶ 119, 143.  NFHA "was one of the leading advocates pushing for the creation of the AFFH Rule to replace" the AI process, *id.* ¶ 142, and "[o]nce HUD issued the final AFFH Rule, NFHA and its members worked in local communities across the country to generate effective community participation and substantive provisions in AFHs that would make meaningful differences to communities, *id.* ¶ 144.  NFHA

members "actively participated in the AFH planning process in many jurisdictions, with NFHA providing resources, guidance, and strategic help." *Id.* Likewise, "[s]ince the AFFH Rule's promulgation," Texas Housers and Texas Appleseed (the "Texas Plaintiffs") have also "devoted resources to the development of effective AFHs in a number of" jurisdictions within Texas, including the municipalities of Fort Worth, Corpus Christi, and League City, as well as the Hidalgo County region, which covers nineteen jurisdictions and housing authorities. *Id.* ¶ 121.

According to the Amended Complaint, in response to the withdrawal of the LG2017 Tool in May 2018, the Texas Plaintiffs "have had to divert resources they were planning to devote to other activities critical to their missions to remedying the effects of" HUD's actions. *Id.* ¶ 118. Similarly, the NFHA "has had to divert resources to assisting its members around the country in similar efforts to combat the effects" of HUD's actions. *Id.* The plaintiffs claim that "HUD's unlawful suspension of the AFH process has greatly undermined" their "ability to accomplish their missions and is making them divert resources to activities they would not otherwise have engaged in, just to get to an inferior result." *Id.* ¶ 132; *see also id.* ¶ 152 ("In the absence of HUD oversight, NFHA is preparing to devote substantial resources to outreach, public education, and advocacy to assist its members and community groups working to ensure that jurisdictions formulate AIs that are [as] robust as possible.").

In addition, the State of New York seeks to intervene, either as a matter of right or permissively, as a plaintiff in this action. NYS's Mem. Supp. Mot. Intervene ("NYS's Mem.") at 1, ECF No. 24-1. New York asserts that its interests "are directly and adversely affected by HUD's withdrawal of the Assessment Tool, reinstatement of the 'Analysis of Impediments' process, and concomitant suspension of compliance with the AFFH Rule" because "HUD's actions will make it more difficult for New York's local jurisdictions to analyze barriers to fair

housing choices or identify meaningful actions to address these barriers." *Id.* at 4. HUD's actions allegedly will "deprive New York's local jurisdictions of the support that HUD had previously determined was necessary to effectively identify and address obstacles to fair housing." *Id.* at 5. New York also argues that HUD's actions "directly injure the State's *parens patriae* interests" by "delay[ing]" fair-housing reforms, "thus subjecting New York's residents to ongoing segregation and discrimination." *Id.* at 7.

### 2. *The Plaintiffs' Challenge to HUD's Notices*

On May 8, 2018, the plaintiffs filed a complaint against HUD challenging the January 5, 2018, notice extending the AFH deadline to October 31, 2020, which the plaintiffs alleged was a "suspension of the AFFH Rule's requirements," in violation of the APA. Compl. ¶ 3, ECF No. 1. Ten days later, on May 18, 2018, HUD notified this Court that the January 5, 2018, notice had been withdrawn and that "two related notices" had been posted regarding the LG2017 Tool. Not. ¶¶ 1–2, ECF No. 15. HUD promised to confer with the plaintiffs "to determine what, if any, additional proceedings" would be "necessary in this matter." *Id.* at 2. The plaintiffs subsequently filed, on May 29, 2018, an Amended Complaint and a Renewed Motion for a Preliminary Injunction and for Expedited Summary Judgment. *See generally* Am. Compl.; Pls.' Mot. PI. During briefing on this motion, the State of New York moved, on June 5, 2018, to intervene on behalf of the plaintiffs. *See generally* NYS's Mot. Intervene. The defendants then moved to dismiss this matter due to a lack of standing, under Federal Rule of Civil Procedure 12(b)(1). *See generally* Defs.' MTD. After all briefing was complete on July 30, 2018, this Court held a hearing on the three motions on August 9, 2018. *See* Minute Entry (dated Aug. 9, 2018).

## II.    LEGAL STANDARD

### A.    Motion to Dismiss for Lack of Subject-Matter Jurisdiction

In evaluating a motion to dismiss for lack of subject-matter jurisdiction, under Federal Rule of Civil Procedure 12(b)(1), federal courts must be mindful that they "are courts of limited jurisdiction, possessing only that power authorized by Constitution and statute." *Gunn v. Minton*, 568 U.S. 251, 256 (2013) (internal quotation marks omitted) (quoting *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994)).  Indeed, federal courts are "forbidden . . . from acting beyond our authority," *NetworkIP, LLC v. FCC*, 548 F.3d 116, 120 (D.C. Cir. 2008), and, therefore, "have an affirmative obligation to consider whether the constitutional and statutory authority exist for us to hear each dispute." *James Madison Ltd. v. Ludwig*, 82 F.3d 1085, 1092 (D.C. Cir. 1996) (internal quotation marks omitted) (quoting *Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192, 196 (D.C. Cir. 1992)).  Absent subject-matter jurisdiction over a case, the court must dismiss it. *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 506 (2006); Fed. R. Civ. P. 12(h)(3).

Article III of the Constitution restricts the power of federal courts to hear only "Cases" and "Controversies."  U.S. Const. art. III, § 2, cl. 1; *see also Mendoza v. Perez*, 754 F.3d 1002, 1010 (D.C. Cir. 2014) ("Article III of the Constitution limits the jurisdiction of federal courts to 'actual cases or controversies between proper litigants.'" (quoting *Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 661 (D.C. Cir. 1996) (en banc))).  "The doctrine of standing gives meaning to these constitutional limits by 'identify[ing] those disputes which are appropriately resolved through the judicial process.'" *Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2341 (2014) (alteration in original) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)).  Absent standing by the plaintiff, the court lacks subject-matter jurisdiction to hear the claim and dismissal is mandatory. *See* Fed. R. Civ. P. 12(h)(3).

Where the plaintiff's standing is challenged, the court "must assume that [the plaintiff] states a valid legal claim."  *Info. Handling Servs., Inc. v. Def. Automated Printing Servs.*, 338 F.3d 1024, 1029 (D.C. Cir. 2003).  In such cases, the plaintiff bears the burden of "show[ing] a substantial probability that [he or she has] been injured, that the defendant caused [his or her] injury, and that the court could redress that injury."  *Carbon Sequestration Council v. EPA*, 787 F.3d 1129, 1133 (D.C. Cir. 2015) (internal quotation marks omitted) (quoting *Sierra Club v. EPA*, 292 F.3d 895, 899 (D.C. Cir. 2002)); *see also Khadr v. United States*, 529 F.3d 1112, 1115 (D.C. Cir. 2008).  "Each element of standing must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation."  *Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015) (alterations omitted) (quoting *Lujan*, 504 U.S. at 561).  Thus, where the plaintiff's standing is challenged under Rule 12(b)(1), the court must "accept the well-pleaded factual allegations as true and draw all reasonable inferences from those allegations in the plaintiff's favor."  *Id.* (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)); *see also Mendoza*, 754 F.3d at 1010.  In addition, to assure itself of its jurisdiction over a claim, "the district court may consider materials outside the pleadings."  *Jerome Stevens Pharm., Inc. v. FDA*, 402 F.3d 1249, 1253 (D.C. Cir. 2005); *see also Belhas v. Ya'Alon*, 515 F.3d 1279, 1281 (D.C. Cir. 2008) (examining materials outside the pleadings in ruling on a Rule 12(b)(1) motion to dismiss for lack of subject-matter jurisdiction).

### B.      Preliminary Injunction for Relief under the APA

The APA authorizes any "person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action," to seek "judicial review thereof."  5 U.S.C. § 702.  Actions subject to review include "final agency action for which there is no other adequate remedy in a court."  *Id.* § 704.  A "reviewing court shall decide all relevant questions of

law . . . and determine the meaning or applicability of the terms of an agency action." *Id.* § 706. An agency's "interpretation of its own regulations 'controls unless plainly erroneous or inconsistent with the regulation.'" *Press Commc'ns LLC v. FCC*, 875 F.3d 1117, 1121 (D.C. Cir. 2017) (alterations omitted) (quoting *Auer v. Robbins*, 519 U.S. 452, 461 (1997)); *accord Safari Club Int'l v. Zinke*, 878 F.3d 316, 326 (D.C. Cir. 2017) (same). The "court shall [ ] compel agency action unlawfully withheld or unreasonably delayed; and [ ] hold unlawful and set aside agency action, findings, and conclusions found to be," *inter alia*, "arbitrary, capricious, . . . or otherwise not in accordance with law," or "without observance of procedure required by law." 5 U.S.C. § 706(1)–(2)(A), (D).

"Agency action is arbitrary and capricious 'if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, or offered an explanation for its decision that runs counter to the evidence before the agency.'" *Mayo v. Reynolds*, 875 F.3d 11, 19 (D.C. Cir. 2017) (alteration omitted) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.* ("*State Farm*"), 463 U.S. 29, 43 (1983)); *see also Safari Club Int'l*, 878 F.3d at 325 (noting that "[a] disputed action also may be set aside as arbitrary and capricious if the agency has acted 'without observance of procedure required by law'" (citing 5 U.S.C. § 706(2)(D))). A court engaged in arbitrary and capricious review "must 'not substitute its own judgment for that of the agency,'" and "ordinarily uphold[s] an agency's decision so long as the agency 'examined the relevant data and articulated a satisfactory explanation for its action, including a rational connection between the facts found and the choice made.'" *Animal Legal Def. Fund, Inc. v. Perdue*, 872 F.3d 602, 611 (D.C. Cir. 2017) (alterations omitted) (quoting *State Farm*, 463 U.S. at 43).

"A party seeking a preliminary injunction must make a 'clear showing that four factors, taken together, warrant relief: likely success on the merits, likely irreparable harm in the absence of preliminary relief, a balance of the equities in its favor, and accord with the public interest.'" *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 6 (D.C. Cir. 2016) (quoting *Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 505 (D.C. Cir. 2016)). Whether a plaintiff must show each of the four factors independently, or else may make a sufficiently "strong showing on one factor [to] make up for a weaker showing on another," remains an open question in the D.C. Circuit. *Id.* at 7 (quoting *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011)).[8]

When a plaintiff moves for a preliminary injunction, the plaintiff's claims are typically evaluated "under the heightened standard for evaluating a motion for summary judgment." *Food & Water Watch, Inc. v. Vilsack* ("*FWW*"), 808 F.3d 905, 912 (D.C. Cir. 2015). In cases where a moving party has filed only its complaint "and moved for a preliminary injunction contemporaneously," any challenge to standing must be "evaluated under the motion to dismiss standard," pursuant to Federal Rule of Civil Procedure 12(b)(1), because "the litigation ha[s] not proceeded past the pleadings stage." *Id.* at 913.

---

[8] The Supreme Court, in *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008), referred to the four factors conjunctively, indicating that a plaintiff seeking a preliminary injunction "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, *and* that an injunction is in the public interest." *Id.* at 20 (emphasis added). *Winter* pointedly rejected the contention that "when a plaintiff demonstrates a strong likelihood of prevailing on the merits, a preliminary injunction may be entered based only on a 'possibility' of irreparable harm," holding that "plaintiffs seeking preliminary relief [must] demonstrate that irreparable injury is *likely* in the absence of an injunction." *Id.* at 21–22 (emphasis in original). The D.C. Circuit repeatedly has observed that "the so-called 'sliding-scale' approach to weighing the four preliminary injunction factors" may no longer be viable post-*Winter*, but the Circuit has not expressly resolved this question. *League of Women Voters*, 838 F.3d at 7; *see also Pursuing Am.'s Greatness*, 831 F.3d at 505 n.1 ("We need not resolve here any tension in the case law regarding the showing required on the merits for a preliminary injunction."); *Aamer v. Obama*, 742 F.3d 1023, 1043 (D.C. Cir. 2014) ("[I]t remains an open question whether the 'likelihood of success' factor is 'an independent, free-standing requirement,' or whether, in cases where the other three factors strongly favor issuing an injunction, a plaintiff need only raise a 'serious legal question' on the merits. . . . But we have no need to resolve this question here because the remaining factors do not, in any event, weigh in petitioners' favor."); *Sherley*, 644 F.3d at 392–93 ("[W]e read *Winter* at least to suggest if not to hold that a likelihood of success is an independent, free-standing requirement for a preliminary injunction." (internal quotation marks omitted)).

