# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NATIONAL FAIR HOUSING ALLIANCE, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> BENJAMIN C. CARSON, SR., M.D., in his official capacity as Secretary of Housing and Urban Development, *et al.*, <br><br> Defendants. | Civil Action No. 18-1076 <br><br> Chief Judge Beryl A. Howell |

## MEMORANDUM OPINION

The three plaintiffs, an alliance of nonprofit organizations dedicated to promoting fair housing opportunities plus two organizations focused on housing opportunities in Texas, previously sought a preliminary injunction and expedited motion for summary judgment to require the defendant, the U.S. Department of Housing and Urban Development ("HUD"), to rescind administrative action taken on May 23, 2018 suspending the use of an "Assessment Tool," a version of which was first adopted by the agency in December 2015. *See* Pls.' Mot. Prelim. Injunc. & Exped. Summ. J., ECF No. 19; *see also* HUD Notice, Affirmatively Furthering Fair Housing: Withdrawal of the Assessment Tool for Local Governments ("LG2017 Withdrawal Notice"), 83 Fed. Reg. 23,922 (May 23, 2018); HUD Notice, Affirmatively Furthering Fair Housing (AFFH): Responsibility to Conduct Analysis of Impediments ("AI Reliance Notice"), 83 Fed. Reg. 23,927 (May 23, 2018). HUD had taken these steps after concluding, based on operational experience, that the Assessment Tool was unsustainably costly, *see* LG2017 Withdrawal Notice, 83 Fed. Reg. at 23,925, and ultimately ineffective for its purpose, namely: ensuring HUD grantees were affirmatively furthering fair housing, *id.* at

1

23,923–25. In this litigation, HUD both opposed the plaintiffs' motions, *see* Defs.' Opp'n Pls.' Mot. Summ. J., ECF No. 33, and moved to dismiss the action for lack of subject matter jurisdiction because no plaintiff had standing, *see* Defs.' Mot. Dismiss Pls.' Am. Compl. ("Defs.' MTD"), ECF No. 38. The Court granted HUD's motion to dismiss for lack of subject matter jurisdiction and further held that the plaintiffs would not have been entitled to the injunctive relief they sought, even if they had standing. *See Nat'l Fair Hous. All. v. Carson* ("*NFHA*"), 330 F. Supp. 3d 14 (D.D.C. 2018).

Now, with a proposed second amended complaint that would add to the first amended complaint 46 new paragraphs and three new sections, respectively titled "How the Consolidated Plan Differs from the Assessment of Fair Housing," Proposed Second Am. Compl., ¶¶ 79–85, ECF No. 48-1, "The AI Process Under HUD's Notices," *id.* ¶¶ 112–117, and "Significant Provisions of the Rule That Are No Longer in Effect," *id.* ¶¶ 118–128, the plaintiffs seek, pursuant to Federal Rules of Civil Procedure 59(e) and 15(a)(2), to set aside the prior decision and restart this litigation. *See* Pls.' Mot. Am. J. & Leave Am. Compl. ("Pls.' Mot."), ECF No. 48; Pls.' Mem. Supp. Mot. Am. J. & Leave Am. Compl. ("Pls.' Mem."), ECF No. 48. This time around, rather than seeking expedited summary judgment, the plaintiffs want to follow the regular course in an Administrative Procedure Act case by requiring "submission of HUD's entire administrative record," Pls.' Reply Supp. Mot. Am. J. & Leave Am. Compl. ("Pls.' Reply") at 6, ECF No. 51, so that the claims may be resolved on "a fuller record," *id*. at 1. Thus, the plaintiffs' motion asks the Court to amend its decision only with respect to whether the plaintiffs have standing, but without challenging the "denial of Plaintiffs' motion for a preliminary injunction or expedited summary judgment." *See* Pls.' Mem. at 1 n.1. For the reasons set forth below, the plaintiffs' motion is denied.