## III.    DISCUSSION

The plaintiffs' standing to sue is discussed first, since that is "a threshold, jurisdictional concept." *Deutsche Bank Nat'l Trust Co. v. FDIC*, 717 F.3d 189, 194 n.4 (D.C. Cir. 2013). HUD challenges the plaintiffs' standing in opposing the plaintiffs' motion for a preliminary injunction, *see* Defs.' Opp'n PI at 15–22, and presses this issue in seeking dismissal of the amended complaint, *see generally* Defs.' Mem. Supp. Mot. Dismiss ("Defs.' Mem. MTD"), ECF No. 38-1.  As explained below, the plaintiffs have fallen short of adequately alleging organizational standing under Article III.[9]  For the same reason, New York's Motion to Intervene is denied for lack of Article III standing.  Moreover, even if the plaintiffs had met the threshold hurdle of organizational standing, they would not be entitled to the requested preliminary injunctive relief.

### A.    The Plaintiffs Do Not Have Standing to Sue

For standing, the plaintiffs must establish three elements: (1) an "injury in fact," *i.e.*, "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical," *Lujan*, 504 U.S. at 560 (citations and internal quotation marks omitted); (2) "a causal connection between the injury and the conduct complained of," *i.e.*, the injury alleged must be fairly traceable to the challenged conduct of the defendant, *id.*; and (3) that a favorable decision must likely redress the injury, *id.* at 561; *see also Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016).  Where multiple plaintiffs have brought suit, "to proceed to the merits of [the plaintiffs'] claims," a court "need only find one party with

---

[9]    The D.C. Circuit's "organizational-standing doctrine and the unwarranted disparity it seems to have spawned between individuals' and organizations' ability to bring suit" has been the focus of pointed concern. *FWW*, 808 F.3d at 926 (Millett, J., concurring) ("Because the majority opinion properly applies our precedent to keep a bad jurisprudential situation from getting worse, I concur.  But I continue to believe that our organizational standing doctrine should be revisited in an appropriate case.").

standing." *Ams. for Safe Access v. Drug Enf't Admin.*, 706 F.3d 438, 443 (D.C. Cir. 2013) (citing *Tozzi v. U.S. Dep't of Health & Human Servs.*, 271 F.3d 301, 310 (D.C. Cir. 2001)). Following a brief summary of the law in this Circuit governing organizational standing, the sufficiency of the plaintiffs' showing on each of the three requisite standing elements is addressed.

### 1. *Overview of Organizational Standing*

An organization "can assert standing on its own behalf, on behalf of its members or both." *Equal Rights Ctr. v. Post Props., Inc.*, 633 F.3d 1136, 1138 (D.C. Cir. 2011). Here, the plaintiffs rely exclusively on the theory of "organizational standing"—*i.e.*, that they have established standing "in [their] own right." *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378 (1982). For organizational standing, each plaintiff is required, "like an individual plaintiff, to show 'actual or threatened injury in fact that is fairly traceable to the alleged illegal action and likely to be redressed by a favorable court decision.'" *Equal Rights Ctr.*, 633 F.3d at 1138 (quoting *Spann v. Colonial Vill., Inc.*, 899 F.2d 24, 27 (D.C. Cir. 1990)).

*Havens*, on which the plaintiffs heavily rely, *see* Pls.' Opp'n Defs.' Mot. Dismiss ("Pls.' Opp'n MTD") at 1, ECF No. 40, is particularly instructive as a seminal Supreme Court case on organizational standing as well as a case involving enforcement of rights under the FHA between private parties. There, the Supreme Court considered whether a plaintiff nonprofit organization "whose purpose was to make equal opportunity in housing a reality in the Richmond Metropolitan Area" and whose "activities included the operation of a housing counseling service, and the investigation and referral of complaints concerning housing discrimination," *Havens*, 455 U.S. at 368 (internal quotation marks and citation omitted), had standing to sue, as an organization "in its own right," a real estate corporation "alleged to have engaged in 'racial steering' violative of" the FHA. *Id.* at 367, 378. The defendant real estate company had, *inter*

*alia*, incorrectly advised black "testers" that apartments were not available in certain apartment complexes. *Id*. at 374.[10] The Supreme Court determined that, at the pleading stage, the nonprofit organization had sufficiently alleged "suffer[ing] injury in fact" for standing, based on alleged facts that the real estate company's "steering practices ha[d] perceptibly impaired [the nonprofit's] ability to provide counseling and referral services for low-and moderate-income homeseekers," and that "[s]uch concrete and demonstrable injury to the organization's activities—with the consequent drain on the organization's resources—constitute[d] far more than simply a setback to the organization's abstract social interests." *Id*. at 379; *see also Elec. Privacy Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity* ("*EPIC*"), 878 F.3d 371, 378 (D.C. Cir. 2017) (explaining that under *Havens*, "an organization may establish Article III standing if it can show that the defendant's actions cause 'a concrete and demonstrable injury to the organization's activities' that is 'more than simply a setback to the organization's abstract social interests'" (quoting *Am. Soc'y for Prevention of Cruelty to Animals v. Feld Entm't, Inc.* ("*Feld*"), 659 F.3d 13, 25 (D.C. Cir. 2011) (quoting *Havens*, 455 U.S. at 379))).[11]

The D.C. Circuit has "establishe[d] two important limitations on the scope of standing under *Havens*," *EPIC*, 878 F.3d at 378 (quoting *Feld*, 659 F.3d at 25 (citing *Havens*, 455 U.S. at 379)), with a two-prong inquiry. In determining when an organizational plaintiff has alleged facts sufficient to demonstrate the first element of Article III standing—injury in fact—the D.C.

---

[10]     "'[T]esters' are individuals who, without an intent to rent or purchase a home or apartment, pose as renters or purchasers for the purpose of collecting evidence of unlawful steering practices." *Havens*, 455 U.S. at 373.

[11]     The *Havens* Court expressed some skepticism about the individual plaintiffs, "irrespective of their status as testers," claiming standing based on their residency in the area and the alleged "indirect" injury of being "deprived of the benefits that result from living in an integrated community," due to the defendant's "steering of persons other than the plaintiff." 455 U.S. at 375. Noting that "[t]his concept of 'neighborhood' standing differs from that of 'tester' standing," for which the injury "is a direct one," the Court pointed out that "[t]he distinction is between 'third-party' and 'first-party' standing." *Id*. For this standing claim for "indirect injury," the Court directed the district court to "afford the plaintiffs an opportunity to make more definite the allegations of the complaint," or "the claims should be dismissed." *Id.* at 378.

Circuit requires "[f]irst [that] the plaintiff must show that the defendant's 'action or omission to act injured the organization's interest.'" *Id.* (quoting *People for the Ethical Treatment of Animals v. U.S. Dep't of Agric.* ("*PETA*"), 797 F.3d 1087, 1094 (D.C. Cir. 2015)). This initial inquiry addresses the requirement in *Havens* that an organizational plaintiff show its services have been "perceptibly impaired," constituting "far more than simply a setback to the organization's abstract social interests." 455 U.S. at 379. The D.C. Circuit has elaborated that an organization's services have been "perceptibly impaired," for the purposes of organizational standing, when the plaintiff demonstrates that "a direct conflict" exists "between the defendant's conduct and the organization's *mission*," *Nat'l Treasury Emps. Union v. United States* ("*NTEU*"), 101 F.3d 1423, 1430 (D.C. Cir. 1996) (emphasis in original); *see also Elec. Privacy Info. Ctr. v. FAA*, 892 F.3d 1249, 1255 (D.C. Cir. 2018); *League of Women Voters*, 838 F.3d at 8; *PETA*, 797 F.3d at 1095; *Abigail All. for Better Access to Developmental Drugs v. Eschenbach* ("*Abigail All.*"), 469 F.3d 129, 133 (D.C. Cir. 2006), and when "the defendant's conduct causes an 'inhibition of [the organization's] daily operations,'" *FWW*, 808 F.3d at 919 (quoting *PETA*, 797 F.3d at 1094); *see also Action All. of Senior Citizens of Greater Phila. v. Heckler* ("*Action All.*"), 789 F.2d 931, 938 (D.C. Cir. 1986). In other words, the defendant's action must be "at loggerheads" with the plaintiffs' mission-driven activities. *NTEU*, 101 F.3d at 1429 (internal quotation marks omitted). This "requirement exists because, '[i]f the challenged conduct affects an organization's activities, but is neutral with respect to its substantive mission,' then it is '"entirely speculative" whether the challenged practice will actually impair the organization's activities.'" *PETA*, 797 F.3d at 1095 (quoting *Feld*, 659 F.3d at 25, 27 (quoting *NTEU*, 101 F.3d at 1430)).

The second prong of *Havens* standing requires a plaintiff to "show that it 'used its resources to counteract [the] harm'" caused by "the defendant's 'action or omission to act.'" *EPIC*, 878 F.3d at 378 (quoting *PETA*, 797 F.3d at 1094). The plaintiff must demonstrate that it has expended "'operational costs beyond those normally expended' to carry out its advocacy mission." *Nat'l Ass'n of Home Builders v. EPA*, 667 F.3d 6, 12 (D.C. Cir. 2011) (quoting *Nat'l Taxpayers Union, Inc. v. United States*, 68 F.3d 1428, 1434 (D.C. Cir. 1995)). When a plaintiff alleges "any chain of allegations for standing purposes" under the *Havens* factors, a court "may reject as overly speculative those links which are predictions of future events (especially future actions to be taken by third parties)." *FWW*, 808 F.3d 905 at 913 (quoting *Arpaio*, 797 F.3d at 21 (quoting *United Transp. Union v. ICC*, 891 F.2d 908, 913 (D.C. Cir. 1989))).

The D.C. Circuit has "elaborated as to when an organization's purported injury is *not* sufficiently concrete and demonstrable to invoke our jurisdiction." *PETA*, 797 F.3d at 1093 (emphasis in original). For instance, "an organization's diversion of resources to litigation or to investigation in anticipation of litigation is considered a 'self-inflicted' budgetary choice that cannot qualify as an injury in fact for purposes of standing." *Id.* (quoting *Feld*, 659 F.3d 13 at 25); *see also Nat'l Taxpayers Union*, 68 F.3d at 1434 ("An organization cannot, of course, manufacture the injury necessary to maintain a suit from its expenditure of resources on that very suit." (quoting *Spann*, 899 F.2d at 27)). Nor is standing available "when the only 'injury' arises from the effect of the regulations on the organizations' lobbying activities," *PETA*, 797 F.3d at 1093 (quoting *Ams. for Safe Access*, 706 F.3d at 457), or, relatedly, when the "'service' impaired is pure issue-advocacy," *id.* at 1093–94 (quoting *Ctr. for Law & Educ. v. Dep't of Educ.*, 396 F.3d 1152, 1162 (D.C. Cir. 2005)); *Turlock Irr. Dist. v. FERC*, 786 F.3d 18, 24 (D.C. Cir. 2015) (finding organization "does not allege impairment of its ability to provide services" when it

alleges "only impairment of its advocacy"). Making these distinctions can get murky, however, prompting the D.C. Circuit to acknowledge that "many of our cases finding *Havens* standing involved activities that could just as easily be characterized as advocacy—and, indeed, sometimes are." *Feld*, 659 F.3d at 27; *see also PETA*, 797 F.3d at 1094 n.4.

An organizational plaintiff must, in addition to alleging facts to establish cognizable harm under *Havens*, satisfy the requirements for alleging the second and third elements of Article III standing—causation and redressability. In a case where "a plaintiff's asserted injury arises from the Government's regulation of a third party that is not before the court, it becomes 'substantially more difficult' to establish standing." *Nat'l Wrestling Coaches Ass'n v. Dep't of Educ.* ("*Nat'l Wrestling*"), 366 F.3d 930, 938 (D.C. Cir. 2004) (quoting *Lujan*, 504 U.S. at 562 (citing *Allen v. Wright*, 468 U.S. 737, 758 (1984))). "Because the necessary elements of causation and redressability in such a case hinge on the independent choices of the regulated third party, 'it becomes the burden of the plaintiff to adduce facts showing that those choices have been or will be made in such manner as to produce causation and permit redressability of injury.'" *Id.* (quoting *Lujan*, 504 U.S. at 562). Thus, "mere 'unadorned speculation' as to the existence of a relationship between the challenged government action and the third-party conduct 'will not suffice to invoke the federal judicial power.'" *Id.* (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 44 (1976)).

"While the burden of production to establish standing is more relaxed at the pleading stage than at summary judgment, a plaintiff must nonetheless allege 'general factual allegations of injury resulting from the defendant's conduct' (notwithstanding 'the court presumes that general allegations embrace the specific facts that are necessary to support the claim')." *Nat'l Ass'n of Home Builders*, 667 F.3d at 12 (quoting *Sierra Club*, 292 F.3d at 898–99); *see also*

*Lujan*, 504 U.S. at 561 ("[E]ach element [of standing] must be supported . . . with the manner and degree of evidence required at the successive stages of the litigation.").