## I. BACKGROUND

The statutory, regulatory, and factual background for this case were accounted for in the Court's opinion granting the defendants' motion to dismiss. *See NFHA*, 330 F. Supp. 3d at 24–37. Still, the background bears repeating here to some degree as context for why the plaintiffs' Rule 59(e) motion is denied.

### A. Statutory and Regulatory Framework

The Fair Housing Act ("FHA"), 42 U.S.C. § 3601, *et seq.*, prohibits discrimination based on "race, color, religion, sex, familial status, or national origin" in the sale and rental of housing and other residential real estate–related transactions. *Id.* §§ 3604–05. That statute also requires HUD to "administer the programs and activities relating to housing and urban development in a manner affirmatively to further the policies of" fair housing, *id.* § 3608(e)(5), known as the "affirmatively further fair housing," or "AFFH," requirement. The AFFH requirement imposes duties on HUD, *Otero v. N.Y. City Hous. Auth.*, 484 F.2d 1122, 1134 (2d Cir. 1973), which HUD meets, in part, through grants to State and local governments.

To qualify for funds under the largest of these grants, "a grantee must submit a consolidated plan." 24 C.F.R. § 570.302. A Consolidated Plan operates as (1) "[a] planning document for the jurisdiction, which builds on a participatory process among citizens, organizations, businesses, and other stakeholders"; (2) "[a] submission for federal funds under HUD's formula grant programs for jurisdictions"; (3) "[a] strategy to be followed in carrying out HUD programs"; and (4) "[a] management tool for assessing performance and tracking results." *Id.* § 91.1(b). Moreover, grantees, also known as program participants, must certify that the grant will be administered to comply with the AFFH requirement. 42 U.S.C. § 5304(b)(2) (local

3

government grantees); *id.* § 5306(d)(7)(B) (State grantees); *id.* § 12705(b)(15) (State and local grantees); *id.* § 1437c-1(d)(16) (public housing agency grantees).

Beginning in the 1990s, HUD required grantees certifying compliance with the AFFH requirement to undergo a process called Analysis of Impediments in Fair Housing ("AI"). *See* 24 C.F.R. § 91.225(a)(1) (1995). That process called for grantees to analyze impediments to fair housing within the relevant jurisdiction, respond appropriately to those impediments, and maintain relevant records. *Id.* Experience proved, however, that the AI process failed to ensure compliance with the AFFH requirement. *See* U.S. GOV'T ACCOUNTABILITY OFFICE, RPT. NO. GAO-10-905, HOUSING AND COMMUNITY GRANTS: HUD NEEDS TO ENHANCE ITS REQUIREMENTS AND OVERSIGHT OF JURISDICTIONS' FAIR HOUSING PLANS (2010), *available at* https://www.gao.gov/assets/320/311065.pdf; U.S. DEP'T OF HOUSING AND URBAN DEVELOPMENT, OFFICE OF POLICY DEVELOPMENT AND RESEARCH, ANALYSIS OF IMPEDIMENTS STUDY (2009), *available at* http://www.documentcloud.org/documents/365748-hud-reporting-compliance-report.html.

In 2013, HUD took a significant step toward overhauling the ineffectual AI process by proposing a rule that would revamp how HUD enforced grantees' compliance with the AFFH requirement. *See* HUD Proposed Rule, Affirmatively Furthering Fair Housing, 78 Fed. Reg. 43,710 (July 19, 2013). By July 2015, HUD finalized the new rule, realizing many of the proposed changes. *See* HUD Final Rule, Affirmatively Furthering Fair Housing ("AFFH Rule"), 80 Fed. Reg. 42,272 (July 16, 2015).