### 2. *Analysis of Plaintiffs' Organizational Standing*

The plaintiffs aver that they collectively "have alleged facts that . . . constitute injuries in fact traceable to the Defendants' actions and redressable by this Court" because HUD's withdrawal of the LG2017 Tool has "effectively suspend[ed]" the AFFH Rule, thereby frustrating their "abilit[ies] to carry out [their] missions," making "it harder for [them] to provide core programmatic services," and requiring them "to divert resources to efforts to counteract the effect of that action." Pls.' Opp'n MTD at 1, 5. HUD disputes that withdrawal of this Tool constitutes a suspension of the AFFH Rule and contends that the plaintiffs' "dissatisfaction with policy choices made by [HUD] in determining how best to administer its block-grant programs for local governments" does not "rise[ ] to the level of an Article III case or controversy." Defs.' Reply Supp. Mot. Dismiss ("Defs.' Reply MTD") at 1, ECF No. 41. Moreover, in HUD's view, the plaintiffs' "litany of complaints about" the manner in which local governments comply with the AFFH statutory requirement "all . . . 'hinge on the independent choices' of third parties not before the Court." Defs.' Mem. MTD at 20 (quoting *Nat'l Wrestling*, 366 F.3d at 938).

HUD's position, thus, is that the plaintiffs, who are not themselves regulated entities, "lack a cognizable Article III injury that can properly be traced to HUD and redressed by this Court, and for that reason the Amended Complaint should be dismissed." Defs.' Reply MTD at 1. The plaintiffs counter that they do not "claim[ ] harm [ ] based on local governments' failure to reach particular substantive outcomes," but rather that their "injury derives directly from HUD's suspension of concrete requirements for local governments," and, thus, "requiring HUD to reinstate those requirements—all of which make it much easier for Plaintiffs to do their work

and advance their missions—would directly redress the injuries that Plaintiffs claim." Pls.'
Opp'n MTD at 17. This is a close case, but HUD has the more persuasive argument on standing.

*a)*      *First Element: Injury in Fact*

HUD's acknowledgment of the superiority of the AFH process set out in the AFFH Rule,
over the admittedly flawed AI process, in meeting the AFFH statutory requirement, *see* Mot.
Hr'g at 68:25–69:5, does not confer organizational standing on the plaintiffs, even though
adoption by the agency of a less effective process may frustrate the plaintiffs' overarching
missions of promoting compliance with the AFFH statutory requirement. A cognizable injury
for the purposes of standing is not so simply met; if it were, anyone genuinely interested in
promoting steps for affirmatively furthering fair housing could have standing in the instant
matter. As the D.C. Circuit has explained, "[s]tanding protects democratic government by
requiring citizens to express their generalized dissatisfaction with government policy through the
Constitution's representative institutions, not the courts," *Coal. for Mercury-Free Drugs v.
Sebelius*, 671 F.3d 1275, 1278–79 (D.C. Cir. 2012), and "thus helps preserve the Constitution's
separation of powers and demarcates 'the proper—and properly limited—role of the courts in a
democratic society,'" *id.* at 1279 (quoting *Warth v. Seldin*, 422 U.S. 490, 498 (1975)). *See also
FWW*, 808 F.3d at 926 (Henderson, J., concurring) (noting that "our circuit has drawn a bright-
line between private-party suits and suits against the government to compel the state to take, or
desist from taking, certain action," the latter of which "implicate most acutely the separation of
powers, which, the Supreme Court instructs, is the 'single basic idea' on which the Article III
standing requirement is built" (quoting *Spann*, 899 F.2d at 25–26)).

The plaintiffs' asserted injury must be clearly identified and then assessed under the D.C.
Circuit's two-prong analysis for determining whether an organizational plaintiff has established a
cognizable injury under *Havens*. First, the plaintiffs must show that HUD's withdrawal of the

LG2017 Tool and reversion to the AI process "perceptibly impaired a non-abstract interest" of the plaintiffs, *see Nat'l Ass'n of Home Builders*, 667 F.3d at 12 (internal quotation marks omitted), and "[s]econd, the plaintiff must show that it 'used its resources to counteract that harm,'" *EPIC*, 878 F.3d at 378 (quoting *PETA*, 797 F.3d at 1094).

> *(1)     Withdrawal of the LG2017 Tool does not perceptibly impair the plaintiffs' missions*

The plaintiffs allege that they have suffered an injury because "HUD's suspension of the AFFH Rule impairs their ability to carry out their respective missions," Pls.' Opp'n MTD at 5, and because withdrawal of the LG2017 Tool has deprived them of "critical procedural protections that make it far easier to develop and promote local policies that affirmatively further fair housing," *id.* at 1. As noted, *supra* Part I.B.1, the plaintiffs' overarching missions are to promote fair housing. In particular, NFHA seeks "to promote residential integration and combat discrimination in housing based on race, national origin, disability, and other protected classes covered by federal, state, and local fair housing laws." Am. Compl. ¶ 16; *see also* Second Decl. Deborah Goldberg, Vice President of Housing & Special Projects, NFHA ("NFHA Decl.") (dated June 25, 2018) ¶ 2, ECF No. 37-2. Texas Housers focuses "on expanding housing opportunities for low-income residents of Texas," Am. Compl. ¶ 17, and has "worked on issues relating to residential segregation and access to fair housing choice throughout Texas," Second Decl. John Henneberger, Co-Director, Texas Housers ("Texas Housers Decl.") ¶ 3, ECF No. 19-6. Finally, Texas Appleseed seeks "to promote social and economic justice for all Texans, including by" helping Texans "recover in the wake of natural disasters," ensuring "communities are rebuilt to be more resilient," and ensuring "that all families have the opportunity to live in safe, decent neighborhoods with equal access to educational and economic opportunity." Am.

Compl. ¶ 18; *see also* Second Decl. Madison Sloan, Director of the Disaster Recovery & Fair Housing Project, Texas Appleseed ("Texas Appleseed Decl.") ¶ 2, ECF No. 19-7.

The plaintiffs contend that HUD's withdrawal of the LG2017 Tool harmed their ability to carry out these missions because "HUD's action deprives Plaintiffs of many of the Rule's procedural protections," including "the requirements that jurisdictions solicit community participation," "respond to public comments, and undergo HUD review." Pls.' Opp'n MTD at 6. The plaintiffs cite, as examples, four AFFH Rule provisions for this procedural injury assertion: (1) 24 C.F.R. § 5.158, which "describe[es] community participation, consultation, and coordination"; (2) 24 C.F.R. § 91.100(a)(1), which "list[s] the types of organizations with which program participants must consult, including fair housing groups"; (3) 24 C.F.R. § 5.154(d)(6), which "requir[es] program participants to respond to public comments"; and (4) 24 C.F.R. § 5.162, which "provid[es] for HUD review and acceptance or non-acceptance of program participants' AFH submissions." *Id.* The plaintiffs further allege that withdrawal of the LG2017 Tool "hinder[s] Plaintiffs' ability to obtain the information necessary to monitor and ensure jurisdictions' compliance with the requirement to affirmatively further fair housing." *Id.*[12] These arguments fail to recognize that many aspects of the AFFH Rule remain active, even with the withdrawal of the LG2017 Tool, and, in light of these active provisions, HUD's withdrawal of the Tool does not "perceptibly impair" the plaintiffs' abilities to carry out their missions,

---

[12] Based on the plaintiffs' briefing, the defendants conjured that the plaintiffs put forth "three overlapping theories of Article III standing—informational, procedural, and organizational." Defs.' Reply MTD at 2. Plaintiffs' counsel clarified at the motions hearing that the plaintiffs are not claiming an informational injury, Mot. Hr'g at 37:2–8 (responding to Court's query whether "[y]ou are not claiming . . . an informational injury; is that right?" plaintiffs' counsel stated "Yes"). Instead, the injury claimed by the plaintiffs is that "the deprivation of these procedural and informational mechanisms are causing plaintiffs' activities to be perceptibly impaired, and that's frustrating their mission. We are not [ ] arguing, specifically, that the denial of the information is, like in a FOIA case, the harm standing alone." *Id.* at 36:13–20; *see also* Pls.' Opp'n MTD at 15 (claiming procedural injury).

*League of Women Voters*, 838 F.3d at 8, or cause a "direct conflict" with the organizations' *mission[s]*," *NTEU*, 101 F.3d at 1430.

As an initial matter, and as all parties concede, certain key portions of the AFFH Rule remain active, including the definitions of "affirmatively furthering fair housing," "community participation," and certain "data," which all apply when local governments submit their Consolidated Plans to HUD and certify their compliance with the AFFH requirement. *See* 24 C.F.R. §§ 5.152, 91.225(a)(1); Mot. Hr'g at 14:24–21:24; 61:2–64:11. These new definitions apply to the AIs that local government agencies, as well as other program participants, must complete in lieu of AFHs, *see* Mot. Hr'g at 61:2–64:11, and, rather than *impede* the plaintiffs' missions, these new, more detailed definitions actually *aid* their missions.

In addition, while the plaintiffs argue that withdrawal of the LG2017 Tool "deprives Plaintiffs" of "the requirement[ ] that jurisdictions solicit community participation," Pls.' Opp'n MTD at 6, the AFFH Rule includes new community participation requirements that remain active even without use of the AFH process and Assessment Tools. For example, the new regulation, 24 C.F.R. § 5.158, which the plaintiffs specifically identify as a basis for their injury, *see* Pls.' Opp'n MTD at 6, requires that, "[t]o ensure that the AFH, *the consolidated plan, and the PHA Plan and any plan incorporated therein* are informed by meaningful community participation," program participants must "employ communications means designed to reach the broadest audience," including by, *inter alia*, "publishing a summary of each document in one or more newspapers of general circulation, and by making copies of each document available on the Internet," 24 C.F.R. § 5.158(a) (emphasis added). Thus, to the extent the plaintiffs argue they have been deprived of any benefit conferred by this regulation, they are mistaken because the provision continues to be active.

Similarly, § 91.100(a)(1), also cited by the plaintiffs in asserting their injury, continues to require "consult[ation] with other public and private agencies that provide assisted housing, health services, and social services" in the preparation of a Consolidated Plan. 24 C.F.R. § 91.100(a)(1). Despite the fact that local government program participants temporarily have been relieved of the obligation to prepare and submit AFHs, they are still required to submit Consolidated Plans and, in doing so, must continue to solicit community participation. Although the plaintiffs posit that the public participation requirements attendant to the Consolidated Plan process "are not equivalent to those imposed as part of the AFH process that HUD has suspended," Pls.' Opp'n MTD at 9–10, the difference is not so great as to "'perceptibly impair[ ]' the [plaintiffs'] ability to provide services in order to establish injury in fact." *Turlock Irr. Dist.*, 786 F.3d at 24 (quoting *Equal Rights Ctr.*, 633 F.3d at 1138–39). The fact that these provisions remain active, despite withdrawal of the LG2017 Tool, indicates that the plaintiffs' missions have not been "perceptibly impaired" by HUD's actions.

Given that significant requirements of the AFFH Rule remain intact, the fact that certain other obligations cited by the plaintiffs, including 24 C.F.R. § 5.154(d)(6) (public comments process) and § 5.162 (submission to, and review by, HUD of AFHs), are presently dormant does not translate to the dismantling and suspension of the AFFH Rule in a way that affects the plaintiffs' mission-driven activities to a degree that is sufficient for showing organizational standing. To be sure, withdrawal of the LG2017 Tool has suspended certain procedures and additional analysis required under the AFFH Rule and resulted in a concomitant loss in the effectiveness of HUD's enforcement of the AFFH statutory requirement. Yet, even granting that the plaintiffs' mission has been compromised by HUD's actions "does not impart standing." *Nat'l Taxpayers Union*, 68 F.3d at 1433. Given the continuing opportunities for the plaintiffs to

participate in the now somewhat more robust AI process (due to the portions of the AFFH Rule that remain active), the extent to which the challenged HUD notices directly conflict or perceptibly impede the plaintiffs' mission-oriented activities seems difficult to measure, or, in other words, are imperceptible.