First, the AFFH Rule defined "affirmatively further fair housing" to mean "taking meaningful actions, in addition to combating discrimination, that overcome patterns of segregation and foster inclusive communities free from barriers that restrict access to opportunity

4

based on protected characteristics." 24 C.F.R. § 5.152. More specifically, HUD defined that phrase to mean "taking meaningful actions that, taken together, address significant disparities in housing needs and in access to opportunity, replacing segregated living patterns with truly integrated and balanced living patterns, transforming racially and ethnically concentrated areas of poverty into areas of opportunity, and fostering and maintaining compliance with civil rights and fair housing laws." *Id.*

Second, the AFFH Rule required grantees to integrate an Assessment of Fair Housing ("AFH") into the planning documents, such as a Consolidated Plan, required by a grant. *Id.* § 5.154(a). AFHs were to be conducted "[u]sing the Assessment Tool prescribed by HUD," *id.* § 5.154(d), which were the "forms or templates and the accompanying instructions provided by HUD that program participants must use to conduct and submit an AFH," *id.* § 5.152. AFHs were intended to compel grantees to study local fair housing concerns, compliance with fair housing laws and regulations, and disparities with respect to, among other things, poverty and housing opportunities based on any protected characteristic. *Id.* § 5.154(d)(1)–(2). Additionally, grantees were to determine the factors contributing to, and goals to overcome, any identified fair housing disparities. *Id.* § 5.154(d)(3)–(4). That accumulated information would then inform the planning documents a grantee submitted to HUD. *Id.* § 5.154(d)(5). The rule obligated HUD to review completed AFHs for compliance with the regulations, *id.* § 5.162(a)(1), and to return any AFH that the agency deemed "inconsistent with fair housing or civil rights requirements," *id.* § 5.162(b)(1), or that was "developed without the required community participation or the required consultation," *id*. § 5.162(b)(1)(ii)(A). For any rejected AFH, HUD committed to providing program participants with reasons for non-acceptance and an opportunity to revise the AFH. *Id.* § 5.162(a)(1), (c). Approval of a Consolidated Plan would be contingent upon an

5

approved AFH.  *Id.* § 5.162(d).  The AFFH Rule set deadlines for program participants to complete initial AFHs that depended on the type of the program participant.  *Id.* § 5.160(a).  All deadlines were triggered by HUD's publication of an Assessment Tool for use by that type of program participant.  *Id.* § 5.160(a)(1)(ii).  Grantees facing a distant initial deadline were, in the meantime, obligated to certify compliance with the AFFH requirement through the AI process.  *Id.* § 5.151.

Third, the AFFH Rule enhanced the role of community participation in the development of both AFHs and Consolidated Plans.  *Id.* § 5.158(a).  To ensure "meaningful community participation" in each, program participants were instructed to "employ communications means designed to reach the broadest audience," which could be accomplished through posting summaries of the relevant documents in "newspapers of general circulation," and uploading them to the program participant's website.  *Id.*  The AFFH Rule also reinvigorated the community participation requirements set out in 24 C.F.R. § § 91.105, 91.115, and 91.401, which required grantees, among other things, to consult with organizations, and to create a "citizen participation plan," while preparing a Consolidated Plan and, following the AFFH Rule, an AFH.  *Id.* § 91.105.

Fourth, the AFFH Rule tightened program participants' record keeping duties.  *Id.* § 5.168.  For example, the rule compelled grantees to maintain records documenting "compliance with the consultation and community participation requirements" and "the actions the program participant has taken to affirmatively further fair housing."  *Id.* § 5.168(a)(2), (3).  Inadequate recordkeeping had been one reason that HUD's pre-2015 regime had not secured compliance with the AFFH requirement.

Fifth, the AFFH Rule revised many of the provisions governing Consolidated Plans to match those applicable to AFHs. *See, e.g.*, *id.* § § 91.105 (citizen participation plans), 91.205 (housing and homeless needs assessment), 91.215 (strategic plan), 91.220 (action plan), 91.225 (certifications).

HUD published an Assessment Tool for local government program participants in December 2015, *see* HUD Notice, Affirmatively Furthering Fair Housing Assessment Tool: Announcement of Final Approved Document, 80 Fed. Reg. 81,840 (Dec. 31, 2015), initiating local government program participants' duty to submit an AFH, 24 C.F.R. § 5.160(a)(1)(ii). HUD issued a new version of the same tool in 2017. HUD Notice, Affirmatively Furthering Fair Housing: Announcement of Renewal of Approval of the Assessment Tool for Local Governments, 82 Fed. Reg. 4,388 (Jan. 13, 2017). HUD never fully implemented an Assessment Tool for any type of program participant other than local governments, which consequently were the only type of program participant ever required to complete an AFH.