This conclusion is bolstered by examination of the plaintiffs' descriptions of their daily operations, which have not been perceptibly impeded because they remain able to "educate community members and organizations, organize individuals to attend public meetings," "develop and submit public comments," and "work with community members and government entities," Pls.' Opp'n MTD at 6–7, even without program participants being required to submit an AFH. Indeed, the plaintiffs' declarations indicate that they have been taking precisely these actions since the withdrawal of the LG2017 Tool. *See, e.g.*, NFHA Decl. ¶¶ 8, 10 (explaining that, after HUD's withdrawal of the LG2017 Tool, NFHA has been "conducting affirmative outreach to NFHA members" and "provid[ing] extensive comments in response to HUD's January notice"); Texas Housers Decl. ¶ 17 (noting Texas Housers' actions after withdrawal of the Tool of "participat[ing] in a number of conference calls with national partners," "provid[ing] an on line webinar," and "submit[ing] extensive comments to HUD objecting to the suspension of the rule and the AFH process"). Perhaps most significantly, the plaintiffs can still encourage local government program participants to use the now-withdrawn LG2017 Tool; indeed, the plaintiffs' declarations reveal that "[t]hree large Regional AFHs in Texas [ ] are proceeding using the AFH assessment process and tool despite HUD's actions to withdraw the AFH tool." Texas Appleseed Decl. ¶ 24; *see also* Texas Housers Decl. ¶ 17 (noting that Texas Housers has "urge[d] local jurisdictions to continue to use the AFH template and HUD data to submit AFHs rather than AIs").

Furthermore, although the plaintiffs contend that the LG2017 Tool "require[d]" program participants to engage in community participation efforts, Pls.' Opp'n MTD at 9, the AFFH Rule indicates that many forms of community participation that the plaintiffs complain are no longer available were not mandatory in the AFH process. *See, e.g.*, AFFH Rule, 80 Fed. Reg. at 42,325 (noting that "consultation with adjacent units of general local government, while encouraged, *is not mandatory*") (emphasis added); *id.* at 42,328 (noting that "HUD already strongly encourages collaboration by program participants"); *id.* at 42,332 (encouraging, but not requiring, "PHAs to collaborate with relevant entities); *id.* at 42,339 (noting that, while "[p]rogram participants are encouraged to undertake active outreach efforts" such as "survey[ing] local opinions about diversity," "the rule does not require it outside of the public participation requirements in the rule"). Given the discretionary nature of these rules, HUD's withdrawal of LG2017 has not deprived the plaintiffs of such procedural protections.

The plaintiffs also argue that withdrawal of the LG2017 Tool harmed their ability to carry out their missions by relieving HUD of the obligation to review each program participant's AFH and provide feedback during the process. Pls.' Opp'n MTD at 6. Although local governments temporarily have been relieved of the obligation to submit AFHs, and HUD temporarily has been relieved of the obligation to review and accept AFHs, HUD continues to review Consolidated Plans. Under an active provision of the AFFH Rule, Consolidated Plans must now include a certification that the participant "will affirmatively further fair housing," 24 C.F.R. § 5.166(a), and the AFFH Rule includes "[n]ew AFFH certification language at §§ 91.225, 91.325, 91.425, and 903.15(d)(3)," providing "the standard under which HUD will review the validity of AFFH certifications," AFFH Rule, 80 Fed. Reg. at 42,299. HUD therefore remains engaged in reviewing program participants' certification efforts, indicating that withdrawal of the LG2017

Tool did not result in "a direct conflict between the defendant's conduct and the [plaintiffs'] mission[s]." *Abigail All.*, 469 F.3d at 133.

The plaintiffs primarily invoke two cases to show how they have suffered cognizable harm from HUD's withdrawal of the LG2017 Tool, but the cases are distinguishable. First, the plaintiffs rely on *Action Alliance*, 789 F.2d 931 (D.C. Cir. 1986), to argue that HUD's action "deprive[d] them of regularized 'access to information and avenues of redress they wish to use in their routine' activities in furtherance of their missions." Pls.' Opp'n MTD at 7 (quoting *Action All.*, 789 F.2d at 937–38). In *Action Alliance*, the organizational plaintiff asserted that an agency's elimination of two regulations restricted "a generous flow of information regarding services available to the elderly" that would have "enhance[d] the capacity of [the plaintiff] to refer members to appropriate services." *Action All.*, 789 F.2d at 937. The D.C. Circuit concluded that the organizational plaintiff had standing, because the plaintiffs had "alleged inhibition of their daily operations" and because "the ultimate relief appellants seek cannot sensibly be viewed as dependent upon the actions of third parties." *Id.* at 938. Here, however, the plaintiffs have not established that their daily operations were inhibited. Before withdrawal of the LG2017 Tool, the plaintiffs were engaged in "researching and assessing impediments to fair housing," "organiz[ing] and conduct[ing] community meetings," and "train[ing] local residents on the requirements of the AFH rules." Texas Housers Decl. ¶ 7. After withdrawal of the Tool, the plaintiffs contend that they will have to "meet on an ongoing and regular basis with community groups," "analyze public records related to governmental expenditures," and "convene meetings and information sharing activities to keep local affected persons and organizations involved and informed about each of the many fair housing issues that confront the area." *Id.* ¶ 14. The plaintiffs' daily operations therefore do not appear to be tangibly different

in kind to those occurring before the withdrawal of the LG2017 Tool or to have been "perceptibly impaired" by HUD's withdrawal of the LG2017 Tool. *League of Women Voters*, 838 F.3d at 8.

The plaintiffs similarly rely on *PETA* and argue that they have been "harm[ed] [ ] in similar ways" to the plaintiff in that case. Pls.' Opp'n MTD at 8. In *PETA*, the D.C. Circuit concluded that the organization had standing because the U.S. Department of Agriculture's ("USDA's") failure to apply certain animal welfare regulations to birds "perceptibly impaired PETA's ability to both bring [Animal Welfare Act ('AWA')] violations to the attention of the agency charged with preventing avian cruelty and to continue to educate the public." *PETA*, 797 F.3d at 1095 (internal quotation marks omitted). Importantly, AWA violations could be brought only if the animal in question fell within the scope of the AWA, which did not include birds, and although the USDA had issued a Notice of Proposed Rulemaking for "avian-specific animal welfare regulations," *id.* at 1091, the agency "ha[d] repeatedly set, missed, and then rescheduled deadlines" for the publication of those regulations, *id.*, thereby directly preventing PETA from being able to bring AWA violations to the agency.

Here, however, HUD's withdrawal of the LG2017 tool has not prevented the plaintiffs from being able to file complaints with HUD, as several of the plaintiffs have done successfully in the past. *See, e.g.*, Texas Appleseed Decl. ¶ 4 (describing the Texas Plaintiffs' 2009 discrimination complaint against HUD based on Texas's allegedly inadequate AI); Texas Housers Decl. ¶ 4 (same). Similarly, the plaintiffs here remain able to "continue to educate the public" and to seek "investigatory information" from program participants, rather than directly from HUD. *PETA*, 797 F.3d at 1095. For example, the plaintiffs may continue to "analyze public records related to governmental expenditures, practices and policies," Texas Housers

Decl. ¶ 14, and may even encourage local government program participants to continue using the LG2017 Tool despite HUD's withdrawal, *see* Texas Appleseed Decl. ¶ 24 (noting that "[t]hree large Regional AFHs in Texas [ ] are proceeding using the AFH assessment process and tool despite HUD's actions to withdraw the AFH tool").  Unlike the organization in *PETA*, then, the plaintiffs remain able to bring an entity's failure to meet its AFFH obligations to HUD and to educate the public regarding AFFH obligations.

For all the reasons provided, the plaintiffs have not satisfied the first prong of *Havens* standing, which requires a showing that the plaintiffs' mission-driven activities were perceptibly impaired.

> (2)      *Withdrawal of the LG2017 Tool has not caused a drain in the plaintiffs' resources*

Even if the necessary impairment were established, the plaintiffs have also failed to satisfy the second prong of *Havens* standing—a showing that they have had to divert resources to counteract the withdrawal of the LG2017 Tool in the form of expending "'operational costs beyond those normally expended' to carry out [their] advocacy mission[s]." *Nat'l Ass'n of Home Builders*, 667 F.3d at 12 (quoting *Nat'l Taxpayers Union*, 68 F.3d at 1434).  The plaintiffs claim that, "[b]y removing the procedural protections and clear accountability structure of the AFFH Rule, HUD has compelled Plaintiffs to divert significant resources to efforts to counteract the effects of suspension."  Pls.' Opp'n MTD at 12.  This claim falls for two main reasons.

First, as explained above, the plaintiffs are largely engaged in the same kinds of activities now that they were undertaking before the withdrawal of the LG2017 Tool and even before promulgation of the AFFH Rule, namely, education, research, advocacy, and counseling.  For example, the plaintiffs allege that HUD's withdrawal of the LG2017 Tool has forced them to "put[ ] greater resources into community education efforts, without the benefit of the focused

AFH process to do it more efficiently." *Id.* at 13. The plaintiffs' argument admits, however, that even without the withdrawal of the Tool, they would be engaged in the same activity— withdrawal of the Tool merely makes their efforts less "efficient[ ]." *Id.*

The plaintiffs' declarations further reveal that withdrawal of the LG2017 Tool has not required that they spend more on operational costs. For example, before withdrawal of the LG2017 Tool, Texas Housers "hired researchers, consultants and contractors to develop information and policy solutions around locally specific fair housing issues that could be addressed through the AFH process," "organized and conducted many small and large community meetings," and "trained local residents on the requirements of the AFH rules." Texas Housers Decl. ¶ 7. In these efforts, Texas Housers spent at least $60,000, which represents only part of its work. *See id.* (providing amounts of money spent on AFH efforts in Fort Worth ("at least $7,000"), Amarillo and Lubbock ("at least $13,000"), and Hidalgo County ("at least $40,000")). After HUD's withdrawal of the LG2017 Tool, Texas Housers continues to "participate[ ] in a number of conference calls with national partners," "provide[ ] an on line webinar," "communicate with[ ] many jurisdictions in Texas," and "invest resources in educating local groups." *Id.* ¶¶ 17, 22. Now, rather than expend money and resources helping local groups understand and participate in the AFH process, Texas Housers is expending resources encouraging local jurisdictions to continue following the AFH process. In fact, although Texas Housers contends that it will, for instance, "be required to expend additional resources" in Hidalgo County "to secure compliance by HUD," *id.* ¶ 14, Texas Housers provides no dollar figure to show an increase in its operational costs over those costs associated with ensuring this jurisdiction fully complied with the AFH process. The other plaintiffs have similarly failed to demonstrate that withdrawal of the LG2017 Tool has caused them to modify the general nature

of their daily activities or to increase the amount of money they spend on their operational costs. *Compare, e.g.*, NFHA Decl. ¶ 6 (explaining that, after the AFFH Rule was promulgated, NFHA "provided training, technical assistance, and support to NFHA members that were engaging in the community participation process" for AFHs) *with id.* ¶ 10 (noting that, after withdrawal of the LG2017 Tool, NFHA is "developing written materials to help members continue advocating for effective AFFH activities in their communities and counseling and providing technical support to individual members").  Any shift in the plaintiffs' focus simply does not amount to the expenditure of "operational costs beyond those normally expended."  *Nat'l Taxpayers Union*, 68 F.3d at 1434.

In addition, the law is clear that "budgetary choice[s]" do not satisfy the requirements for demonstrating a "consequent drain on resources."  *Feld*, 659 F.3d at 25.  The plaintiffs allege that, after the withdrawal of the LG2017 Tool, they "have had to divert resources to attempt to generate the same local fair housing commitments that the Rule would have required as a matter of law," Pls.' Opp'n MTD at 13, and have "been forced to divert resources from planned activities such as events to commemorate the 50th anniversary of the passage of the Fair Housing Act, the publication of its annual trends report, technical assistance to its members regarding equitable disaster recovery, and federal fair lending advocacy," *id.* at 14.  The plaintiffs made a choice to spend their money on "written materials," "counseling," and "technical support" to "continue advocating for effective AFFH activities" after withdrawal of the Tool, rather than to spend that money on publishing an annual trends report or on equitable disaster recovery.  NFHA Decl. ¶ 10.  The plaintiffs cannot claim to have been injured by this reallocation of funds "simply because [they] chose to spend [their] money" on some programs rather than on others.  *Equal Rights Ctr.*, 633 F.3d at 1139.  Although the plaintiffs contend that this diversion of resources

was necessary to counteract HUD's "unlawful[ ]" action, Pls.' Opp'n MTD at 13, as discussed above, HUD's withdrawal of the LG2017 Tool did not cause perceptible harm to the plaintiffs' abilities to further their missions. The plaintiffs' diversion of resources to counteract that unestablished harm thus cannot, on its own, satisfy the standing requirements. Accordingly, the plaintiffs have failed to allege all components of an Article III injury in fact and do not have organizational standing in this matter.

### b) Second and Third Elements: Causation and Redressability

The plaintiffs' arguments for causation and redressability are entirely premised on the plaintiffs' theory of injury in fact. In the plaintiffs' view, their "injury derives directly from HUD's suspension of concrete requirements for local governments," and, thus, "[a]n order requiring HUD to reinstate those requirements—all of which make it much easier for Plaintiffs to do their work and advance their missions—would directly redress the injuries that Plaintiffs claim." *Id.* at 17. As explained above, since HUD's withdrawal of the LG2017 Tool did not cause a cognizable injury under the theory of organizational standing that the plaintiffs put forth, the plaintiffs' causation and redressability arguments cannot hold. In any event, when injury in fact is not established, causation and redressability need not be considered.