According to a HUD notice issued in January 2018, the local government Assessment Tool and the AFH process had bugs. *See* HUD Notice, Affirmatively Furthering Fair Housing: Extension of Deadline for Submission of Assessment of Fair Housing for Consolidated Plan Participants, 83 Fed. Reg. 683 (Jan. 5, 2018). The first 49 AFHs HUD received suggested that, "local government program participants need additional time and technical assistance from HUD to adjust to the new AFFH process and complete acceptable AFH submissions." *Id.* at 685. At that time, HUD solicited comments for improving the Assessment Tool local governments had been using. *Id.*

In May 2018, however, HUD pulled the plug on Assessment Tools, withdrawing the 2017 version altogether because, the agency explained, "HUD has become aware of significant

deficiencies in the Tool impeding completion of meaningful assessments by program participants," such that the Tool "is inadequate to accomplish its purpose of guiding program participants to produce meaningful AFHs."  LG2017 Withdrawal Notice, 83 Fed. Reg. at 23,922.  Local governments' difficulty with the Assessment Tool had been an unexpected drain on HUD's resources.  *Id.* at 23,925–96.  The same day, in a separate notice, HUD announced that due to the withdrawal of the Assessment Tool, program participants would once again establish compliance with the AFFH requirement by conducting an AI.  AI Reliance Notice, 83 Fed. Reg. at 23,927.

The two May 2018 notices did not completely jettison the AFFH Rule.  Rather, the Rule's definition of affirmatively furthering fair housing, *see* 24 C.F.R. § 5.152, and its recordkeeping requirements, *see id.* § 5.168, remained.  Similarly, program participants were not relieved of the duty to "certify that they will affirmatively further fair housing when required by statutes and regulations governing HUD programs," *id.* § 5.166, or certify that they "will take no action that is materially inconsistent with [their] obligation to affirmatively further fair housing," *id.* § 91.225(a)(1), consistent with that phrase's new definition.  Moreover, even without the Assessment Tool, program participants still were beholden to the AFFH Rule's heightened community participation standard for Consolidated Plans.  *See id.* § 5.158.  Program participants also retained access to data HUD used to implement the AFFH Rule.  AI Reliance Notice, 83 Fed. Reg. at 23,927.  Finally, HUD left open that it might return insufficient AI submissions and request additional documentation to confirm a program participant is taking steps to affirmatively further fair housing.  *Id.* at 23,927–28.

### B. The Instant Litigation

The plaintiffs instituted this action on May 8, 2018, Compl., ECF No. 1, but amended the complaint on May 29, 2018 to challenge HUD's two May 2018 notices, Am. Compl, ECF No. 18. In the plaintiffs' view, the two notices constituted unlawful agency action because they effectively suspended the AFFH Rule without notice-and-comment procedures and because the withdrawal of the Assessment Tool was arbitrary and capricious. The plaintiffs moved for preliminary injunctive relief, pursuant to Federal Rule of Civil Procedure 65 and Local Civil Rule 65.1, and expedited summary judgment for an order that HUD rescind the May 2018 notices and reinstate the Assessment Tool for local governments. *See* Pls.' Mot. Prelim. Injunc. & Exped. Summ. J. The defendants, on the other hand, moved, under Federal Rule of Civil Procedure 12(b), to dismiss the case entirely due to the plaintiffs' lack standing. *See* Defs.' MTD.

The Court dismissed the action because no plaintiff had standing. As discussed in the accompanying opinion, the standing analysis applicable to an organization suing on its own behalf has a familiar framework: the organization must establish an injury, causation, and redressability. *NFHA*, 330 F. Supp. 3d at 40. The Supreme Court, in *Havens Realty Corporation v. Coleman*, 455 U.S. 363 (1982), described a unique way in which an organization might be injured: when the challenged action "'perceptibly impaired a non-abstract interest' of the plaintiffs," *NFHA*, 330 F. Supp. 3d at 44 (quoting *Nat'l Ass'n of Home Builders v. EPA*, 667 F.3d 6, 12 (D.C. Cir 2011)), forcing them to "use[] . . . resources to counteract that harm," *id.* (quoting *Elec. Privacy Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, 878 F.3d 371, 378 (D.C. Cir. 2017)).