Even assuming, however, the plaintiffs could establish that HUD's withdrawal of the LG2017 Tool caused a cognizable injury, any theories of causation and redressability that the plaintiffs assert would be too speculative because redress would largely be premised on the actions of third parties. The plaintiffs, obviously, are not HUD grantees, nor are they required to prepare an AFH or use the LG2017 Tool. Defs.' Mem. MTD at 10. As the D.C. Circuit has noted, "courts [only] occasionally find the elements of standing to be satisfied in cases challenging government action on the basis of third-party conduct." *Nat'l Wrestling*, 366 F.3d at 940; *see also Arpaio*, 797 F.3d at 20 ("We have required 'substantial evidence of a causal

relationship between the government policy and the third-party conduct, leaving little doubt as to causation and the likelihood of redress.'" (quoting *Nat'l Wrestling*, 366 F.3d at 941)); *Renal Physicians Ass'n v. U.S. Dep't of Health & Human Servs.*, 489 F.3d 1267, 1275 (D.C. Cir. 2007). In *National Wrestling*, the plaintiffs, who were "membership organizations representing the interests of collegiate men's wrestling coaches, athletes, and alumni," *Nat'l Wrestling*, 366 F.3d at 935, challenged an interpretive rule promulgated by the Department of Education, which laid out three ways in which the Department would assess whether educational institutions had complied with Department regulations requiring such institutions to select sports and levels of competition to "effectively accommodate the interests and abilities of members of both sexes," *id.* at 934–35 (internal quotation marks omitted).

The D.C. Circuit found causation and redressability lacking in *National Wrestling* because "nothing but speculation suggests that schools would act any differently than they do with the [challenged interpretive rule] in place" since "[s]chools would remain free to eliminate or cap men's wrestling teams and may in some circumstances feel compelled to do so to comply with the statute and the [previous Department] Regulations." *Id.* at 940. Further, the court found that "other reasons unrelated to the challenged legal requirements [*e.g.*, moral considerations, budget constraints] may continue to motivate schools to take such actions." *Id.* From this analysis, and a comprehensive review of the case law, the *National Wrestling* court concluded that "it is purely speculative whether a decision in appellants' favor would alter the process by which schools determine whether to field certain sports teams." *Id.* at 944.

Similarly here, even with the LG2017 Tool in place, local governments may still not engage in all the activities that the plaintiffs assert are necessary for those entities to affirmatively further fair housing. For instance, the Hidalgo County Consortium was obligated

to complete and submit an AFH to HUD, but the Consortium failed to engage with certain populations, including *colonias*, to the plaintiffs' satisfaction. *See* Pls.' Mem. Supp. Renewed Mot. Preliminary Injunction & for Summ. J. ("Pls.' Mem. PI") at 36–37, ECF No. 19-11. In fact, as even the plaintiffs note, "[i]n essence, the Hidalgo AFH had all of the same problems that prior AIs had, either because Hidalgo County was not attentive to the new requirements, or thought that HUD wouldn't enforce them." Texas Appleseed Decl. ¶ 16. While this example makes plain that the LG2017 Tool—or any Assessment Tool under the AFFH Rule—is no panacea, the plaintiffs contend that "HUD's withdrawal of the AFH places additional barriers in the way of convincing" jurisdictions such as Hidalgo County "to conduct a fair housing assessment that complies with their statutory obligation to AFFH." *Id.* ¶ 19. At this point, however, given the uncertainty surrounding the effect of the AFH process, as it has thus far existed, whether reinstatement of the LG2017 Tool would result in any greater efforts of HUD grantees to comply with their statutory obligations under the AFFH requirement is too speculative. *See* LG2017 Withdrawal Notice, 83 Fed. Reg. at 23,924 (explaining that 63 percent of AFHs originally submitted were not acceptable).

Moreover, it is worth noting that the reasoning at the heart of *National Wrestling* is not unique and has been applied in numerous other cases from this Circuit and in the Supreme Court to conclude that a plaintiff lacks standing. *See, e.g.*, *Allen*, 468 U.S. at 758; *Simon*, 426 U.S. at 40–46; *Warth*, 422 U.S. at 507; *Renal Physicians*, 489 F.3d at 1276–78; *Crete Carrier Corp. v. EPA*, 363 F.3d 490, 493–94 (D.C. Cir. 2004); *Fla. Audubon Soc'y*, 94 F.3d at 669–71; *Freedom Republicans, Inc. v. FEC*, 13 F.3d 412, 416–19 (D.C. Cir. 1994); *see also Arpaio*, 797 F.3d at 27–28 (finding arguments for causation "overly speculative" where the "injury rest[ed] on the behavior of third parties" and "[t]he link between" the government programs at issue and the

future actions of third parties was "too attenuated and susceptible to intervening factors"); *Grocery Mfrs. Ass'n v. EPA*, 693 F.3d 169, 176 (D.C. Cir. 2012) (finding alleged injury "speculative at best" where it "depend[ed] upon the acts of third parties not before the court"); *C-SPAN v. FCC*, 545 F.3d 1051, 1054–57 (D.C. Cir. 2008) (concluding that plaintiffs lacked standing to challenge regulation imposed on third-party market participants where causation and redressability were "speculative").

The exceptions to this line of cases further illuminate the insufficiency of the plaintiffs' showing regarding standing. In two cases from this Circuit—*Tozzi v. U.S. Department of Health & Human Services*, 271 F.3d 301 (D.C. Cir. 2001), and *Block v. Meese*, 793 F.2d 1303 (D.C. Cir. 1986)—the Court of Appeals found causation and redressability despite the fact that the challenged agency actions regulated third parties not before the court. As the Circuit recognized in *National Wrestling*, however, both of those cases contained "record[s] [that] presented substantial evidence of a causal relationship between the government policy and the third-party conduct, leaving little doubt as to causation and the likelihood of redress." *Nat'l Wrestling*, 366 F.3d at 941. For example, in *Tozzi*, the plaintiffs, who were manufacturers of PVC plastic that contained the chemical dioxin, challenged a decision by the U.S. Department of Health and Human Services to add dioxin to the category of "known" carcinogens. *See id.* (discussing *Tozzi*). The court found standing based on the introduction of "affidavits and other record evidence demonstrating that municipalities and health care organizations opted to phase out their use of PVC plastic as a direct result of the Secretary's decision." *Id.* (citing *Tozzi*, 271 F.3d at 308–09). Similarly, *Block* involved a challenge by a group of film distributors to a decision of the Department of Justice to classify certain films as "political propaganda." *Block*, 793 F.2d at 1306–07. The court concluded that the plaintiffs had established causation and redressability

based on "the recitation of instances in which potential customers declined to take the film because of the classification," as well as based on "the affidavits of potential customers" stating that they would have purchased the films but for the government's classification. *Id.* at 1308.

In this case, the plaintiffs point to evidence that, but for HUD's withdrawal of the LG2017 Tool, particular jurisdictions would have engaged in the more rigorous analysis outlined under the AFFH Rule for the AFH process. For instance, several local government agencies in Hidalgo County, Corpus Christi, and Fort Worth prepared deficient AFHs and, without the LG2017 Tool in place and the HUD submission requirement, these jurisdictions have no incentive to work on improving their AFHs and thus will submit equally deficient AIs. *See* Texas Housers Decl. ¶¶ 14–16; Texas Appleseed Decl. ¶¶ 15–21. The same evidence of the deficient AFHs, however, demonstrates that, even *with* the LG2017 Tool in place, these jurisdictions fell short of complying with HUD guidance and requirements. *See, e.g.*, Texas Appleseed Decl. ¶ 16 (discussing Hidalgo County Consortium's failure to "consider and accept or reject any of the comments [the plaintiffs] submitted" on its AFH); *id.* (explaining Hidalgo county's failure to "examine neighborhood level segregation and disparities in access to opportunity" in its AFH); Texas Housers Decl. ¶ 15 (noting Fort Worth's failure to "address important civil rights issues" in its AFH); *id.* ¶ 16 (providing that Corpus Christi's AFH "barely acknowledged massive housing loss, extended displacement, and infrastructure impacts caused by Hurricane Harvey just a few months earlier"). This evidence does not readily suggest, let alone establish, that reinstatement of the LG2017 Tool will result in compliance with AFFH Rule requirements by these or other program participants. *See, e.g.*, LG2017 Withdrawal Notice, 83 Fed. Reg. at 23,924 (providing that 63 percent of AFHs originally submitted were not

acceptable). For these reasons, the plaintiffs' submissions have not demonstrated that this case falls within the exceptions to *National Wrestling*.

* * *

For these reasons, the plaintiffs have failed to allege facts sufficient to satisfy any of the three elements of Article III standing as organizational plaintiffs challenging HUD's two May notices withdrawing the LG2017 Tool for local government agencies and directing compliance with the prior AI process. Essentially, the plaintiffs in this case have asked this Court to undo HUD's choice among alternative mechanisms for overseeing local government agencies' compliance with a particular component of agency-administered grant programs, while the statutory requirement remains intact, the agency rule remains at least in part effective, and the plaintiffs' mission-driven activities, though more challenging, continue unimpeded. The Court is without jurisdiction to micromanage agency choices on program implementation when the plaintiffs bringing suit lack a cognizable injury to their mission of having program participants fulfill an important statutory requirement more effectively and also do not have a cognizable injury that is caused by the challenged agency action or fully redressable, even if that agency action were ordered reversed.

### B. The Plaintiffs Are Not Entitled to a Preliminary Injunction

The plaintiffs have failed to meet the threshold hurdle of showing organizational standing under the Rule 12(b)(1) standard. Had this showing been made, the plaintiffs would nonetheless not be entitled to the preliminary injunctive relief they seek under the heightened standard for resolving motions for preliminary injunctions, as explained below.

#### 1. *The Plaintiffs Have Not Established a Likelihood of Success on the Merits*

In addressing their likelihood of success on the merits, the plaintiffs assert two claims: first, that withdrawal of the LG2017 Tool required notice-and-comment rulemaking procedures,

and second, that withdrawal of that Tool was arbitrary or capricious. *See* Pls.' Mem. PI at 14–15. The plaintiffs have not established a likelihood of success on the merits of either argument.

### a) Withdrawal of the LG2017 Tool Did Not Require Notice-and-Comment Procedures

The plaintiffs first contend that they are likely to succeed on the merits because HUD's notices in May 2018 "effectively suspended the AFFH Rule without observing the notice-and-comment procedures that the APA requires." *Id.* at 17. HUD counters that the APA's notice-and-comment requirements do not apply to the AFH Assessment Tools, which HUD argues are more properly described as "information-collection devices governed by the Paperwork Reduction Act." Defs.' Opp'n PI at 23. HUD has the better argument.

The APA generally requires a federal agency to engage in notice-and-comment procedures when promulgating "legislative" or "substantive" rules. *Mendoza*, 754 F.3d at 1021; 5 U.S.C. § 553(b). Specifically, a "notice of proposed rule making" must be "published in the Federal Register" and notify the public of "the time, place, and nature of public rule making proceedings"; "the legal authority under which the rule is proposed"; and "either the terms or substance of the proposed rule or a description of the subjects and issues involved." 5 U.S.C. § 553(b)(1)–(3). "[A]n agency issuing a legislative rule is itself bound by the rule until that rule is amended or revoked and may not alter such a rule without notice and comment." *Clean Air Council v. Pruitt*, 862 F.3d 1, 9 (D.C. Cir. 2017) (alterations and internal quotation marks omitted). Notably, "an order delaying [a] rule's effective date" is "tantamount to amending or revoking a rule." *Id.* at 6; *see also Nat. Res. Def. Council v. Abraham*, 355 F.3d 179, 194 (2d Cir. 2004) ("[A]ltering the effective date of a duly promulgated standard could be, in substance, tantamount to an amendment or rescission of the standard[ ]."); *Envtl. Def. Fund, Inc. v. EPA*,

716 F.2d 915, 920 (D.C. Cir. 1983) ("[S]uspension or delayed implementation of a final regulation normally constitutes substantive rulemaking under APA § 553.").