The plaintiffs argued that they had pleaded facts demonstrating that sort of injury. For perceptible impairment, the plaintiffs contended that HUD, by suspending the AFFH Rule, had deprived them of procedural protections that fostered their ability to promote policies affirmatively furthering fair housing, as is each plaintiff's mission. *Id.* at 44–45. The plaintiffs, however, overstated the effect of the LG2017 Withdrawal Notice, which, while retiring the Assessment Tool, left other elements of the AFFH Rule in place so that the plaintiffs' mission-drive work was not perceptibly impaired. *Id.* at 45–46. For example, the AFFH Rule's more rigorous definition of "affirmatively furthering fair housing" and its heightened community engagement requirements still bound grantees submitting Consolidated Plans. *Id.* Although, following the LG2017 Withdrawal Notice, HUD would no longer review AFHs, HUD still would review Consolidated Plans for compliance with these new standards. *Id.* at 47. Beyond that, some of the withdrawn components of the AFFH Rule were not mandatory to begin with. *Id.*

Two cases—*Action Alliance of Senior Citizens of Greater Philadelphia v. Heckler* ("*Action Alliance*"), 789 F.2d 931 (D.C. Cir. 1986) and *People for the Ethical Treatment of Animals v. U.S. Department of Agriculture* ("*PETA*"), 797 F.3d 1087 (D.C. Cir. 2015)—that, the plaintiffs maintained, demonstrated how the LG2017 Withdrawal Notice impaired each plaintiff's mission were distinguishable. *NFHA*, 330 F. Supp. 3d at 48–49. Unlike the organizational plaintiff in *Action Alliance*, here "the plaintiffs' daily operations . . . do not appear to be tangibly different in kind to those occurring before the withdrawal of the LG2017 Tool or to have been 'perceptibly impaired' by HUD's withdrawal of the LG2017 Tool." *Id.* at 48 (quoting *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 8 (D.C. Cir. 2016)). Nor did *PETA* help the plaintiffs because, unlike the plaintiff there, "HUD's withdrawal of the LG2017

10

tool has not prevented the plaintiffs from being able to file complaints with HUD" and the plaintiffs "remain able to 'continue to educate the public' and to seek 'investigatory information' from program participants, rather than directly from HUD." *Id.* at 49 (quoting *PETA*, 797 F.3d at 1095).

As for actions to counteract the purported harm, by the plaintiffs' own account, their mission-driven activities were similar before and after HUD's notices, even if the efficiency of their efforts has been hampered. *Id.* at 49. Further, review of the plaintiffs' declarations did not show that the plaintiffs' operational costs had increased. *Id.* at 49–50. Finally, in the absence of any harm attributable to the LG2017 Withdrawal Notice, the plaintiffs' alleged diversion of money reflected only budgetary choices. *Id.* at 50.

Without a cognizable injury, the plaintiffs' positions on causation and redressability, which were linked to their theory of injury, crumbled. *Id.* at 50–51. Independently, the plaintiffs' arguments about causation and redressability were too speculative given that third parties, rather than the plaintiffs, were the objects of HUD's challenged notices, introducing doubt as to whether ordering HUD to retract the notices would produce the plaintiffs' desired result. *Id.* at 51–53.

The plaintiffs now seek to alter that judgment, pursuant to Federal Rule of Civil Procedure 59(e), and then to amend the complaint a second time, pursuant to Federal Rule of Civil Procedure 15(a). Pls.' Mot. at 1. This motion is ripe for resolution.