If a rule is more properly classified as an "information collection" mechanism, however, that rule is not subject to APA notice-and-comment procedures and instead falls under the ambit of the Paperwork Reduction Act ("PRA"), 44 U.S.C. § 3501, *et seq.*, which seeks to "minimize the paperwork burden for individuals, small businesses, educational and nonprofit institutions, Federal contractors, State, local and tribal governments, and other persons resulting from the collection of information by or for the Federal Government." *Id.* § 3501(1).  Under the PRA, an agency is required to submit any proposed collection of information to the OMB for review and approval.  *See id.* § 3507(a)(1)(C).  "Collection of information" is defined as "obtaining, causing to be obtained, soliciting, or requiring the disclosure to third parties or the public, of facts or opinions by or for an agency" that call for either "answers to identical questions posed to, or identical reporting or recordkeeping requirements imposed on, ten or more persons, other than agencies, instrumentalities, or employees of the United States," or "answers to questions posed to agencies, instrumentalities, or employees of the United States which are to be used for general statistical purposes." *Id.* § 3502(3)(A)(i)–(ii); *see also Action All. of Senior Citizens of Greater Phila. v. Sullivan*, 930 F.2d 77, 79 (D.C. Cir. 1991).  The Supreme Court has explained that "[t]ypical information collection requests include tax forms, Medicare forms, financial loan applications, job applications, questionnaires, compliance reports, and tax or business records," *Dole v. United Steelworkers of Am.*, 494 U.S. 26, 33 (1990), and the D.C. Circuit has concluded that "[t]o come within this definition the [device in question] must impose a 'reporting requirement' on applicants," *Benkelman Tel. Co. v. FCC*, 220 F.3d 601, 607 (D.C. Cir. 2000) (quoting *Saco River Cellular, Inc. v. FCC*, 133 F.3d 25, 33 (D.C. Cir. 1998)).

Once such an information-collection rule is forwarded to OMB, OMB can "approve, disapprove, or 'instruct the agency to make substantive or material change,'" *CTIA-The Wireless Ass'n v. FCC*, 530 F.3d 984, 987 (D.C. Cir. 2008) (quoting 44 U.S.C. § 3507(e)(1)), and must "provide at least 30 days for public comment prior to making a decision," 44 U.S.C. § 3507(b). OMB approval of an information collection may not exceed three years, 44 U.S.C. § 3507(g), but the PRA does not otherwise impose any requirements on the withdrawal of an information-collection rule, *see id.* §§ 3506–07.

The plaintiffs argue that, by withdrawing the LG2017 Tool, HUD "alter[ed] the substantive requirements imposed by regulation, without undertaking notice-and-comment rulemaking." Pls.' Mem. PI at 20. This argument assumes that the Assessment Tools are "legislative" or "substantive" rules subject to the APA's notice-and-comment requirements. Here, however, the Assessment Tools are more properly classified as "information collection devices" governed by the requirements of the PRA, rather than the APA. HUD explained that the "Assessment Tool aides [sic] program participants in their analysis by providing a series of questions about fair housing issues and contributing factors and providing menus for several responses to certain questions." AFFH Rule, 80 Fed. Reg. at 42,347. The Assessment Tools are thus essentially "questionnaires," which the Supreme Court has noted are "[t]ypical information collection requests." *United Steelworkers*, 494 U.S. at 33. Rather than "effect[ing] a substantive change in existing law or policy," *Mendoza*, 754 F.3d at 1021, the Assessment Tools are "meant to aid program participants in determining if and where conditions exist that may restrict fair housing choice and access to opportunity," AFFH Rule, 80 Fed. Reg. at 42,282, and to "*guide[ ]* program participants in considering access to public transportation, quality schools and jobs, exposure to poverty, environmental health hazards, and the location of deteriorated or abandoned

properties when identifying where fair housing issues may exist," *id.* (emphasis added). The Assessment Tools also impose reporting requirements on applicants, given that once OMB has approved an Assessment Tool, the relevant program participants are then required to submit an AFH using the Assessment Tool and HUD data. *See* 24 C.F.R. § 5.154(d); *Benkelman Tel.*, 220 F.3d at 607 (noting that an information-collection rule "must impose a 'reporting requirement' on applicants") (internal quotation marks omitted).

Moreover, the AFFH Rule itself specifies that the Assessment Tools were intended to be information-collection devices subject to the requirements of the PRA, not the APA. *See* AFFH Rule, 80 Fed. Reg. at 42,276 ("[T]he burden imposed by the Assessment Tool and additional Assessment Tools issued by HUD must, in accordance with the Paperwork Reduction Act, be renewed for approval by the Office of Management and Budget (OMB) every 3 years."); *id.* at 42,352 (noting that HUD published its first notice under the PRA on September 26, 2014, and that "[t]he Assessment Tool is undergoing the required notice and solicitation of public comment process required by the Paperwork Reduction Act"). The AFFH Rule and the corresponding regulations clarify that "the Assessment Tool will be subject to periodic notice and opportunity to comment in order to maintain the approval of the Assessment Tool as granted by the Office of Management and Budget (OMB) under the PRA." *Id.* at 42,353; *see also* 24 C.F.R. § 5.152. Given the definition of "Assessment Tools" as "forms or templates and the accompanying instructions provided by HUD that program participants must use to conduct and submit an AFH," 24 C.F.R. § 5.152, HUD properly determined that the Assessment Tools were subject to the requirements of the PRA, rather than the APA.

Nevertheless, even assuming the plaintiffs are somehow correct that the withdrawal of the LG2017 Tool is governed by the APA's notice-and-comment requirements, the plaintiffs'

argument fails.  The plaintiffs' argument rests on the contention that, "by withdrawing the Assessment Tool that makes completion of an AFH possible," HUD "effectively suspended the AFFH Rule without observing the notice-and-comment procedures that the APA requires."  Pls.' Mem. PI at 17; *see also Clean Air Council*, 862 F.3d at 9 ("[A]n agency issuing a legislative rule is itself bound by the rule until that rule is amended or revoked and may not alter such a rule without notice and comment." (alterations and internal quotation marks omitted)).  This premise is incorrect—withdrawal of the LG2017 Tool did not suspend the AFFH Rule.  Although the AFFH Rule and the Assessment Tool are related, the AFFH Rule remains in effect despite the withdrawal of the LG2017 Tool.  For example, as discussed above, the new definitions promulgated in the AFFH Rule remain active, as do the new provisions requiring recordkeeping, community participation, and certification.  *See* 24 C.F.R. §§ 5.152, 5.158, 5.166, 5.168.  These provisions address several of the primary concerns voiced in the GAO 2010 Report and highlighted in the preamble to the AFFH Rule.  *See* GAO 2010 Report at summary page, 32–33.  Although the provisions specifically relating to development, submission, and revision of AFHs are dormant until a new Assessment Tool is published, other provisions in the AFFH Rule remain active and binding on program participants.  Withdrawal of the LG2017 Tool thus did not amount to a wholesale withdrawal or suspension of the AFFH Rule.

In addition, HUD's May 2018 notice withdrawing the LG2017 Tool made clear that, pursuant to 24 C.F.R. § 5.160(a)(3), until a "revised and approved Local Government Assessment Tool" is issued, each program participant must "continue to provide the AFFH certification with its Consolidated Plan, in accordance with the requirements that existed prior to August 17, 2015."  LG2017 Withdrawal Notice, 83 Fed. Reg. at 23,926.  HUD explained that it was "immediately seeking comment on ways to make the Local Government Assessment Tool

workable and effective," *id.*, and that local government program participants would be required to submit a first AFH "not less than 9 months following the future publication of a revised and approved Local Government Assessment Tool," *id.* The AFFH Rule thus remains active, and the deadline for program participants to submit their AFHs will be automatically reimposed, pursuant to the Rule, upon HUD's issuance of a revised and OMB-approved Assessment Tool. Indeed, local government program participants are now in the same position as the other program participants for which HUD has not yet published an applicable Assessment Tool.

The plaintiffs also contend that "HUD erroneously relies on [24 C.F.R.] § 5.160(a)(1)(ii) to authorize its suspension of the Rule." Pls.' Reply Mem. Supp. Mot. PI ("Pls.' Reply PI") at 3, ECF No. 37. That regulatory provision provides that a program participant need not submit a first AFH submission until at least nine months after an applicable Assessment Tool has been published. 24 C.F.R. § 5.160(a)(1)(ii). The AFFH Rule thus acknowledged and anticipated that Assessment Tools would be approved and published at different times and that an approved Tool might not be published for every type of program participant when the AFH submission requirements began to take effect for some types. *See* U.S. DEP'T OF HOUSING AND URBAN DEVELOPMENT, AFFH RULE GUIDEBOOK 17 (Dec. 15, 2015), available at https://www.hudexchange.info/resources/documents/AFFH-Rule-Guidebook.pdf. In addition, because Assessment Tools must "maintain the approval of" OMB, 24 C.F.R. § 5.152, which approval may last for no longer than three years, *see* 44 U.S.C. § 3507(g), the AFFH Rule evidently contemplated that certain Tools would lapse and repeatedly would be assessed and evaluated.

In the plaintiffs' view, however, "§ 5.160(a)(1)(ii) was added to ensure adequate transition time for entities whose Assessment Tools were published *after* the one used by

'entitlement jurisdictions'" like local governments. Pls.' Reply PI at 5. Nothing in that provision, however, limits its applicability to only future Assessment Tools. Indeed, as of the issuance of the AFFH Rule on July 16, 2015, no Local Government Assessment Tool had yet been published—LG2015 was not published until December 31, 2015. *See generally* LG2015 Tool Announcement, 80 Fed. Reg. at 81,840; Pls.' Reply PI at 5. Thus, withdrawal of the LG2017 Tool merely placed local government program participants on the same footing as the other types of program participants, for which HUD had never issued an applicable Assessment Tool. Accordingly, the plaintiffs have not established a likelihood of success on their claim that HUD's withdrawal of the LG2017 Tool was invalid for failing to follow APA notice-and-comment procedures.

> b) *Withdrawal of the LG2017 Tool Was Not Arbitrary or Capricious*

The plaintiffs next contend that HUD's withdrawal of the LG2017 Tool, "an action that renders the AFFH Rule inoperative for local jurisdictions," was arbitrary and capricious. Pls.' Mem. PI at 21–35. HUD correctly asserts, as explained *supra* Part III.A, that the AFFH Rule remains operative and responds that it acted reasonably in withdrawing LG2017 given the high AFH failure rate and the costs HUD would have been required to expend to assist program participants in submitting compliant AFHs. *See* Defs.' Opp'n PI at 27–38. Again, HUD has the better argument.[13]

"One of the basic procedural requirements of administrative rulemaking is that an agency must give adequate reasons for its decisions." *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125 (2016); *see also Pub. Citizen, Inc. v. FAA*, 988 F.2d 186, 197 (D.C. Cir. 1993) ("The

---

[13] To reiterate, the relevant action here is HUD's withdrawal of the LG2017 Tool through the two May notices—not a wholesale suspension of the AFFH Rule for local governments. Thus, only the withdrawal of the LG2017 Tool is evaluated under the arbitrary-and-capricious standard.

requirement that agency action not be arbitrary or capricious includes a requirement that the agency adequately explain its result.").  An agency therefore "must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made."  *Encino Motorcars*, 136 S. Ct. at 2125 (quoting *State Farm*, 463 U.S. at 43).  "Where the agency has failed to provide a reasoned explanation, or where the record belies the agency's conclusion, [the court] must undo its action."  *Cty. of L.A. v. Shalala*, 192 F.3d 1005, 1021 (D.C. Cir. 1999) (internal quotation marks and citation omitted).

In examining an agency's decision, however, a court "must 'not substitute its own judgment for that of the agency.'"  *Mayo v. Reynolds*, 875 F.3d 11, 19–20 (D.C. Cir. 2017) (alterations omitted) (quoting *State Farm*, 463 U.S. at 43).  Rather, an agency's decision ordinarily will be upheld "so long as the agency 'examined the relevant data and articulated a satisfactory explanation for its action, including a rational connection between the facts found and the choice made.'"  *Animal Legal Def. Fund*, 872 F.3d at 611 (alterations omitted) (quoting *State Farm*, 463 U.S. at 43).  HUD has provided adequate reasoning for its decision to withdraw the LG2017 Tool, and accordingly, the plaintiffs have failed to establish a likelihood of success on this argument.

The plaintiffs present three primary reasons why HUD's decision to withdraw the LG2017 Tool allegedly was arbitrary and capricious.  First, the plaintiffs argue that "HUD failed to adequately explain why its professed concerns justified its decision to withdraw the AFH Assessment Tool."  Pls.' Mem. PI at 22 (capitalization omitted).  Second, the plaintiffs contend that "HUD ignored the benefits of ongoing implementation of the AFFH Rule."  *Id.* at 30 (capitalization omitted).  Finally, the plaintiffs assert that HUD's action was "contrary to the Fair Housing Act."  *Id.* at 32 (capitalization omitted).  The plaintiffs' critical appraisal of HUD's

reasons for withdrawing the LG2017 Tool raises legitimate concerns but, ultimately, falls short of establishing that the reasons HUD provided are arbitrary or capricious.