## II. LEGAL STANDARD

Altering or amending a judgment under Federal Rule of Civil Procedure 59(e) "is an extraordinary remedy which should be used sparingly," *Mohammadi v. Islamic Republic of Iran*, 782 F.3d 9, 17 (D.C. Cir. 2015) (quoting 11 Charles Wright & Arthur Miller, Federal Practice &

Procedure § 2810.1 (3d ed. 2012)), as a "limited exception to the rule that judgments are to remain final," *Leidos, Inc. v. Hellenic Republic*, 881 F.3d 213, 217 (D.C. Cir. 2018). A Court "may grant a motion to amend or alter a judgment under three circumstances only: (1) if there is an 'intervening change of controlling law'; (2) if new evidence becomes available; or (3) if the judgment should be amended in order to 'correct a clear error or prevent manifest injustice.'" *Id.* (quoting *Firestone v. Firestone*, 76 F.3d 1205, 1208 (D.C. Cir. 1996)). Whether to grant a Rule 59(e) motion is within the District Court's discretion. *Mohammadi*, 782 F.3d at 17.

Absent a demonstrated intervening change of controlling law or new evidence, the law is well-settled that litigants may not use Rule 59(e) either to repeat unsuccessful arguments or to assert new but previously available arguments. *See Exxon Shipping Co. v. Baker*, 554 U.S. 471, 485 n.5 (2008). As the Supreme Court observed, "Rule 59(e) permits a court to alter or amend a judgment, but it may not be used to relitigate old matters, or to raise arguments or present evidence that could have been raised prior to the entry of judgment." *Id.* (internal quotation marks and citation omitted); *see also Messina v. Krakower*, 439 F.3d 755, 759 (D.C. Cir. 2006) (finding no error in denying Rule 59(e) motion where "motion did nothing more than rely on the same arguments that [the movant] originally made") (internal quotation marks and citation omitted).

When a Rule 59(e) motion seeks review of dismissal of a complaint, and is accompanied by a proposed amended complaint that purports to cure the deficiency prompting the original dismissal, the proper procedure requires the plaintiffs first to "satisfy Rule 59(e)'s more stringent standard," before Federal Rule of Civil Procedure "15(a)'s liberal standard for granting leave to amend governs," *Firestone*, 76 F.3d at 1208; *see also Osborn v. Visa Inc.*, 797 F.3d 1057, 1062 (D.C. Cir. 2015) (noting that "[a]s a technical matter, the District Court lacked authority to rule

on the merits of the Rule 15(a) motion because it did not modify its final judgment dismissing those cases.").

## III. DISCUSSION

The plaintiffs do not contend that an intervening change of controlling law has occurred since the Court's judgment or that new evidence has become available. Instead, the plaintiffs seek to amend the final judgement to "correct . . . errors and prevent manifest injustice." Pls.' Mem. at 8. The supposed error is that the judgment rests on "factual conclusions that are inconsistent with the complaint." *Id.* at 9. According to the plaintiffs, the Court repeated that error several times over, such as by concluding "that the AI process now is materially different from the one followed prior to August 17, 2015," *id.* at 9–10, "that the community participation requirements of the Consolidated Plans process could make up for the loss of such requirements in the now-suspended AFH Process," *id.* at 10, that HUD's "Consolidated Plan process in fact involves . . . meaningful review of compliance with AFFH obligations," *id.* at 12, that the "Plaintiffs failed to allege the sort of diversion of resources to counteract HUD's action that contribute to standing," *id.* at 16, and "that jurisdictions will not comply" with the AFH process "such that Plaintiffs would not benefit from the reinstatement of the AFH process," *id.* at 18.