The plaintiffs first contend that HUD failed to adequately explain its decision to withdraw the LG2017 Tool because it did not explain why the low acceptance rate of initial AFH submissions was problematic, *id.* at 22, why HUD's expenditure of resources made the LG2017 Tool unworkable, *id.* at 24, how purported deficiencies in the Tool caused these problems, *id.* at 26, and why these problems could not be fixed by a measure short of withdrawing the Tool, *id.* at 27. Many of these concerns speak for themselves. In withdrawing the LG2017 Tool, HUD explained that, between October 2016 and December 2017, HUD had "received, reviewed, and issued initial decisions on 49 AFHs submitted by local government program participants," but that, of these submissions, "a significant proportion of program participants had difficulty completing or understanding how to use the Tool to complete acceptable AFHs." LG2017 Withdrawal Notice, 83 Fed. Reg. at 23,923. Only 37 percent of the initial submissions were "determined to be acceptable on initial submission," and another 28 percent of the submissions "were accepted only after the program participants submitted revisions and additional information in the form of addendums in response to HUD's technical assistance." *Id.* at 23,923–24. HUD explained that "[t]he high failure rate from the initial round of submissions" and "the level of technical assistance HUD provided to this initial round of 49 AFHs" impacted its decision because that assistance "cannot be scaled up to accommodate the increase in the number of local government program participants with AFH submission deadlines in 2018 and 2019." *Id.* at 23,923. The low acceptance rate was especially problematic because HUD had issued the LG2017 Tool in an attempt to "clearly convey[ ] the analysis of fair housing issues and contributing factors that program participants must undertake" to submit a compliant AFH,

LG2017 Announcement, 82 Fed. Reg. at 4,390, but the low acceptance rate of initial submissions indicated that the LG2017 Tool was not conveying the analysis and factors as "clearly" as HUD intended.

HUD also explained why its expenditure of resources to assist program participants rendered the LG2017 Tool unworkable. Given that this Tool was expected to "guid[e] program participants to produce meaningful AFHs," LG2017 Withdrawal Notice, 83 Fed. Reg. at 23,922, the fact that HUD was required to expend considerable resources to assist participants was in direct conflict with the goal of simplifying the AFH process. In promulgating the AFFH Rule, HUD had estimated "resource costs to HUD of $9 million annually" across all types of program participants, including states, PHAs, and local governments. AFFH Rule, 80 Fed. Reg. at 42,273. In reviewing the limited use of the LG2017 Tool alone, however, HUD estimated that it had spent "over $3.5 million on technical assistance for the initial round of 49 AFH submissions" from local governments, LG2017 Withdrawal Notice, 83 Fed. Reg. at 23,925, and noted that the number of such submissions was slated to increase exponentially, with "104 local government program participants [ ] scheduled to submit AFHs to HUD" in 2018, while at least 682 AFHs were expected in 2019. *Id.*; *see also* HUD Decl. ¶ 35. In fact, HUD spent $109,815.08 on direct technical assistance only to the City of Philadelphia and the Philadelphia Housing Authority, *see* HUD Decl. ¶ 19, over $300,000 on direct technical assistance for the first 49 AFH submissions, *id.* ¶ 26, and nearly $1.5 million on regional trainings, *id.* ¶ 24. Thus, HUD concluded that "[t]he level of technical assistance provided to the initial 49 participants could not be extended to these numbers of AFHs due in 2018 and 2019." LG 2017 Withdrawal Notice, 83 Fed. Reg. at 23,925.

HUD also explained that it would not be able to "scale up" this assistance to accommodate that increase, because HUD staffers are required to "communicate with program

participants" and must assess AFHs on a case-by-case basis. *Id.* at 23,925; Defs.' Opp'n PI at

32–33. While the plaintiffs contend that "[t]he bulk of HUD's expenditures have been for one-

time start-up costs or for trainings not primarily attended by representatives of the initial 49

submissions," Pls.' Reply PI at 10, HUD explained that these costs would have to be repeated in

the creation of Assessment Tools for other program participants, including for states and PHAs.

Defs.' Opp'n PI at 30–33. Moreover, although HUD "expected that, particularly at the

beginning, a number of jurisdictions would need additional feedback," Pls.' Reply PI at 8

(quoting Pls.' Mot. PI, Ex. 5, Second Decl. Janet Hostetler ("Second Hostetler Decl.") ¶ 10, ECF

No. 19-5), HUD reasonably determined that this amount of feedback was unworkable given the

anticipated increase in submissions in 2018 and 2019, and that its money could instead be used

to further fair housing in other, potentially more effective, ways.

Although the plaintiffs contend that potentially high costs in 2019 did not justify

withdrawing the tool in 2018, Mot. Hr'g at 33:18–35:4, 91:7–14, HUD was not obligated to keep

in place a system that, in the agency's view, drained its financial and personnel resources while it

simultaneously expended resources working to remedy the defects in the Tool. The plaintiffs'

criticism here evidences a strong policy difference with HUD about resource allocation, rather

than a showing that HUD made an arbitrary or capricious policy choice. *See Heckler v. Chaney*,

470 U.S. 821, 842 (1985) (concluding that an agency's action "that is based on valid resource-

allocation decisions will generally not be arbitrary, capricious, an abuse of discretion, or

otherwise not in accordance with law" (internal quotation marks omitted)); *Nat'l Trust for*

*Historic Pres. v. Blanck*, 938 F. Supp. 908, 925 (D.D.C. 1996) ("[T]he APA does not permit this

Court to substitute its judgment for that of the agency with respect to resource allocations, so

long as those allocations are not arbitrary or capricious, an abuse of discretion or contrary to law." (citing *Citizens to Pres. Overton Park v. Volpe*, 401 U.S. 402, 415 (1971))).

HUD's withdrawal notice also explained how the Tool's deficiencies created these problems: as just one example, the questions in the LG2017 Tool "vaguely incorporate[d] by reference" certain existing requirements in the Consolidated Plan regulations but "d[id] not explicitly state the specific requirements or ask that program participants explain how they met these specific requirements." LG2017 Withdrawal Notice, 83 Fed. Reg. at 23,924. HUD specified "at least seven different categories of critical problems with the Local Government Assessment Tool," including such problems as "[i]nadequate community participation," "insufficient use of local data and knowledge," "lack of regional analysis," and "inadequate responses due to duplication of questions." *Id.* The LG2017 Withdrawal Notice then provided a detailed explanation of each of these seven broad categories, concluding that "this summary of issues describes the basis for HUD's determination that the Assessment Tool is ineffective and unduly burdensome on program participants." *Id.* Finally, regarding possible approaches short of withdrawing the Tool, HUD explained that "[w]ithdrawal and revision of the Assessment Tool will also conserve HUD's limited resources, allowing HUD to use those limited resources more effectively to help program participants produce meaningful improvements in the communities they serve." *Id.* at 23,926. Although the plaintiffs have identified several steps that they allege HUD could have taken, *see* Pls.' Reply PI at 15, HUD has adequately explained why HUD believed withdrawing the LG2017 Tool was justified.

The plaintiffs next argue that HUD "ignored the benefits already accruing from the AFH process." Pls.' Mem. PI at 30; Pls.' Reply PI at 16. As HUD explains, however, the withdrawal of the LG2017 Tool "was motivated in part by a concern that HUD's inability to provide

sufficient technical assistance in 2018 and 2019 would mar any progress made." Defs.' Opp'n PI at 38 (citing LG2017 Withdrawal Notice, 83 Fed. Reg. at 23,925–26). HUD further explained that "uncertainty" regarding "how to submit an acceptable AFH" would lead to "uncertainty regarding the status of [participants'] HUD-funded programs," LG2017 Withdrawal Notice, 83 Fed. Reg. at 23,926, such that withdrawing the Tool entirely was the most effective way of eliminating that uncertainty. Moreover, as explained above, although the plaintiffs characterize the withdrawal of the LG2017 Tool as "an unexplained 180 degree turn away from precedent," Pls.' Mem. PI at 30 (internal quotation marks and alterations omitted), the AFFH Rule remains in effect, albeit in a diminished form, and HUD has not indicated abandonment of Assessment Tools altogether. Rather, HUD concluded that withdrawing the LG2017 Tool and soliciting comments for further improvements to "make it more effective in assisting program participants" was the best way to affirmatively further fair housing. LG2017 Withdrawal Notice, 83 Fed. Reg. at 23,926. Indeed, the LG2017 Withdrawal Notice explains that the participants' AFH deadlines will be triggered once a replacement Tool is published, and that the participants are required to "continue to comply with existing, ongoing legal obligations to affirmatively further fair housing (legal obligations which AFHs were merely intended to help participants plan to fulfill)." *Id.* HUD thus was not reversing its position but rather taking an action that it perceived would better further the AFFH Rule in the long term. Again, the plaintiffs' disagreement with HUD's policy choice concerning the need for further improvements to the LG2017 Tool to continue its deployment does not render this agency decision arbitrary or capricious.

Finally, the plaintiffs contend that "[b]y reverting to a failed regulatory system that HUD has already found to be inadequate, HUD is failing to carry out its affirmative duties under the Fair Housing Act." Pls.' Mem PI. at 32; *see also* Pls.' Reply PI at 16–18. The plaintiffs are

correct that, in withdrawing the LG2017 Tool, HUD instructed local government program participants to "conduct an analysis of impediments [ ] to fair housing choice," which is the process that existed prior to the promulgation of the AFFH Rule. AI Reliance Notice, 83 Fed. Reg. at 23,927. The FHA does not define, however, the precise methods by which HUD is obligated to affirmatively further fair housing and does not require HUD to adopt certain procedures over others. Indeed, as HUD notes, program participants "have an independent obligation to affirmatively further fair housing, regardless [of] whether they conduct an AFH or an AI." Defs.' Opp'n PI at 39 (citing 42 U.S.C. §§ 12705(b)(15), 1437c-1(d)(16), 5304(b)(2), 5306(d)(7)(B)).

In support of this argument, the plaintiffs offer several cases to show that "courts have consistently found" that "the Fair Housing Act imposes on HUD a duty to provide a strong system of oversight and accountability that ensures recipients of federal funds actually take meaningful steps to affirmatively further fair housing." Pls.' Mem. PI at 32 (citing *Shannon*, 436 F.2d at 819–21; *NAACP*, 817 F.2d at 158; *Thompson v. U.S. Dep't of Hous. & Urban Dev.*, 348 F. Supp. 2d 398 (D. Md. 2005)). Neither *Shannon* nor *NAACP* discusses the AI process, however. In *Shannon*, the plaintiffs alleged that "HUD had no procedures for consideration of and in fact did not consider [the] effect on racial concentration" resulting from a proposed apartment project. *Shannon*, 436 F.2d at 811. The Third Circuit concluded that, although HUD may exercise "broad discretion to choose between alternative methods of achieving the national housing objectives," *id.* at 819, HUD must nevertheless exercise that discretion "within the framework of the national policy against discrimination in federally assisted housing" and must consider "social factors" including race discrimination, *id.* The court did not address the efficacy of the AI process in particular, however.

Similarly, in *NAACP*, the plaintiffs alleged that "HUD had failed to enforce constitutional and statutory proscriptions against discrimination in Federally-assisted programs." *NAACP*, 817 F.2d at 151 (internal quotation marks omitted). The First Circuit concluded that HUD must "do more than simply refrain from discriminating (and from purposely aiding discrimination by others)," *id.* at 155, and must instead "take seriously its minimal Title VIII obligation to evaluate alternative courses of action in light of their effect upon open housing," *id.* at 157. *NAACP* also did not address the AI process specifically, but rather concluded that courts must "decide whether, over time, HUD's pattern of activity reveals a failure to live up to its obligation." *Id.* at 158.

In *Thompson*, the District of Maryland did consider the AI process in addressing a challenge in which the plaintiffs alleged that Baltimore City had discriminated against residents of public housing units on the basis of race. *Thompson*, 348 F. Supp. 2d at 404. In concluding that the federal defendants had "fail[ed] adequately to consider regional approaches to ameliorate racial segregation in public housing in the Baltimore Region," *id.* at 524, the court analyzed Baltimore City's AI and HUD's review of the AI, but the court did not conclude that the AI process itself was to blame. Rather, the court focused on HUD's inappropriately narrow focus on "rearranging Baltimore's public housing residents within the Baltimore City limits," rather than on "the effect of its policies on the racial and socioeconomic composition of the surrounding area" and on "regional approaches to promoting fair housing opportunities for African-American public housing residents in the Baltimore Region." *Id.* at 409. Thus, while *Shannon*, *NAACP*, and *Thompson* each fault HUD for failing to "live up to its statutory mandate" to affirmatively further fair housing and consider race discrimination, *id.*, those cases do not hold that the AI process itself is an improper method of fulfilling that obligation. HUD has "broad

discretion to choose between alternative methods of achieving the national housing objectives set forth in the several applicable statutes," *Shannon*, 436 F.2d at 819, and the Court may not substitute its judgment for HUD's in determining the best way of doing so.