The plaintiffs' argument, however, attempts to recast as "factual conclusions" the Court's review of the regulatory regime in place after HUD's contested actions. Critically, the plaintiffs' purported injury was losing procedural protections created under the AFFH Rule once HUD retired the Assessment Tool and AFH process. Those lost protections included "'the requirements that jurisdictions solicit community participation,' 'respond to public comments, and undergo HUD review.'" *NFHA*, 330 F. Supp. 3d at 45 (quoting Pls.' Opp'n Defs.' MTD at 6, ECF No. 40). Each protection assisted the plaintiffs in realizing their missions. Yet, the Court

explained, the Assessment Tool and AFH process were just parts of the extensive reform brought on by the AFFH Rule. Even without the Assessment Tool and AFH, "certain key portions of the AFFH Rule remain active, including definitions of 'affirmatively furthering fair housing,' 'community participation,' and certain 'data,' which all apply when local governments submit their Consolidated Plans to HUD and certify their compliance with the AFFH requirement." *Id.* Indeed, despite the May 2018 notices, "the community participation, consultation, and coordination requirements stated in § 5.158 remain active insofar as they require participants to 'ensure that the AFH, the consolidated plan, and the PHA Plan and any plan incorporated therein are informed by meaningful community participation.'" *NFHA*, 330 F. Supp. 3d at 34 (quoting 24 C.F.R. § 5.158). Since the AFFH Rule's community participation obligations still apply to Consolidated Plans, grantees still must consult with the broadest possible audience while developing those plans. *Id.* Additionally, HUD's notices did not retreat from the definition of "affirmatively further fair housing" supplied by the AFFH Rule. *Id.* Nor have the AFFH Rule's record keeping requirements been abandoned. *Id.*

After surveying the legal landscape following the May 2018 notices, the Court noted that "even without an Assessment Tool in place, program participants, including local government agencies, remain bound by key definitional, recordkeeping, and enhanced certification components of the AFFH Rule, and, importantly, to complying with the AFFH statutory requirement." *Id.* at 35. Given all of the AFFH Rule that remained, "the fact that certain other obligations cited by the plaintiffs, including 24 C.F.R. § 5.154(d)(6) (public comments process) and § 5.162 (submission to, and review by, HUD of AFHs), are presently dormant does not translate to the dismantling and suspension of the AFFH Rule in a way that affects the plaintiffs' mission-driven activities to a degree that is sufficient for showing organizational standing." *Id.*

at 46. Accordingly, the plaintiffs did not demonstrate that HUD's May 2018 notices impaired an identifiable interest of the plaintiffs, and thus failed to plead facts establishing the first piece of organizational injury. That judgment was not premised on factual conclusions but rather on a legal assessment of the existing regulatory regime after HUD's contested actions.

Similarly, in the absence of harm attributable to HUD's action, the plaintiffs' alleged reallocation of funds—the second piece of organizational injury—was simply a budgetary choice rather than a step to counteract perceptible impairment of mission-drive activities. *Id.* at 50. Consequently, the plaintiffs had not pleaded facts to meet their burden for this aspect of organizational injury either.

As to causation and redressability, the Court explained that because "[t]he plaintiffs' arguments for causation and redressability are entirely premised on the plaintiffs' theory of injury in fact" and because "HUD's withdrawal of the LG2017 Tool did not cause cognizable injury under the theory of organizational standing that the plaintiffs put forth, the plaintiffs' causation and redressability arguments cannot hold." *Id.* at 50–51. Here, too, the Court did not engage in fact finding.

At bottom, the changes in the regulatory landscape brought about by HUD's withdrawal of the Assessment Tool were too inconsequential to establish that the plaintiff's mission-driven activities were cognizably impaired. Without that showing, the plaintiffs could not meet their pleading burden for any component of standing.

Separately, the plaintiffs insist that the legal conclusion that some aspects of the AFFH Rule remain effective is clearly wrong because HUD stated in the AI Reliance Notice that, following withdrawal of the Assessment Tool, program participants must certify compliance with the AFFH requirement "in accordance with the requirements that existed prior to August