Thus, contrary to the plaintiffs' assertions, the agency "adequately explain[ed] why [HUD's] professed concerns justified its decision to withdraw the AFH Assessment Tool." Pls.' Mem. PI at 22 (capitalization omitted), engaged in reasoned decisionmaking, and did not act contrary to the Fair Housing Act. Accordingly, even had the plaintiffs had organizational standing, they would not have shown a likelihood of success on their claim that HUD's action was arbitrary or capricious.

### 2. *Risk of Irreparable Harm*

"The party seeking a preliminary injunction must make two showings to demonstrate irreparable harm." *League of Women Voters*, 838 F.3d at 7. "First, the harm must be 'certain and great,' 'actual and not theoretical,' and so 'imminent that there is a clear and present need for equitable relief to prevent irreparable harm.'" *Id.* at 7–8 (alteration omitted) (quoting *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006)). "Second, the harm 'must be beyond remediation.'" *Id.* at 8 (quoting *Chaplaincy*, 454 F.3d at 297). As discussed *supra* Part III.A.2, an organizational party establishes such harm if the "actions taken by [the defendant] have 'perceptibly impaired' the [organization's] programs." *Fair Emp't Council of Greater Wash., Inc. v. BMC Mktg. Corp.*, 28 F.3d 1268, 1276 (D.C. Cir. 1994) (quoting *Havens*, 455 U.S. at 379). "If so, the organization must then also show that the defendant's actions 'directly conflict with the organization's mission.'" *League of Women Voters*, 838 F.3d at 8 (quoting *NTEU*, 101 F.3d at 1430).

The plaintiffs contend that "HUD's unlawful withdrawal of the Assessment Tool, suspension of the AFH process, and reversion to the AI process is causing, and absent an

injunction will continue to cause, irreparable harm" to the plaintiffs. Pls.' Mem. PI at 35. As discussed above, however, the plaintiffs have failed to show even a substantial likelihood of standing—rather, they have failed to establish Article III standing because they have failed to establish an injury in fact. Without an injury in fact, the plaintiffs have not suffered the higher threshold of "irreparable harm" that is required for a preliminary injunction. *League of Women Voters*, 838 F.3d at 7.

### 3. *Balance of Equities and Public Interest*

The third and fourth factors that courts consider in determining whether a preliminary injunction is warranted are "a balance of the equities in [the plaintiffs'] favor, and accord with the public interest." *Id.* at 6 (quoting *Pursuing Am.'s Greatness*, 831 F.3d at 505). In evaluating these factors, courts must "balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 542 (1987).

The plaintiffs argue that both the balance of the equities and the public interest support their request for preliminary relief, contending that "[a] preliminary injunction would not harm HUD," Pls.' Mem. PI at 44, because "[t]here is generally no public interest in the perpetuation of an unlawful agency action," *id.* (internal quotation marks omitted; alteration in original), and because the AFFH Rule has provided "substantial benefit not only for program participants but also for the communities they serve and the United States as a whole," *id.* at 45 (internal quotation marks omitted). Again, the plaintiffs have not suffered an injury as a result of HUD's actions. By contrast, although the plaintiffs contend that "[a] preliminary injunction would not harm HUD," *id.* at 44, requiring HUD to leave the LG2017 Tool in place and provide assistance to the local governments required to submit AFHs would require the expenditure of potentially millions of dollars that could otherwise be directed toward improving the Assessment Tool or

other federal housing priorities. *See* Defs.' Opp'n PI at 43. HUD would also have to "make substantial reallocations of resources to maintain the necessary involvement in AFH reviews," *id.* (citing HUD Decl. ¶¶ 32–35), as failure to provide adequate assistance to local governments might "run the risk of endangering their receipt of federal funds should HUD prove unable to guide them through the AFH process using the defective tool," *id.* at 43–44. Finally, although the plaintiffs are correct that "[t]here is generally no public interest in the perpetuation of unlawful agency action," Pls.' Mem. PI at 44 (quoting *League of Women Voters*, 838 F.3d at 12), HUD's actions in withdrawing the LG2017 Tool were not unlawful, as discussed above. Accordingly, the plaintiffs, even if they had standing, would not have met their burdens of showing that the balance of equities and consideration of the public interest support the injunctive relief they seek.

## C. New York State's Motion to Intervene

Federal Rule of Civil Procedure 24 states that the Court "must permit anyone to intervene who . . . claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest." FED. R. CIV. P. 24(a)(2). To intervene as a matter of right under Rule 24(a), "(1) the application to intervene must be timely; (2) the applicant must demonstrate a legally protected interest in the action; (3) the action must threaten to impair that interest; and (4) no party to the action can be an adequate representative of the applicant's interests." *Karsner v. Lothian*, 532 F.3d 876, 885 (D.C. Cir. 2008) (quoting *SEC v. Prudential Sec. Inc.*, 136 F.3d 153, 156 (D.C. Cir. 1998)); *see also Aref v. Holder*, 774 F. Supp. 2d 147, 171 (D.D.C. 2011). If a movant does not meet the requirements to intervene as a matter of right, intervention may nonetheless be allowed, pursuant

to Rule 24(b), if the movant "has a claim or defense that shares with the main action a common question of law or fact."  FED. R. CIV. P. 24(b)(1)(B).

For either intervention as a matter of right or permissive intervention, however, the movant must establish Article III standing.  *See Deutsche Bank*, 717 F.3d at 193 ("It is [ ] circuit law that intervenors must demonstrate Article III standing."); *Fund for Animals, Inc. v. Norton*, 322 F.3d 728, 731–32 (D.C. Cir. 2003) ("[I]n addition to establishing its qualification for intervention under Rule 24(a)(2), a party seeking to intervene as of right must demonstrate that it has standing under Article III of the Constitution.").  New York has failed to do so.

New York contends that HUD's withdrawal of the LG2017 Tool causes injury to the State's proprietary interests because that action "will make it more difficult for New York's local jurisdictions to analyze barriers to fair housing choices or identify meaningful actions to address these barriers," NYS's Mem. at 4, but this purported injury is speculative.  While New York contends that its state housing authority "reviews and relies upon the data and analyses that local jurisdictions submit to HUD" and is therefore harmed by HUD's withdrawal of this Assessment Tool, *id.* at 6, the State is free to require submissions of its own.  Indeed, HUD's responses to comments on the AFFH Rule indicate that many other avenues remain open to States seeking to affirmatively further fair housing.  For example, state housing finance agencies must still use Qualified Allocation Plans ("QAPs") to "establish the criteria by which applicants will be awarded low-income housing tax credits."  AFFH Rule, 80 Fed. Reg. at 42,326.  Although commenters requested that QAPs be included in the AFH process, HUD rejected this proposal and encouraged "innovative approaches by States to encourage state housing finance agencies to

affirmatively further fair housing through benefits and incentives." *Id.* New York thus remains able to use QAPs, among other processes, to further its fair-housing goals.[14]

Moreover, New York is not a local government entitled to use the LG2017 Tool; rather, New York claims that its alleged interest arises because "its own ability to comply with the Fair Housing Act is undermined by HUD's suspension and withdrawal of its fair-housing guidance for local governments." NYS's Reply Supp. Mot. Intervene ("NYS's Reply") at 2, ECF No. 36. The fear that local governments' AIs will be less "robust" or "complete" than the AFHs that they would have been required to submit with the LG2017 Tool in place is hardly a concrete and particularized injury. *See* NYS's Mem. at 6. Local governments are still required to submit AIs and, under the provisions of the AFFH Rule that remain active, are required to fulfill enhanced recordkeeping, certification, and community participation standards. *See* 24 C.F.R. §§ 5.158, 5.166, 5.168. Indeed, 24 C.F.R. § 570.490(b) requires States to "establish recordkeeping requirements for units of general local government receiving CDBG funds that are sufficient to facilitate reviews and audits of such units," thereby authorizing States to impose such recordkeeping requirements as they see fit. In addition, given the low success rate of the first round of AFH submissions, New York has no assurances that the local governments' AFHs would have been more helpful than the AIs will be.

New York also contends that "HUD's recent actions also directly injure the State's *parens patriae* interests," NYS's Mem. at 7, thereby causing injury to the State's "quasi-sovereign interests," NYS's Reply at 4–7. Generally, "a State does not have standing as *parens*

---

[14]     New York explained, at the motions hearing, that using QAPs in place of the AFH process would be "inadequate . . . compared to the AFHs" because some areas of the State "don't have low income housing" and because the State "do[es]n't necessary award [low-income housing tax credits] every year, or even [every] five years." Mot. Hr'g at 84:12–19. Even recognizing that some parts of the State may not award low-income housing tax credits, however, New York provided no reason why local government program participants that do award such credits could not use QAPs to help further fair housing. *See* AFFH Rule, 80 Fed. Reg. at 42,326 (encouraging states to explore "innovative approaches" to furthering fair housing).

*patriae* to bring an action against the Federal Government." *Md. People's Counsel v. FERC*, 760 F.2d 318, 320 (D.C. Cir. 1985) (alteration omitted). New York points to a line of district court cases, primarily in New York district courts, that have "allowed States to bring suits *parens patriae* against the federal government where enforcement of a federal right is sought, rather than the avoidance of a federal statute." *New York v. Sebelius*, No. 07-cv-1003, 2009 WL 1834599, at *12 (N.D.N.Y. June 22, 2009); *see also Massachusetts v. EPA*, 549 U.S. 497, 520 n.20 (2007) (recognizing a "critical difference between allowing a State 'to protect her citizens from the operation of federal statutes' (which is what *Mellon* prohibits) and allowing a State to assert its rights under federal law (which it has standing to do)" (quoting *Georgia v. Pa. R. Co.*, 324 U.S. 439, 447 (1945))). Although the D.C. Circuit has recognized that "the state, under some circumstances, may sue in that capacity for the protection of its citizens," *City of Olmsted Falls v. FAA*, 292 F.3d 261, 268 (D.C. Cir. 2002) (quoting *Massachusetts v. Mellon*, 262 U.S. 447, 485–86 (1923)), the Circuit has yet to elaborate on what those circumstances include and has not recognized the distinction between enforcement suits and avoidance suits. *Cf. Ctr. for Biological Diversity v. U.S. Dep't of Interior*, 563 F.3d 466, 477 (D.C. Cir. 2009) (noting that "only the United States, and not the states, may represent its citizens and ensure their protection under federal law in federal matters" (citing *Mellon*, 262 U.S. at 485–86)).

Assuming *parens patriae* standing were available, New York has not satisfied its burden of showing "[a] quasi-sovereign interest" that is "sufficiently concrete to create an actual controversy between the State and the defendant." *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 601 (1982). New York contends that "[t]he inevitable delays to fair-housing reforms caused by HUD's actions will substantially injure New York's quasi-sovereign interests in the health and well-being of its residents," NYS's Mem. at 7, which includes "a

state's interest in eradicating discrimination in all its forms," *id.* HUD made clear in promulgating the AFFH Rule, however, that the final rule "is a planning rule, not a rule directed to the enforcement of the duty to affirmatively further fair housing." AFFH Rule, 80 Fed. Reg. at 42,313. New York has not established how withdrawing the LG2017 Tool harms its interest in lessening discrimination, especially given the enhanced AFFH certification, recordkeeping, and community participation requirements that remain in effect even without a published Assessment Tool. Accordingly, New York has failed to establish standing and the State's motion to intervene is denied.[15]

## IV. CONCLUSION

For the foregoing reasons, the defendants' Motion to Dismiss, ECF No. 38, for lack of standing is granted, and the plaintiffs' Motion for a Preliminary Injunction, ECF No. 19, is consequently denied. The State of New York's Motion to Intervene, ECF No. 24, is also denied for lack of standing. An appropriate Order accompanies this Memorandum Opinion.

Date: August 17, 2018

_____
BERYL A. HOWELL
Chief Judge

---

[15] In certain cases, "even if [a] court lacks jurisdiction over [an] action brought by [the] original parties, [an] intervenor may continue suit if it provides an independent jurisdictional basis." *Aeronautical Radio, Inc. v. FCC*, 983 F. 2d 275, 283 (D.C. Cir. 1993) (citing *Simmons v. ICC*, 716 F.2d 40, 46 (D.C. Cir. 1983)). Given New York's lack of standing, however, no such independent jurisdictional basis is present here. *See id.* at 283–84 (finding no "independent jurisdictional basis" when intervenor failed to "satisfy the requirements of Article III standing").