15

17, 2015." Pls.' Mem. at 9 (quoting AI Reliance Notice, 83 Fed. Reg. at 23,927). The plaintiffs ignore the next sentence of the same notice, which clarifies HUD's directive. Any grantee, to be eligible, must "certify that it will affirmatively further fair housing, which means that it will conduct an . . . AI to fair housing choice within the jurisdiction, take appropriate actions to overcome the effects of any impediments identified through that analysis, and maintain records reflecting the analysis and actions." AI Reliance Notice, 83 Fed. Reg. at 23,927. While a grantee must again establish compliance with the AFFH requirement by conducting an AI, the AI Reliance Notice does not walk back changes to the AFFH requirement itself. Importantly, following the AFFH Rule, the AFFH requirement is more rigorous relative to its pre-2015 counterpart. Also, the AI Reliance Notice does not undermine the AFFH Rule's more stringent record keeping requirement, which ensures that HUD will have access to the resources needed to investigate compliance with the remaining parts of the AFFH Rule, such as enhanced community participation obligations. For those reasons, continued application of certain pieces of the AFFH Rule fits with the AI Reliance Notice and, as HUD has acknowledged, "the revived AI process is not the same process operating prior to the AFFH Rule." *NFHA*, 330 F. Supp. 3d at 35.

Finally, the plaintiffs again argue that the outcome here must follow those reached in *Action Alliance* and *PETA*. Pls.' Mem. at 12–15. Yet, the Court's prior opinion already addressed why neither case dictates the outcome that the plaintiffs prefer. *NFHA*, 330 F. Supp. 3d at 48–49. A motion under Rule 59(e) is not the vehicle for renewing arguments about the effect of those two cases as the rule "permits a court to alter or amend a judgment, but . . . may not be used to relitigate old matters . . . ." *Exxon*, 554 U.S. at 485, n.5 (internal quotation marks and citation omitted).[1]

---

[1] After briefing on the plaintiffs' Rule 59(e) motion was completed, another judge of this court issued an opinion determining that, under the same D.C. Circuit precedent relied on in this case, an organizational plaintiff had

As the plaintiffs acknowledge, "a court cannot permit an amendment unless the plaintiff first satisfies Rule 59(e)'s more stringent standard for setting aside that judgment." Pls.' Mem. at 8 (quoting *Ciralksy v. CIA*, 355 F.3d 661, 673 (D.C. Cir. 2004)); *see also Ciralsky*, 355 F.3d at 673 ("Since the court declined to set aside the judgment under Rule 59(e), it properly concluded that [plaintiff's] motion to amend under Rule 15(a) was moot."). Since the plaintiffs' Rule 59(e) motion is denied, the plaintiffs' complaint remains dismissed with prejudice and their Rule 15(a)(2) motion for leave to amend is denied as moot.

## IV. CONCLUSION

A motion to amend the judgment is an "extraordinary remedy," *Mohammadi*, 782 F.3d at 17, and plaintiffs seeking reconsideration based on clear error must, therefore, meet a very high bar. The plaintiffs' disagreement with the Court's decision does not clear that bar. The plaintiffs' motion to amend the judgement is therefore denied. An order will be entered contemporaneously with this Memorandum Opinion.

Date: August 26, 2019

_____

BERYL A. HOWELL
Chief Judge

---

standing to bring its lawsuit. *See Nat'l Women's Law Ctr. v. Office of Mgmt. & Budget*, 358 F. Supp. 3d 66, 77–84 (D.D.C. 2019) (citing *Action Alliance* and *PETA* as the relevant "binding precedent"). The plaintiffs furnished a copy of that opinion to the Court as supplemental authority for their Rule 59(e) motion, claiming that the decision "is relevant to the motion's adjudication, as Plaintiffs contend that they have pleaded facts that, if taken as true, establish similar harm." *See* Pls.' Suppl. Authority Supp. Mot. Am. J & Leave Am. Compl. at 2, ECF No. 53. While the plaintiffs see similarities between *National Women's Law Center* and this case, they make no effort to explain why that opinion is relevant to the resolution of a Rule 59(e) motion, which may be granted only if "there is an 'intervening change of controlling law'; (2) if new evidence becomes available; or (3) if the judgment should be amended in order to 'correct a clear error or prevent manifest injustice.'" *Leidos*, 881 F.3d at 217 (quoting *Firestone*, 76 F.3d at 1208). *National Women's Law Center* does not advance the ball as to any of the three bases.